**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Action No.:**

AML SOFTWARE, INC., an Illinois
corporation,

                Plaintiff,

v.

ATHENA BITCOIN, INC., d/b/a
ATHENA BITCOIN GLOBAL, a Delaware
corporation, PSBC, LLC, a Delaware
limited liability company, and JORDAN MIRCH, an individual,
BITOM LABS INC., a Canadian Corporation,
and RYAN PINEO, an individual,

                Defendants.

_____/

**FIRST AMENDED COMPLAINT**

Plaintiff, AML SOFTWARE, INC. ("AML" or "Plaintiff"), hereby files its First Amended

Complaint against Defendants, ATHENA BITCOIN, INC. d/b/a ATHENA BITCOIN GLOBAL

("Athena"), PSBC, LLC ("PSBC"), JORDAN MIRCH ("Mirch"), BITOM LABS INC. ("Bitom

Labs"), and RYAN PINEO ("Pineo") (collectively "Defendants"), and allege:

**Introduction and Nature of Action**

1.      AML owns valuable and proprietary computer source code used with Bitcoin

ATMs ("AML Code" or "AML Software"), along with all copyrights and other intellectual

property rights in and to its AML Code, portions of which are protected trade secrets. This lawsuit

arises out of Defendants' improper acquisition and use of AML's proprietary Code through a

scheme intended to strip AML of its title and intellectual property rights in and to its Code.

1

2.      In June 2024, AML received information that its code developer, Defendant Pineo, purportedly licensed the AML Software through Pineo's separate consulting company, Defendant Bitom Labs, to Defendant Athena.

3.      Critically, no contract, written or otherwise, was entered into between AML and Athena regarding the AML Software, the purported scope of the purported license, the length of the purported license, the monetary amount for the purported license, or any terms whatsoever. Nor did Athena ever directly pay AML. Instead, Athena made periodic and/or recurring payments to Defendant Bitom Labs, which was owned and operated by Pineo.

4.      Pineo transferred some of the funds paid by Athena to AML, which was in line with a purported oral non-exclusive, revocable license. AML accepted those payments received from Pineo's company but strictly in exchange for a non-exclusive, revocable license to use the AML Software (similar to other of its non-exclusive licenses).

5.       However, AML eventually discovered that Pineo and Defendant Mirch had covertly concocted an elaborate scheme to pilfer and substantially profit off of AML's valuable Software/Code. Specifically, in October 2024, AML learned that, notwithstanding the utter absence of any written transfer or conveyance, Pineo had not actually licensed the AML Software to Athena. Rather, Pineo had employed his own company, Bitom Labs, *which never owned AML's Software/Code or its accompanying copyrights*, to purportedly sell (or attempted to sell) the AML Software, including title to the Software and all accompanying copyrights and other intellectual property, to Defendant Mirch's company, PSBC. According to Pineo, he purportedly sold the Software to PSBC for $2 million.

6.      Concurrently, at that very same time, Defendants PSBC and Mirch had set up a separate agreement with Athena to immediately sell and transfer the AML Software to Athena for

$5.5 million, nearly triple the amount of what PSBC/Mirch had just paid days before. Per a written agreement entered into between PSBC and Athena, PSBC purportedly transferred the AML Software, including all copyrights and other intellectual property rights, to Athena immediately following the purported sale from Bitom Labs to PSBC.

7.      It is legally impossible to transfer, convey, or "sell" copyrights in the absence of "an instrument of conveyance, or a note or memorandum of the transfer, … in writing and signed by the owner of the rights conveyed" *See* 17 U.S.C. § 201(a). AML did not enter into any written agreement to transfer, convey or sell its AML Code, nor did it authorize Pineo to transfer title to and all rights in AML's most valuable asset (its  proprietary AML Code) to PSBC.

8.      At the end of the day, Pineo, Bitom Labs, PSBC and Mirch, hatched and implemented a scheme to substantially benefit themselves at the expense of AML, which received a mere licensing fee at a pittance of the cost of a complete and legitimate sale of its most valuable asset.

9.      In this action, AML seeks, among other things, a declaration that the purported and fraudulent "sale" of AML's Software to PSBC is invalid, particularly in the absence of any written instrument of conveyance signed by AML, that no title to the AML Software or intellectual property ever properly transferred to Athena, that the purported sale was null and void, that AML is the true and correct owner of the AML Software, along with all copyrights and intellectual property in and to the AML Software (including any derivative works created from that Software), and that Athena and the other Defendants cease all use of the AML Code (including derivatives) and destroy and/or return any and all copies of the AML Code.

10.      Additionally, AML has ceased receiving any payments from Athena, Pineo and/or any of the other Defendants for use of the AML Software. Thus, whatever revocable license rights

that Athena or any other Defendant may have held for use of the AML Software have now been terminated.  However, upon information and belief, Athena and the other Defendants continue to use and/or access the AML Code, and such unauthorized use constitutes copyright infringement, misappropriation of trade secrets and other unlawful conduct.

## The Parties

11.     Plaintiff, AML, is an Illinois limited liability company with its principal place of business in Illinois.

12.     Defendant, Athena, is a Delaware corporation with its principal place of business in Miami-Dade County, Florida.

13.     Defendant, PSBC, is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida.

14.     Defendant, Mirch, is an individual who, upon information and belief, resides in and/or is domiciled in Miami-Dade County, Florida.  Mirch is the Chief Executive Officer and/or managing member of PSBC, and he supervises and controls its activities, including its participation in the unauthorized scheme to acquire and profit off of AML's Software, as well as PSBC's use, access, and infringement of the AML source code at issue in this case. Mirch also induced, caused, encouraged, facilitated, and is the motivating force behind the infringing activity set forth herein. He also has a financial interest in and actually participated in the infringing activity.

15.     Defendant Bitom Labs is a Canadian corporation that entered into an agreement or agreements with PSBC and the other Defendants in Florida concerning the Software at issue in this case. The subject Consulting Agreement entered into by Bitom Labs referenced below is governed by Florida law, and the parties to that agreement agreed that actions to enforce it shall be brought in federal or state courts in Miami-Dade County, Florida.

4

16.     Pineo is an individual who resides in Canada. Pineo was the primary code developer for AML. He was also the listed President and a director of AML but has since been removed from those positions (or is in the process of being formally removed) at least in part based on his participation in the scheme to pilfer the AML Software. Pineo entered into an agreement(s) with PSBC and/or the other Defendants in Florida concerning the AML Software at issue in this case.

### Jurisdiction and Venue

17.     This is an action for a declaratory judgment, copyright infringement under the U.S. Copyright Act of 1976, misappropriation of trade secrets, and for other related claims and causes of action more specifically set forth below.

18.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises, at least in part, from Defendants' acts of copyright infringement.

19.     Moreover, an actual case or controversy exists regarding ownership of the AML Software and, thus, the Court has subject matter jurisdiction over AML's claim for declaratory judgment pursuant to at least 28 U.S.C. §§ 2201 and 2202.

20.     The state law claims asserted herein are so related to those over which this Court has original jurisdiction as to form part of the same case or controversy.  Therefore, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over those claims.

21.     This Court has personal jurisdiction over Athena and PSBC under Fla. Stat. § 48.193(1)(a)(1) and (2) because their principal places of business are in, they operate, conduct, engage in, and carry on business in, and they committed a tortious act within, Florida, including within this judicial district.  Among other things, Athena and PSBC are using, selling reproducing,

publishing, and/or distributing the AML Software, and/or infringing derivatives of that Software, within Florida, including within this District, and are causing injury to Plaintiff in Florida.

22.     This Court also has general personal jurisdiction over Athena and PSBC under § 48.193(2) because they are engaged in substantial and not isolated activities in this State.

23.     This Court has personal jurisdiction over Mirch under Fla. Stat. § 48.193(1)(a) (1) because he resides and/or is domiciled in, operates, conducts, engages in, and carries on business in, and has supervised the acts of unauthorized use, unauthorized access, and infringement committed by PSBC at issue in this case in Florida.

24.     Mirch also committed a tortious act within Florida under § 48.193(1)(a)(2), including within this judicial district, and caused injury to persons within Florida.

25.     This Court has personal jurisdiction over Bitom Labs and Pineo under Fla. Stat. § 48.193(1)(a) because they committed tortious acts within Florida by, among other things, engaging in a scheme with PSBC in Florida regarding the unlawful acts at issue in this case discussed herein.

26.     They are otherwise subject to personal jurisdiction because Bitom Labs operates, conducts, engages in, and carries on business in this State; Pineo has supervised the unlawful acts committed by Bitom Labs at issue in this case in Florida and; they have caused injury to persons within Florida.

27.     Venue is proper in the U.S. District Court for the Southern District of Florida pursuant to at least 28 U.S.C. §§ 1391.

## General Allegations

**A.      Plaintiff's Copyrighted  Software/Code and Chain of Title.**

28.      AML developed and owns original, proprietary computer source code for use with Bitcoin ATMs (the "AML Software" or "AML Code"). Particularly in the world of cryptocurrency, the source code comprises the "guts" of Bitcoin ATMs.

29.      AML and its predecessor in interest, S&P, have been using AML's Code on software installed on Bitcoin ATMs for several years.

30.      Beginning in or around 2019, S&P contracted with a company called SilverLogic LLC ("SilverLogic") to create the initial version of the AML Code for S&P's use. The Master Services Agreement between those parties stated that S&P owned the Code and all copyrights and other intellectual property associated therewith.

31.      The initial version of the AML Code was completed in or about 2020, after which S&P began using it in connection with its Bitcoin ATMs.

32.      At the time of its initial use of the AML Code, S&P owned and/or operated approximately 400 Bitcoin ATMs, which eventually increased to approximately 2,800.

33.      On or about March 10, 2021, S&P entered into a "Software Transfer Agreement" with AML transferring all rights, title and interest in the AML Code, and the proprietary software of which it comprises, to AML, including all copyrights and other intellectual property associated therewith.[1] AML licensed back to S&P the right to use the AML Software on the S&P Bitcoin ATM machines on that same date.

---

[1] A copy of the Software Transfer Agreement is not being filed with this Complaint due to a confidentiality provision in that agreement, but it is available for future filing under seal.

34.     After obtaining ownership of the AML Code and all copyrights associated therewith, AML updated and continued to develop the Code.

35.     On September 9, 2025, AML was issued U.S. Copyright Registration TXu 2-507-802 ("'802 Registration") titled "AML Software Code."  AML is the owner and holder of the '802 Registration and owns all rights, title, and interest in and to AML's Code.  A true and correct copy of the '802 Registration is attached as **Exhibit "1."**

36.     The chain of title to AML's Software ends with AML – there have never been any transfers or conveyances, whether in writing or otherwise, of and to the AML Code or copyrights associated therewith.

37.     Portions of AML's Code are trade secrets.  AML has taken measures to keep them confidential, and they are not readily ascertainable by others.  AML has not disclosed its source Code to any third parties, and the only individuals with knowledge of the trade secrets portions are AML's code developers, all of whom signed confidentiality agreements.

**B.      Mirch's Theft of S&P's Bitcoin ATMs.**

38.     In early March 2023, S&P and several of its principals faced legal issues for, among other things, operating Bitcoin ATMs in Northwest Ohio without the requisite licensure. Although the vast majority of the transactions that occurred at these Ohio ATMs were legitimate, and investigators do not contend that S&P was involved in any scam transactions, unrelated third-parties allegedly utilized S&P's ATMs in furtherance of various nefarious schemes, which de facto implicated S&P. As a result of the charges against it, S&P was prohibited from continuing to operate its inventory of Bitcoin ATMs in Ohio and was left without the resources to continue operations nationwide.

39. This all left S&P in a vulnerable position, and Mirch and entities owned and/or controlled by him used that opportunity to misappropriate S&P Bitcoin ATM's.

40. Among other things, through fraudulent misrepresentations to S&P and other unlawful conduct and while S&P was dealing with its legal issues discussed above, Mirch and entities owned and/or controlled by him managed to overtake all of S&P's 2,800 physical Bitcoin ATMs.

41. Originally categorized by Mirch as "assisting" S&P, he instead pilfered the physical ATMs.  This theft of the physical machines is the subject of a separate lawsuit in Cook County, Illinois, which case is currently stayed due to a bankruptcy filed by S&P.

42. S&P and AML are both owned by the same Trust and share the same Trustee and principal, Sonny Meraban ("Meraban"). Needless to say, Meraban and Mirch are not on good terms.

**C.     The Scheme to Acquire AML's Software.**

43. Separate from the physical Bitcoin ATMs owned by S&P, AML continued to own the AML Software, including all source code and also including all copyrights and intellectual property associated with that Software.  However, in May or June of 2024, Defendants launched their scheme to supposedly transfer the AML Software to PSBC and then immediately to Athena.

44. Specifically, as noted, on or about June 14, 2024, AML's principal, Meraban, received information that its code developer, Defendant Pineo, purportedly licensed the AML Software to Defendant Athena.  However, Meraban did not object to a revocable, non-exclusive license because AML was in dire need of revenue/funds, and AML did not sign any document transferring title to the Code or transferring any intellectual property rights in the Code.

45.     In a message chain with Pineo, Meraban stated "Would love to get 5 more of these deals. Even if they dont buy it and just pay is good. thats 75k a month." Pineo responded, "Yup that's the goal," which clearly portrayed to Meraban a non-exclusive license, not a full-blown sale. When Meraban asked Pineo that same day if Athena could set up auto pay for AML, Pineo oddly responded "Their accounting team watches the auto ones" and went on to inform Meraban that he, Pineo, would just continue to receive the payments directly and then pay portions to AML.

46.     There was never any written contract entered into between AML and Athena whatsoever, whether concerning the AML Software or otherwise. Nor are there any known records documenting the purported scope of the purported license, the length of the purported license, the monetary amount for the purported license or any other terms.

47.     AML's understanding from Pineo was that the revocable, non-exclusive license payments made by Athena were just under $100,000 per month and would remain that way until Athena was in a position to actually purchase ownership of the AML Software for an additional lump sum of $2 million (similar to a lease to own arrangement). Meraban asked Pineo who would be buying the software eventually, and Pineo responded that Athena would be buying it.

48.     As noted, Athena did not make any payments directly to AML. All payments for use of AML's Software were made to Pineo's separate company, Bitom Labs. Pineo then transferred some of those funds to AML and it is unclear whether Athena knew that AML ultimately received any of those funds. It is also unclear whether Athena even made those payments in the first place.

49.     However, unbeknownst to AML and in connection with the scheme discussed, Pineo had not actually licensed the AML Software to Athena.  Rather, notwithstanding that Pineo never owned the AML Software, Pineo purportedly sold and assigned title to the AML Software

10

and all associated intellectual property to Mirch's company, PSBC. This is confirmed in a recent Verification that Pineo supposedly provided to Defendants' attorneys where Pineo stated that the transaction was a "sale of the AML Source Code – not simply a rental" for $2 million.

50.     Yet even Pineo's own verified testimony that he provided Defendants is intrinsically inconsistent: Pineo labels the transaction between AML and PSBC a "sale" and "not simply a rental" for a sale price of $2 million on one hand, but then, on the other hand, Pineo states that *his* company, Bitom Labs, granted PSBC a "nonexclusive, perpetual, irrevocable, royalty-free, fully paid-up, worldwide right and *license*" to "make, have, made [sic], modify, use, distribute, sell, sublicense, and otherwise exploit the AML Source Code" (emphasis added) through a "Consulting Agreement" between Bitom Labs and PSBC.

51.     In other words, Pineo nonsensically contends, simultaneously, both that he *sold* the AML Code (along with the copyrights to reproduce, distribute, publish, make derivative works, etc.) and that he also, on behalf of Bitom Labs, *licensed* the AML Code (to do those very things with it).

52.     Again, there was no written contract whatsoever between AML and PSBC governing the terms of a purported software/code sale, including any written agreement governing the price, payment schedule, date of transfer or any other material terms. Apparently, for a $2 million sale of source code, Pineo and Mirch decided that a written agreement was not needed, nor was any type of valuation of the code.

53.     The only written agreement concerning the secret transaction was the Consulting Agreement referenced in Pineo's Verification, entered into on June 1, 2024, between PSBC and Bitom Labs ("PSBC-Bitom Consulting Agreement"). That PSBC-Bitom Consulting Agreement

11

was executed by Pineo on behalf of Bitom Labs and Mirch on behalf of PSBC. A true and correct copy of the PSBC-Bitom Consulting Agreement is attached as **Exhibit "2."**

54.     According to the PSBC-Bitom Consulting Agreement, Bitom Labs was to provide services in the form of "Development of Bitcoin ATM software platform." The development schedule set forth in the Agreement called for Bitom Labs to deliver the *developed* Bitcoin ATM software platform to PSBC on or by June 10, 2024, only nine days after the Effective Date of the Agreement.

55.     Additionally, the PSBC-Bitom Consulting Agreement provided that all Work Product under that Agreement, including "all patents, copyrights, trademarks (together with the goodwill symbolized thereby), trade secrets, know- how, and other confidential or proprietary information, and other intellectual property rights" would be owned by PSBC.

56.     Finally, per that Agreement, PSBC was to pay Bitom Labs $2 million for the "Development of Bitcoin ATM software platform."

57.     It is apparent that the Consulting Agreement itself is a complete farce and further reveals the egregious nature of Defendants' scheme.  Clearly, the "Development of Bitcoin ATM software platform" referred to delivery of the AML Code and not the development of a new software platform because development of a brand-new platform could not have been completed in 9 days. In other words, Bitom Labs did not "develop" any software for PSBC – it just forked over AML's Code, and AML's Code was then used to make derivative versions, which is expressly acknowledge in Pineo's Verification.

58.     It is also apparent that Mirch and Pineo created the "Consulting Agreement" to further conceal the actual attempted sale of the AML Software to PSBC from AML, as the Consulting Agreement provided that PSBC would own all rights in the Software.  If the sale of the

AML Software had been a true arms-length transaction, in addition to proper due diligence and valuations, Pineo and Mirch would have executed an Agreement between PSBC and AML, who actually owned the Software, not a "Consulting Agreement" between Bitom Labs and PSBC.

59.     Moreover, putting aside the utter absence of "an instrument of conveyance, or a note or memorandum of the transfer, … in writing and signed by the owner of the rights conveyed," (*i.e.* AML), in accordance with 17 U.S.C. § 201(a), nowhere in the Consulting Agreement is there any representation that Bitom Labs had any ownership of the AML Code in the first place, or any licensing rights to be able to convey to PSBC "in connection with the Sale," as Pineo incorrectly verified.

60.     In furtherance of the scheme, simultaneous to the PSBC-Bitom arrangement, PSBC and Mirch set up a separate arrangement with Athena to immediately sell and transfer the AML Software to Athena.

61.     Specifically, Athena and PSBC entered into a written "Development Services Agreement" on June 19, 2024 ("Athena-PSBC Agreement"), a copy of which is attached as **Exhibit "3."**  Per that Agreement, Athena agreed to pay PSBC $5.5 million for "Development of a Bitcoin ATM software platform," the same exact language used in the PSBC-Bitom Agreement, but for nearly triple the price just a few days later.

62.     Additionally, per the Athena-PSBC Agreement, PSBC was to deliver the Bitcoin ATM software platform "on or by June 18, 2024," the day before the Effective Date of that agreement.

63.     As if the illusory Consulting Agreement between Bitom Labs and PSBC was not enough, the timing and pattern of dealings between PSBC and Athena make it even more

abundantly clear that no one was "developing a Bitcoin ATM software platform" – they were just handing over the AML Software, first for $2 million and then for $5.5 million a few days later.

64.     During this entire time, AML believed and understood that it had merely provided a non-exclusive, revocable license to Athena to use the AML Software for a temporary period of time. AML never authorized the sale of the AML Software and never transferred title to the AML Software to Bitom Labs in the first place.

65.     In October 2024, AML (through Meraban) first learned of the scheme and that Bitom Labs/Pineo contended that they had attempted to sell/assign all rights, title and interest in the AML Software rather than merely licensing it.  The following is a message chain between Pineo and Meraban on October 28, 2024:

Pineo:  "We're a bit past ¼ through that deal now just so you know"

Meraban:  "What happens after its completed"

Meraban:  "and they didnt buy it"

Pineo: "they ride off into the sunset. Or whatever they want really"

Pineo:  "the 2M is them buying it"

Meraban:  "wait im confused… how much have they paid so far?"

Pineo: "540 or so"

Meraban:  "wow so ur saying I got $250k?

Pineo: "yup"

Meraban: "so after 2M is paid ur saying they own the software?"

Pineo: "yup"

Meraban: "so after 2M is paid ur saying they own the software?

Pineo: "they do indeeed"

14

Meraban:  "i thought you said they are renting it until they come up with 2M lump sum"

Meraban: "and then they own it and meantime they are renting it"

Pineo: "no they don't have to come up with any lump sum, and I don't expect them to. 2M over whatever time period is the price"

Meraban: "i could have sworn i thought that was the deal"

Pineo: "not sure, the only lump sum we talked about was they might want to just pay it off to be done with it, but regardless it's the same thing. Definitely never had any rental aspec to it"

Meraban: "ah they got a great deal for sure"

66.     As show, Meraban confirmed multiple times that he always understood that Athena was "renting" the AML Software, (*i.e.*, licensing the software), until such time that Athena could come up with an additional $2 million to actually purchase it. But even at that point, it was unclear that Bitom Labs had attempted to sell the AML Software to PSBC/Mirch and not Athena.

67.     AML was still unsure exactly what had transpired with respect to its Software and did not immediately file this action for multiple reasons. AML continued receiving payments from Pineo/Bitom Labs for what AML maintained were Athena's license, or rental, payments. Again, it was not clear who was actually making those payments.

68.     However, at this time, AML has ceased receiving payments for Athena or any other Defendant's use of the AML Software. Thus, any oral license rights that Athena (or any other Defendant) claim to have held to use the AML Software have been terminated. Despite that any purported license rights have now terminated due to lack of payment and that Athena should have ceased any and all use of the AML Software, including any derivative works created from the

15

AML Software, to the best of AML's knowledge, Athena has continued using the AML Software following that termination of the purported license.

69.     Additionally, upon information and belief and based at least on provisions in the PSBC-Athena Agreement, Athena claims to owns the AML Software and all rights associated therewith.

70.     Indeed, Athena, PSBC, and other entities recently entered into a Release and Termination Agreement on September 4, 2025 that references the Athena-PSCB Agreement and provides that "ownership of the New Technology and all associated Intellectual Property Rights has transferred to Athena" and "the Source Code (as defined in the Development Agreement) has been released and transferred to Athena as required therein including under Section 5.2 of the Development Agreement." Again, that agreement makes it clear that Athena believes that it owns the AML Code and derivatives of that Code, including all intellectual property associated with that Code, likely due to the nefarious scheme by Defendants to pilfer title to the AML Code. That Release and Termination Agreement also required Athena to pay PSBC and other Mirch entities an additional $9 million for the stolen Bitcoin ATMs and AML's Software.

71.     Defendants' continued use, reproduction, publication, distribution, and making of derivative works of and from AML's copyrighted Code, following the termination of any license rights, constitutes, among other things, copyright infringement and misappropriation of trade secrets.

72.     Separate from Athena, AML previously licensed the AML Software to other third parties. However, AML has ceased receiving any license payments from those third-party licensees. Upon information and belief, Pineo has received those payments from the third-party licensees but has kept those payments from himself and failed to provide them to AML.

16

**D.      Standing.**

73.      Defendants have asserted that AML did not have proper authority to commence this lawsuit because Pineo was listed as AML's president and Pineo has not authorized the filing of this action. However, AML properly instituted this action. The sole shareholder of AML is a Trust, and the Trustee (Meraban) directed the filing of this action on behalf of AML.

74.      Additionally, AML recently removed (or is in the process of formally removing) Pineo from his AML officer positions as a result of adverse actions taken by Pineo against AML. In addition to the fact that Pineo is no longer President, there are no known company documents providing that only Pineo could authorize a lawsuit by AML.

75.      Regardless, Pineo was a main player in the actions at issue in this case and purported to transfer the AML Software to PSBC without authorization. Of course, Pineo, who was a part of the scheme, would not consent to a lawsuit being brought against himself and/or for actions in which he was a central component. Again, the irony in Defendants asserting that the only person who could authorize a lawsuit on behalf of AML regarding misappropriation of its Software/Code is the very person who improperly sold the Software/Code in the first place is astonishing. Any authorization from Pineo to bring claims for his own actions would be futile.

76.      All conditions precedent to the filing of this action have been fulfilled or waived.

77.      Plaintiff has retained the undersigned counsel to represent it in this action and is obligated to pay undersigned counsel's reasonable attorneys' fees, which fees, together with costs, Plaintiff is entitled to recover from Defendants pursuant to at least 17 U.S.C. § 505 and 18 U.S.C. § 1836(b).

### E.    Defendants' Assertions.

78.    In response to the initial Complaint, Defendants, in an overt attempt to intimidate Plaintiff, asserted that Plaintiff's allegations and claims in this case were frivolous. However, Defendants' assertion that Plaintiff's claims lack a reasonable factual basis is itself spurious.

79.    Defendants primarily rely on two grounds for their assertions: (a) the "Verification" provided by Pineo that was almost certainly prepared by Defendants' counsel and (b) the fact that AML received some payments for Athena's use of the AML Software.

80.    Initially, Pineo's averments in his "Verification" are self-serving and unreliable. Pineo was a linchpin and central component of Defendants' scheme that purported to transfer all rights in AML's Software to the other Defendants. Of course, Pineo has an interest in attempting to alleviate liability for his role in the scheme.

81.    Moreover, the averments in Pineo's Verification are clearly and plainly inconsistent.  On one hand, Pineo states that he *sold* the AML Code to PSBC (along with the copyrights to reproduce, distribute, publish, make derivative works, etc.).  On the other hand, Pineo nonsensically states that he (through Bitom Labs) simultaneously *licensed* the AML Code to PSBC (to do those very same things with it). Pineo's inconsistent averments are directly in line with separate assertions by Defendants – that Pineo both licensed the AML Code to PSBC on one hand but also sold it to PSBC on the other hand.

82.    Putting aside the fact that AML always understood that Athena was the party that received a revocable license to use the AML Software and not PSBC, the critical distinction between a license and sale appears to have been completely lost on Defendants, as the transaction could not have been both a license to use the AML Code and a sale of all title and rights in the AML Code.  Indeed, a person who owns source code owns the copyrights to that code and does

18

not need a license to "make, have, made [sic], modify, use, distribute, sell, sublicense, and otherwise exploit" it.   The Athena-PSBC Agreement reflects that at least PSBC and Athena believed that title and all copyrights and other rights to the AML Software (including derivative works) were being transferred – it was not a mere license, regardless of the fact that Pineo averred in part that it was a license.

83.    Regardless of Pineo's Verification, the entire multi-step transaction of the attempted pilfering of the AML Code was nefarious as explained in detail above. For example, apparently the $2 million "sale" (and then immediate $5.5 million flip) of software code and all intellectual property rights associated therewith was not documented whatsoever in any type of writing with AML. It is legally impossible to transfer, convey, or "sell" copyrights in the absence of "an instrument of conveyance, or a note or memorandum of the transfer, … in writing and signed by the owner of the rights conveyed." *See* 17 U.S.C. § 201(a). But Defendants cannot point to single written agreement between AML and PSBC or Athena.

84.    The only written agreements were the "Consulting Agreement" between Bitom Labs and PSBC and simultaneous "Development Services Agreement" between PSBC and Athena discussed above, and the timing of those arrangements shows the nature of the elaborate scheme. Bitom Labs was supposedly required to "develop" a Bitcoin software platform for PSBC just 9 days after Pineo contends he sold the Source Code to PSBC.  And then PSBC was then supposed to immediately "develop" a software platform for Athena for nearly triple the cost ($5.5 million) that PSBC just paid Bitom Labs. The entire transaction was clearly intended to circumvent AML and pilfer AML's value and proprietary Code. And as Defendants concede, Defendants used the AML Code to develop derivative works from that Code.

85.     Regardless, AML never transferred any rights in the AML Software to Bitom Labs in the first place, so Bitom Labs had nothing to convey to PSBC, including any right to "make, have, made [sic], modify, use, distribute, sell, sublicense, and otherwise exploit the AML Source Code."

86.     As to Defendants' other assertion that AML (through Meraban) received some payments for Athena's use of the AML Software, AML does not deny that fact and it is directly in line with the revocable, non-exclusive license that AML believed Athena had received. Those license payments do not equate to a full-blown sale of the AML Software to PSBC.

87.     At the end of the day, the facts demonstrate a clear scheme by Defendants to attempt to improperly acquire title and all accompanying rights in the AML Software.

88.     Nonetheless, Plaintiff has amended its pleading to, among other things, provide more factual detail, particularly concerning the scheme to pilfer AML's Software, and its illegality and invalidity.

**COUNT I**
**Declaratory Judgment Action regarding Ownership of AML Software**
**(Against all Defendants)**

89.     AML re-alleges and re-avers paragraphs 1-88 as though fully set forth herein.

90.     This is a cause of action for declaratory judgment in which AML seeks a declaration regarding ownership and use of the AML Software.

91.     A bona fide, actual, and present controversy exists between AML and Defendants over ownership and use of the AML Software.

92.     The declaration requested concerns a present controversy over a state of facts, namely ownership and use of the AML Software.

93.     Bitom Labs has never held title to the AML Software, including any intellectual property rights associated with that Software, and had no right or ability to transfer title and rights in the Software that it did not own.

94.     Moreover, Pineo has never held title to the AML Software, including any intellectual property rights associated with that Software, and had no right or ability to transfer title and rights in the Software that he did not own.

95.     PSBC, and now Athena, claim to own title and rights in the AML Software, including derivative copies of that AML Software, such purported ownership and rights acquired from Bitom Labs.

96.     AML never transferred ownership of title and rights in the AML Software to Bitom Labs, Pineo, PSBC and/or Athena, nor did AML ever enter into any written agreement whatsoever regarding the sale/transfer of the AML Software, nor did AML ever authorize the sale of its sole and most value proprietary asset (the AML Software).  Thus, ownership of title and rights in the AML Software are still owned by AML.

97.     AML has an actual, present, adverse and antagonistic interest to that of Defendants in and to ownership of the title and rights in the AML Software.

98.     Moreover, because ownership of title and rights in the AML Software did not transfer to any of the Defendants, and any and all purported license rights to use the AML Software by Defendants have been terminated, Defendants do not have the right to use, access, reproduce, copy or distribute the AML Software, including any derivative copies of the AML Software, yet they continue to do so.

99.     Plaintiffs and Defendants are before the Court by proper process.  Moreover, the relief sought herein is not merely legal advice or the subject of the parties' curiosity.  Indeed, the relief sough herein is emergent.

100.    Accordingly, AML seeks a judgment declaring that AML is the owner of title and all accompanying rights in and to the AML Software, including all intellectual property rights associated with the AML Software, that Defendants do not have a right to use, access, reproduce, copy or distribute the AML Software or any derivatives of the AML Software and that Defendants should return and/or destroy any copies or versions of the AML Software, including any derivatives of the AML Software.

## COUNT II
## Breach of Fiduciary Duty
### (Against Pineo)

101.    AML re-alleges and re-avers paragraphs 1-88 as though fully set forth herein.

102.    This is a cause of action for breach of fiduciary duty against Pineo.

103.    Pineo, in his status as former President/director of AML, owed AML a fiduciary duty.

104.    Pineo breached his fiduciary duty to AML by purporting to sell and transfer AML's sole valuable asset, namely the AML Software, for his own personal benefit and/or the benefit of Bitom Labs.

105.    Additionally, Pineo has breached his fiduciary duty by failing to forward payments to AML received from licensees of the AML Software.

106.    As a direct result of Pineo's breaches of fiduciary duty, AML has been damaged, as third parties now claim rights in and to the AML Software, including derivative versions of that AML Software, and are using the AML Software for their financial gain and without authorization

22

form AML.   Moreover, Pineo has personally benefited, to AML's injury, from retention of payments received from third party licensees.

107.    AML is entitled to all actual damages against Pineo for his breaches of fiduciary duty in an amount to be determined at trial.

**COUNT III**
**Copyright Infringement**
**(Against all Defendants)**

108.    AML re-alleges and re-avers paragraphs 1-88 as though fully set forth herein.

109.    This is an action for copyright infringement under the Copyright Act of 1976.

110.    AML is the exclusive owner of the '802 Registration and all copyrights and other intellectual property rights associated with its copyrighted AML Code.

111.    Pineo, Bitom Labs, PSBC, and Mirch, without authorization, misappropriated, reproduced, published, distributed, used, and/or made derivative works from that AML Code.

112.    Athena, upon information and belief, despite termination of any purported license rights in the AML Code that Athena previously held, continues to use the AML Code and/or derivative works made from that AML Code.

113.    Defendants have reproduced, published, distributed, used and/or made derivative works from AML's Code without authorization or permission from AML and for their own financial gain.

114.    Defendants have directly infringed AML's copyrights in and to the AML Code in violation of 17 U.S.C. § 501, *et. seq.*. Upon information and belief, such infringement is willful and deliberate.

23

115.    As a result of the foregoing, Defendants have violated AML's exclusive rights with respect to the registered AML Code, including without limitation, the right to use, copy, and/or distribute the work, and AML has been damaged.

116.    AML is entitled to its actual damages and a disgorgement of Defendants' profits that (i) are attributable to the infringement and (ii) are not taken into account in computing the actual damages, in an amount to be proved at trial, together with all other relief allowed under the Copyright Act.

117.    Defendants' infringement has caused and continues to cause irreparable harm to AML, for which it has no adequate remedy at law. Unless this Court restrains Defendants from their continued infringement, the harm will continue to occur in the future. Accordingly, AML is entitled to a preliminary and/or permanent injunction.

**COUNT IV**
**Contributory Copyright Infringement**
**(against Mirch and PSBC)**

118.    AML re-alleges and re-avers paragraphs 1-88 and as though fully set forth herein.

119.    This is an action for contributory copyright infringement.

120.    As described above, Defendants, including Athena, directly infringed AML's copyrights in and to its AML Code.

121.    Mirch and PSBC knew of the infringing activities described herein and they intentionally induced and/or encouraged Athena to directly infringe, and/or materially contributed to Athena's direct infringement of, AML's Code.

122.    These actions by Mirch and PSBC were done intentionally and willfully to bring about the copyright infringement.

123.    As a result, AML has been damaged.

124. Mirch and PSBC's contributory infringement has caused and continues to cause irreparable harm to AML, for which it has no adequate remedy at law. Unless this Court restrains Defendants from their continued contributory infringement of AML's copyrights, the harm will continue to occur in the future. Accordingly, AML is entitled to a preliminary and/or permanent injunction.

## COUNT V
## Vicarious Copyright Infringement
## (against Mirch)

125. AML re-alleges and re-avers paragraphs 1-88 as though fully set forth herein.

126. This is an action for vicarious copyright infringement under the Copyright Act.

127. Mirch is the CEO and/or managing member of PSBC and has the capacity to control the acts of PSBC, and has the ability to supervise the acts of unauthorized use, unauthorized access, and infringement of the AML Code committed by PSBC.

128. Mirch induced, caused, and/or was a motivating force behind the elaborate scheme to acquire the AML Code, as well as the unauthorized use, unauthorized access, and/or infringement of the AML Code. At all times, Mirch knew that PSBC's possession and use of the AML Code was unauthorized, unlawful and an infringement of AML's rights.

129. Mirch has a direct financial interest in and/or actually participated in the aforementioned unauthorized use, unauthorized access, and/or infringement of the AML Code, and Mirch directly participates in the profits of the unlawful and unauthorized actions described herein.

130. As a result, Mirch is liable for vicarious copyright infringement of AML's Code covered by its '802 Registration.

131.    AML has been damaged by Mirch's unlawful activities and is entitled to preliminary and permanent injunctive relief to prevent all such infringement.

**COUNT VI**
**Misappropriation of Trade Secrets under 18 U.S.C. § 1836 et seq.**
**(against all Defendants)**

132.    AML re-alleges and re-avers paragraphs 1-88 as though fully set forth herein.

133.    This is an action for misappropriation of trade secrets under 18 U.S.C. § 1836 *et. seq*.

134.    Portions of AML's Code constitute protected trade secrets, and AML owns all rights, title and interests in the trade secrets.

135.    AML has taken reasonable measures to keep the trade secret portions of its AML Code confidential, and it has not disclosed them to any third parties. The only individuals with access to the trade secret portions are developers of the AML Code or licensees, all bound by confidentiality agreements.

136.    The information in the trade secret portions of the AML Code derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

137.    The trade secret portions of the AML Code are used for Bitcoin ATMs but are not ascertainable by third parties and cannot be duplicated without access.

138.    Defendants either misappropriated AML's Code and/or are improperly using and accessing the AML Code following termination of any license rights to use that AML Code. Thus, Defendants are using AML's trade secrets in connection with Bitcoin ATMs.

139.     The infringing Bitcoin ATMs and unlawful copies of AML's Code are being used throughout the United States and, thus, the trade secrets, as well as Defendants' misappropriation and use of them, relate to interstate commerce.

140.     As a result of Defendants' misappropriation and use of AML's trade secrets, AML has been damaged and is entitled to recover from Defendants: (1) (a) all damages resulting from such misappropriation and use; and (b) damages for any unjust enrichment caused by the misappropriation of trade secrets that is not addressed in computing damages for actual loss or (2) alternatively, a reasonable royalty.

141.     Moreover, because the trade secrets at issue were, upon information and belief, willfully and maliciously misappropriated by Defendants, AML is also entitled to exemplary damages in the amount of two times damages awarded, plus its reasonable attorney's fees and costs.

142.     No adequate remedy at law exists, and AML is entitled to preliminary and permanent injunctive relief against Defendants to prevent their further misappropriation and/or use of the trade secrets and formulas.

## COUNT VII
### Conversion
### (Against all Defendants regarding the AML Code)

143.     AML re-alleges and re-avers paragraphs 1-88 as though fully set forth herein.

144.     In or about June 2024, Bitom Labs, Pineo, PSBC and Mirch fraudulently acquired AML's Code without authorization or permission from AML. They wrongfully asserted ownership and took possession of the AML Code, which was inconsistent with true and sole ownership of the code by AML.

145.     Mirch and PSBC then sold and transferred the AML Code (and/or derivative versions) to Athena.

146.     Athena currently retains possession of the AML Code (and/or derivative versions), has wrongfully asserted ownership and possession of the AML Code, and is using it for financial gain.

147.     Such actions by Defendants are inconsistent with AML's true and sole ownership of the AML Code.

148.     As a direct and proximate result of Defendants' unauthorized conduct, AML has been damaged and is entitled to recover from Defendants all damages resulting from the conversion, as well as a return of the AML Code.

**COUNT VIII**
**Conversion**
**(Against Pineo regarding License Payments )**

149.     AML re-alleges and re-avers paragraphs 1-88 as though fully set forth herein.

150.     AML previously received license payments from third-party licensees and is entitled to such payments from those licensees.  However, AML ceased receiving such license payments.

151.     Upon information and belief, Pineo has received those payments from the third-party licensees but has kept those payments from himself and failed to provide them to AML. Thus, Pineo wrongfully asserts ownership of those license payments, which is inconsistent with AML's ownership and entitlement to those payments.

152.     As a direct and proximate result of Pineo's actions, AML has been damaged and is entitled to recover from Pineo all damages resulting from the conversion.

28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, AML SOFTWARE, INC., prays for judgment against Defendants, ATHENA BITCOIN, INC. d/b/a ATHENA BITCOIN GLOBAL, PSBC, LLC, JORDAN MIRCH, BITOM LABS, INC. and RYAN PINEO as follows:

A.  Declaring that AML is the owner of all title and rights in and to the AML Software, including all intellectual property rights associated with the AML Software, that Defendants do not hold any ownership or other rights in the AML Software, that Defendants do not have a right to use, access, reproduce, copy or distribute the AML Software or derivatives of the AML Software, and that Defendants should return and/or destroy any copies or versions of the AML Software, including any derivatives of the AML Software;

B.  Finding Defendants liable for infringement of AML's Code and U.S. Copyright Registration TXu 2-507-802, liable for misappropriation of AML's trade secrets, and otherwise liable for the actions and claims described herein;

C.  For preliminary and permanent injunctive relief enjoining and restraining Defendants and their respective officers, employees, and agents, and all persons or entities in active concert or participation with Defendants:

   i.  from using, accessing, reproducing, copying or distributing the AML Code, including any derivative of the AML Code, and/or otherwise from infringing AML's copyrights;

   ii.  from further misappropriating and/or using AML's trade secrets; and

   iii.  injuring AML's goodwill and reputation.

D.  Ordering Defendants to return or destroy all versions of the AML Code, including any derivative works made from the AML Code, in their possession, custody or control;

E.  Ordering that Defendants be directed to file with this Court and serve upon Plaintiff within thirty (30) days after service of the injunction a report in writing under oath, setting forth in detail the manner and form in which Defendants have complied with the permanent injunction;

F.  Ordering Defendants to account for all profits derived from Defendants' unlawful use of the infringing code and/or trade secrets;

G.  Ordering Defendants to pay Plaintiff monetary relief under 17 U.S.C. § 504 in an amount equal to (a) the actual damages suffered by Plaintiff as a result of Defendants' copyright infringement; and (b) Defendants' profits that are attributable to Defendants' copyright infringement and that are not taken into account in computing actual damages, or alternatively, statutory damages;

H.  Ordering Defendants to pay Plaintiff monetary relief under 18 U.S.C. § 1836 for (1) (a) all damages for actual loss to Plaintiff caused by Defendants' misappropriation and use of Plaintiff's trade secrets; and (b) damages for any unjust enrichment caused by the misappropriation of trade secrets that are not addressed in computing damages for actual loss or (2) alternatively, a reasonable royalty;

I.  Finding that the trade secrets at issue were willfully and maliciously misappropriated by Defendants and, thus awarding Plaintiff exemplary damages in the amount of two times damages awarded;

J.  Ordering Defendants to pay Plaintiff monetary relief for all damages incurred by Plaintiff as a result of Defendants' conversion and other unlawful and/or improper acts;

K.  Awarding Plaintiff its reasonable attorneys' fees and costs incurred in connection with this action;

L.  For prejudgment interest according to law;

M.    Finding that Plaintiff is entitled to recover its costs of Court; and

N.    For such other and further relief the Court deems just and proper.

Dated: October 22, 2025                    Respectfully submitted,

By:   /s/ Joshua D. Martin
Joshua D. Martin
Florida Bar No. 028100
josh.martin@johnsonmartinlaw.com
Matthew S. Nelles
Florida Bar No. 009245
matt.nelles@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd., Suite 430
Fort Lauderdale, Florida  33309
Telephone:  (954) 790-6699
Facsimile:  (954) 206-0017

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above has been filed through the

Court's CM ECF electronic filing system this 22nd day of October, 2025. I also certify that a copy

of this document is being sent via email to Defendants' counsel who has not yet appeared: Jordan

A. Finfer, Patzik, Frank & Samotny Ltd., 200 S. Wacker Drive, Suite 2700, Chicago, Illinois,

60606 at the following email address:  jfinfer@pfs-law.com.

/s/ Joshua D. Martin
Joshua D. Martin, Esq.

31