**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Action No.: 1:25-cv-24378-RAR**

AML SOFTWARE, INC., an Illinois
corporation,

                  Plaintiff,

v.

ATHENA BITCOIN, INC., d/b/a
ATHENA BITCOIN GLOBAL, a Delaware
corporation, PSBC, LLC, a Delaware
limited liability company, and JORDAN MIRCH, an individual,
BITOM LABS INC., a Canadian Corporation,
and RYAN PINEO, an individual,

                  Defendants.

_____/

**<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED</u>**
**<u>MEMORANDUM OF LAW</u>**

1

Plaintiff, AML SOFTWARE, INC. ("AML" or "Plaintiff"), hereby moves for entry of a preliminary injunction against Defendants, ATHENA BITCOIN, INC. d/b/a ATHENA BITCOIN GLOBAL ("Athena"), PSBC, LLC ("PSBC"), JORDAN MIRCH ("Mirch"), BITOM LABS INC. ("Bitom Labs"), and RYAN PINEO ("Pineo") (collectively "Defendants"), and in support states:

## I.       INTRODUCTION

AML owns valuable and proprietary computer source code used with Bitcoin ATMs ("AML Code" or "AML Software"), along with all copyrights and other intellectual property rights in and to its AML Code, portions of which are protected trade secrets. This lawsuit arises out of Defendants' improper acquisition and use of AML's proprietary Code through a scheme intended to strip AML of its title and intellectual property rights in and to its Code.

In June 2024, AML learned from its code developer, Defendant Pineo, that Pineo had orally licensed the AML Software to Defendant Athena. Critically, no written agreement or contract was entered into between AML and Athena (or any Defendant) regarding the AML Software. Nor did Athena ever directly pay AML. Instead, Athena made recurring payments to Defendant Bitom Labs, which is owned and operated by Pineo, and Pineo then transferred half of the funds received to AML. AML accepted those payments but strictly in exchange for an oral, non-exclusive, revocable license for Athena to use the AML Software in connection with Bitcoin ATMs.

However, AML eventually discovered that Pineo and Defendant Mirch had covertly concocted an elaborate scheme to attempt to pilfer AML's valuable Software. Specifically, in October 2024, AML learned that, rather than license the AML Software, Pineo (through his company Bitom Labs) had actually attempted to sell and convey the AML Software away from AML, including title to the Software and all accompanying copyrights and other intellectual property, to Defendant Mirch's company, PSBC. According to Pineo now, he purportedly sold the

Software to PSBC for $2 million in June 2024.  However, as noted, there was absolutely no written transfer or conveyance from AML to Bitom Labs or any other Defendant, Bitom Labs never owned AML's Software to sell in the first place, and AML did not authorize Pineo to transfer title to and all rights in AML's most valuable asset (its proprietary Code) to PSBC or any other party.

Concurrently, at that very same time in June 2024, Defendants PSBC and Mirch had set up a separate agreement with Athena to immediately sell and transfer the AML Software to Athena for $5.5 million, nearly triple the amount of what PSBC/Mirch had just purportedly paid days before. Per a written agreement entered into between PSBC and Athena, PSBC purportedly transferred the AML Software, including all copyrights and other intellectual property rights, to Athena immediately following the purported sale from Bitom Labs to PSBC, even though legal title to the Code and associated copyrights never conveyed to PSBC for PSBC to sell.

Until August 2025, AML continued to receive recurring payments from Pineo for what AML maintained were license fees from Athena for Athena's (only) non-exclusive use of the AML Software. However, in early September 2025, AML ceased receiving payments from Athena. Thus, whatever revocable license rights that Athena or any other Defendant held to use the AML Software have terminated. However, upon information and belief, Athena and the other Defendants continue to use and/or access the AML Code without authorization. AML received its copyright registration in September 2025 (prerequisite to suit) and then filed this action.

AML seeks preliminary injunctive relief declaring that the purported and fraudulent "sale" of AML's Software to PSBC was invalid, that title to the AML Software and intellectual property did not transfer to any Defendant and that AML is the true and correct owner of the AML Software, along with all copyrights and intellectual property in and to that software (including derivative works created from that Software), and requiring that Defendants cease all use of the AML Code

3

(including derivatives) and destroy and/or return any and all copies of the AML Code. Without such preliminary injunctive relief, AML will continue to suffer irreparable harm.

**II.     FACTUAL BACKGROUND**

**A.     Plaintiff's Copyrighted  Software/Code and Chain of Title.**

AML developed and owns original, proprietary computer source code for use with Bitcoin ATMs (the "AML Software" or "AML Code"). *Meraban Declaration*, ¶ 4, attached hereto as **Exhibit "1."** Particularly in the world of cryptocurrency, the source code comprises the "guts" of Bitcoin ATMs. AML and its predecessor in interest, S&P, have been using AML's Code on software installed on Bitcoin ATMs for several years. *Id*.

Beginning in or around 2019, S&P contracted with third-party SilverLogic LLC ("SilverLogic") to create the initial version of the AML Code for S&P's use. The Master Services Agreement ("MSA") between those parties stated that S&P owned the Code and all copyrights and other intellectual property associated therewith.  A redacted version of the MSA is attached as **Exhibit "2."** The initial version of the AML Code was completed in or about 2020, after which time S&P began using it in connection with its Bitcoin ATMs. *Meraban Dec.*, at ¶ 5. At the time of its initial use of the AML Code, S&P owned and/or operated approximately 400 Bitcoin ATMs, which eventually increased to approximately 2,800. *Id*.

On or about March 10, 2021, S&P entered into a "Software Transfer Agreement" with AML transferring all rights, title and interest in the AML Code, and the proprietary software of which it comprises, to AML, including all copyrights and other intellectual property associated therewith, a copy of which is attached as **Exhibit "3."** AML licensed back to S&P the right to use the AML Software on the S&P Bitcoin ATM machines on that same date. A copy of the License

4

agreement is attached as **Exhibit "4."**[1] After obtaining ownership of and copyrights in the AML Code, AML updated and continued to develop the Code. *Meraban Dec.*, at ¶ 6.

On September 9, 2025, AML was issued U.S. Copyright Registration TXu 2-507-802 ("'802 Registration") titled "AML Software Code."  AML is the owner and holder of the '802 Registration and owns all rights, title, and interest in and to AML's Code.  A true and correct copy of the '802 Registration is attached as **Exhibit "5."** The chain of title to AML's Software ends with AML – there have never been any transfers or conveyances, whether in writing or otherwise, of and to the AML Code or copyrights associated therewith. *Meraban Dec.*, at ¶ 7.

Portions of AML's Code are trade secrets. *Id.* at ¶ 8. AML has taken measures to keep them confidential, and they are not readily ascertainable by others.  AML has not disclosed its source Code to any third parties, and the only individuals with knowledge of the trade secrets portions are AML's code developers, all of whom signed confidentiality agreements. *Id*.

**B.      Mirch's Theft of S&P's Bitcoin ATMs.**

In early March 2023, S&P and several of its principals faced legal issues for, among other things, operating Bitcoin ATMs in Northwest Ohio without the requisite licensure. *Id.* at ¶ 9. Although the vast majority of the transactions that occurred at these Ohio ATMs were legitimate, and investigators do not contend that S&P was involved in any scam transactions, unrelated third-parties allegedly utilized S&P's ATMs in furtherance of various nefarious schemes, which de facto implicated S&P. *Id*. As a result, S&P was prohibited from continuing to operate its inventory of Bitcoin ATMs in Ohio and was left without the resources to continue operations nationwide. *Id*.

This all left S&P in a vulnerable position, and Mirch and entities owned and/or controlled by him used that opportunity to misappropriate S&P Bitcoin ATM's.  Among other things, through

---

[1] Due to confidentiality provisions in those agreements, AML will seek to file them under seal.

fraudulent misrepresentations to S&P and other unlawful conduct and while S&P was dealing with its legal issues, Mirch managed to overtake all of S&P's 2,800 physical Bitcoin ATMs. *Id.* at ¶ 10. Originally categorized by Mirch as "assisting" S&P, he instead pilfered the physical ATMs. *Id*. This theft of the physical machines is the subject of a separate lawsuit in Cook County, Illinois, which case is currently stayed due to a bankruptcy filed by S&P. *Id*. S&P and AML are both owned by the same Trust and share the same Trustee and principal, Sonny Meraban ("Meraban"). *Id.* at ¶ 11. Needless to say, Meraban and Mirch are not on good terms. *Id.*

**C.      The Scheme to Acquire AML's Software.**

Separate from the physical Bitcoin ATMs owned by S&P, AML continued to own the AML Software, including all source code and also including all copyrights and intellectual property associated with that Software.  However, in May or June of 2024, Defendants launched their scheme to attempt to transfer the AML Software to PSBC and then immediately to Athena.

Specifically, on or about June 14, 2024, AML's principal, Meraban, learned from AML's code developer, Pineo, that Pineo had purportedly licensed the AML Software to Defendant Athena. *Id.* at ¶ 12. However, Meraban did not object to a revocable, non-exclusive license because AML was in dire need of revenue/funds, and AML did not sign any document transferring title to the Code or transferring any intellectual property rights in the Code. *Id*.

In a message chain with Pineo, Meraban stated "Would love to get 5 more of these deals. Even if they dont buy it and just pay is good. thats 75k a month." An excerpt from the message chain is attached as **Exhibit "6."** Pineo responded, "Yup that's the goal," which clearly portrayed to Meraban a non-exclusive, oral license, not a full-blown sale. *Id.* When Meraban asked Pineo that same day if Athena could set up auto pay for AML, Pineo oddly responded "Their accounting

team watches the auto ones" and went on to inform Meraban that he, Pineo, would just continue to receive the payments directly and then pay portions to AML. *Id.*

There was never any written contract entered into between AML and Athena whatsoever, whether concerning the AML Software or otherwise. *Meraban Dec.*, at ¶ 14. Rather, AML consented to an oral, non-exclusive, revocable license for Athena to use the AML Software in connection with Bitcoin ATMs in exchange for payments by Athena of $75,000 per month. *Id.* Those monthly payments were a condition precedent to use of the ATM Software and would continue until termination of the license or until Athena was in a position to actually purchase ownership of the AML Software for an additional lump sum of $2 million (similar to a lease to own arrangement). *Id.* Meraban asked Pineo who would be buying the software eventually, and Pineo responded that Athena would be buying it. *Id.*

Athena did not make any payments directly to AML. *Id.* at ¶ 15. All payments for use of AML's Software were made to Bitom Labs. *Id.* Pineo then transferred half of those funds to AML. *Id.* It is unclear whether Athena even made those payments in the first place. *Id.*

However, unbeknownst to AML but according to Defendants, Pineo had not actually licensed the AML Software to Athena. Rather, notwithstanding that Pineo/Bitom Labs never owned the AML Software, Pineo attempted to sell and convey title to the AML Software and all associated intellectual property to Mirch's company, PSBC.  This is confirmed in a recent Verification that Pineo supposedly provided to Defendants' attorneys where Pineo stated that the transaction was a "sale of the AML Source Code – not simply a rental" for $2 million. Pineo's Verification from Defendants is attached hereto as **Exhibit "7."**

Yet even Pineo's own verified testimony that he provided Defendants is intrinsically inconsistent:  Pineo labels the transaction between AML and PSBC a "sale" and "not simply a

7

rental" for a sale price of $2 million on one hand, but then, on the other hand, Pineo states that *his* company, Bitom Labs, granted PSBC a "nonexclusive, perpetual, irrevocable, royalty-free, fully paid-up, worldwide right and *license*" to "make, have, made [sic], modify, use, distribute, sell, sublicense, and otherwise exploit the AML Source Code" (emphasis added) through a "Consulting Agreement" between Bitom Labs and PSBC. *Id.* at ¶¶ 5, 7. In other words, Pineo nonsensically contends, simultaneously, both that he *sold* the AML Code (along with the copyrights to reproduce, distribute, publish, make derivative works, etc.) and that he also, on behalf of Bitom Labs, *licensed* the AML Code (to do those very things with it). *Id.*

Again, there was no written contract whatsoever between AML and PSBC governing the terms of a purported software/code sale, including any written agreement governing the price, payment schedule, date of transfer or any other material terms. Apparently, for a $2 million sale of source code, Pineo and Mirch decided that a written agreement was not needed, nor was any type of valuation of the code.

The only written agreement concerning the secret transaction was the Consulting Agreement referenced in Pineo's Verification, entered into on June 1, 2024, between PSBC (by Mirch) and Bitom Labs (by Pineo) ("PSBC-Bitom Consulting Agreement"), a copy of the PSBC-Bitom Consulting Agreement is attached as **Exhibit "8."**

According to the PSBC-Bitom Consulting Agreement, Bitom Labs was to provide services in the form of "Development of Bitcoin ATM software platform." *Id.* The development schedule set forth in the Agreement called for Bitom Labs to deliver the *developed* Bitcoin ATM software platform to PSBC on or by June 10, 2024, only nine days after the Effective Date of the Agreement. *Id.* Additionally, the PSBC-Bitom Consulting Agreement provided that all Work Product under that Agreement, including "all patents, copyrights, trademarks (together with the goodwill

symbolized thereby), trade secrets, know- how, and other confidential or proprietary information, and other intellectual property rights" would be owned by PSBC. *Id.* Finally, PSBC was to pay Bitom Labs $2 million for the "Development of Bitcoin ATM software platform." *Id.*

It is apparent that the Consulting Agreement itself is a complete farce. Clearly, the "Development of Bitcoin ATM software platform" referred to delivery of the AML Code and not the development of a new software platform because development of a brand-new platform could not have been completed in 9 days (to recreate/develop the AML Code would take months or even years). In other words, Bitom Labs did not "develop" any software for PSBC – it just forked over AML's Code, and AML's Code was then used to make derivative versions, which is expressly acknowledged in Pineo's Verification.

It is also apparent that Mirch and Pineo created the "Consulting Agreement" to further conceal the actual attempted sale of the AML Software to PSBC from AML, as the Consulting Agreement provided that PSBC would own all rights in the Software.  If the sale of the AML Software had been a true arms-length transaction, in addition to proper due diligence and valuations, Pineo and Mirch would have executed an Agreement between *PSBC and AML*, who actually owned the Software, not a "Consulting Agreement" between Bitom Labs and PSBC.

In furtherance of the scheme, simultaneous to the PSBC-Bitom arrangement, PSBC and Mirch had set up a separate arrangement with Athena to immediately sell and transfer the AML Software to Athena.  Specifically, Athena and PSBC entered into a written "Development Services Agreement" on June 19, 2024 ("Athena-PSBC Agreement"), a copy of which is attached as **Exhibit "9."**  Per that Agreement, Athena agreed to pay PSBC $5.5 million for "Development of a Bitcoin ATM software platform," the same exact language used in the PSBC-Bitom Agreement, but for nearly triple the price just a few days later. *Id.* Additionally, per the Athena-PSBC

Agreement, PSBC was to deliver the Bitcoin ATM software platform "on or by June 18, 2024," just days after it was supposed to be delivered from Bitom Labs to PSBC. *Id.*

As if the illusory Consulting Agreement between Bitom Labs and PSBC was not enough, the timing and pattern of dealings between PSBC and Athena make it even more abundantly clear that no one was "developing a Bitcoin ATM software platform" – they were just handing over the AML Software, first for $2 million and then for $5.5 million a few days later.

During this entire time, AML believed and understood that it had merely provided an oral, non-exclusive, revocable license to Athena to use the AML Software for a temporary period of time. *Meraban Dec.*, ¶ 16. AML never authorized the sale of the AML Software and never transferred title to the AML Software to Bitom Labs in the first place. *Id.*

In October 2024, AML (through Meraban) first caught wind of the scheme and that Bitom Labs/Pineo contended that they had attempted to sell/assign all rights, title and interest in the AML Software rather than merely licensing it.  The following is a message chain between Pineo and Meraban on October 28, 2024 (excerpt attached as **Exhibit "10"**):

> Pineo:  "We're a bit past ¼ through that deal now just so you know"
> Meraban:  "What happens after its completed"
> Meraban:  "and they didnt buy it"
> Pineo: "they ride off into the sunset. Or whatever they want really"
> Pineo:  "the 2M is them buying it"
> Meraban:  "wait im confused… how much have they paid so far?"
> Pineo: "540 or so"
> Meraban:  "wow so ur saying I got $250k?"
> Pineo: "yup"
> Meraban: "so after 2M is paid ur saying they own the software?"
> Pineo: "yup"
> Meraban: "so after 2M is paid ur saying they own the software?
> Pineo: "they do indeeed"
> Meraban:  "i thought you said they are renting it until they come up with 2M lump sum"
> Meraban: "and then they own it and meantime they are renting it"
> Pineo: "no they don't have to come up with any lump sum, and I don't expect them to. 2M over whatever time period is the price"
> Meraban: "i could have sworn i thought that was the deal"

Pineo: "not sure, the only lump sum we talked about was they might want to just pay it off to be done with it, but regardless it's the same thing. Definitely never had any rental aspec to it"

Meraban: "ah they got a great deal for sure"

As shown, Meraban confirmed multiple times that he always understood that Athena was "renting" the AML Software, (*i.e.*, licensing the software), until such time that Athena could come up with an additional $2 million to actually purchase it. *Meraban Dec.*, ¶ 18. Even at that point, it was unclear to AML that Bitom Labs had attempted to sell the AML Software to PSBC/Mirch and not Athena. *Id.* Moreover, at that time, AML was still unsure exactly what had transpired with respect to its Software and maintained that AML had only provided non-exclusive license rights. *Id.* Indeed, AML continued receiving recurring license payments from Pineo/Bitom Labs for what AML maintained were Athena's license payments up through August 2025. *Id.*

However, starting in early September 2025, AML ceased receiving payments for Athena's use of the AML Software. *Id.* at ¶ 19. Thus, any oral license rights that Athena held to use the AML Software have been terminated, which was formally confirmed by the filing of this lawsuit for copyright infringement. *Id.* Despite that any purported license rights have now terminated and that Athena should have ceased any and all use of the AML Software (including derivative works created from the Software), to the best of AML's knowledge, Athena has continued using the AML Software (or unauthorized derivatives) following termination of the purported license. *Id.*

Additionally, upon information and belief and based at least on provisions in the PSBC-Athena Agreement, Athena claims to own the AML Software and all rights associated therewith. **Ex. 9**. Indeed, Athena, PSBC, and other entities recently entered into a Release and Termination Agreement on September 4, 2025 that references the Athena-PSCB Agreement and provides that "ownership of the New Technology and all associated Intellectual Property Rights has transferred to Athena" and "the Source Code (as defined in the Development Agreement) has been released

11

and transferred to Athena as required therein including under Section 5.2 of the Development Agreement." A copy of that Release and Termination Agreement is attached as **Exhibit "11."** Again, that agreement makes it clear that Athena believes that it owns the AML Code and derivatives of that Code, including all intellectual property associated with that Code, clearly due to the nefarious scheme by Defendants to pilfer title to the AML Code.

Separate from the Athena license, AML also previously licensed the AML Software to other third parties. *Meraban Dec.*, ¶ 20.  However, starting in September 2025, AML ceased receiving any license payments from those third-party licensees as well. *Id*. Upon information and belief, Pineo has continued to receive payments from the third-party licensees but has kept those payments for himself and failed to provide them to AML. *Id*.

### III.   MEMORANDUM OF LAW

**A.   Legal Standard.**

To obtain a preliminary injunction, AML must demonstrate a (1) substantial likelihood of success on the merits; (2) that AML would be irreparably harmed if injunctive relief were denied; (3) that the threatened injury to AML outweighs whatever damage the injunction may cause to the Defendants; and (4) that the injunction, if issued, would not be adverse to the public interest. *See  Davidoff & CIE, S.A. v. PLD Intern. Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001).

**B.   AML Demonstrates a Substantial Likelihood of Success on the Merits.**

**1.   Declaration that AML owns the AML Software.**

It is well settled under the Copyright Act that any transfer of ownership of copyright must be in writing. *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 751 (11th Cir. 1997); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010). Specifically, the Copyright Act provides that "[a]  transfer of copyright ownership, other than by operation of law, is not valid unless an

instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Exclusive licenses fall under the requirement that they must be in writing to be enforceable. *Jacob Maxwell*, 110 F.3d at 751. "The chief purpose of section 204(a), (like the Statute of Frauds), is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995); *see also Nealy v. Atlantic Recording Corp.,* 2021 WL 2280025, at *5 (S.D. Fla. June 4, 2021) (Section 204(a) "protect[s] copyright owners from persons mistakenly or fraudulently claiming that a copyright was transferred orally") (citations omitted); *Gordon v. Lee*, 2007 WL 1450403, *11 (N.D. Ga. May 14, 2007) (finding that defendants' argument that they held ownership rights in home designs failed because neither of the copyright owners executed a written document transferring ownership and, thus, "a valid transfer of copyright ownership never took place").

Here, it is undisputed that there was no agreement in writing between AML and Athena and/or PSBC regarding the AML Software. Thus, despite Pineo's assertions in his Verification that he sold the AML Code to PSBC, along with the purported right to use, modify, distribute, sell, or otherwise exploit the AML Code, any such attempted sale and conveyance was legally impermissible, ineffective and inconsequential and did not convey rights in the Code. The fact that there is no written agreement by AML conveying rights is conclusive and irrefutable evidence that AML is still the true and correct owner of AML Software and all copyrights associated therewith.

Defendants may argue that Pineo was an authorized agent of AML. However, even if true, Pineo still did not execute any written document on behalf of AML conveying rights. The only written agreement was a Consulting Agreement between *Bitom Labs* and PSBC, not AML and

13

PSBC. Thus, efforts by Pineo to transfer rights through Bitom Labs failed because there was no written agreement by AML conveying rights to PSBC or Bitom Labs. Further, Pineo's assertion in his Verification that AML "consented to the Sale through Sonny Meraban" is also legally inconsequential because "consent" is not sufficient to convey title where there is no written agreement as required by the Copyright Act. Indeed, this scenario demonstrates the exact purpose of Section 204(a) – "to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." *See Imperial Residential Design*, 70 F.3d at 99.

Thus, AML is entitled to a declaration that it owns the AML Code and all copyrights in that AML Code, and that no ownership rights were conveyed to Defendants.

### 2.      Copyright Infringement.

To state a claim for copyright infringement, a plaintiff must allege "(1) ownership of a valid copyright, and (2) copying of the constituent elements of the work that are original." *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996). Here, AML demonstrates a substantial likelihood of success on both elements.

### a.      AML Owns the Copyrights in the AML Code.

"'[C]ertificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.'" *Latimer*, 601 F.3d at 1233 (*quoting* 17 U.S.C. § 410(c)). "Once the plaintiff produces a certificate of registration, the burden shifts to the defendant to establish that 'the work in which copyright is claimed is unprotectable (for lack of originality).'" *Id.*

Here, AML is the owner of the '802 Registration titled AML Software Code. AML also established the chain of title from original creation of the AML Code and that AML is the true and

14

correct owner of the AML Code and all rights associated with that Code. Moreover, the AML Code has not been published and, thus, the registration was made before or within five years of publication of the work. *Meraban Dec.*, ¶ 7.  As a result, AML has asserted prima facie evidence of its ownership and of the validity of its copyrights in the AML Code and satisfied this prong.

### b.     Defendants Copied the AML Code.

To satisfy the second prong, "a plaintiff must establish, as a factual matter, that the alleged infringer actually copied plaintiff's copyrighted material." *Latimer*, 601 F.3d at 1233. "Proof of copying may be shown either by direct evidence of the copying or, in the absence of such evidence, '[c]opying as a factual matter typically may be inferred from proof of access to the copyrighted work and 'probative similarity.'" *Bateman*, 79 F.3d at 1541. Moreover, using a copyrighted work to create derivative works without authorization constitutes copyright infringement:

> One of 'the exclusive rights of a copyright owner' is 'to prepare and to authorize others to prepare 'derivate works based upon the copyrighted work.'' *Peter Letterese And Associates, Inc. v. World Inst. Of Scientology Enterprises*, 533 F.3d 1287, 1297, n.9 (11th Cir. 2008) (quoting 17 U.S.C. § 106(2)). Thus, to validly copyright a derivative work, an author must have permission to use the original copyrighted work that the derivative work is 'based upon.' 17 U.S.C. § 101. If a derivative work unlawfully uses copyrighted material without authorization, the derivative work's author will 'receive no [copyright] protection at all.' *Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548, 563 (3d Cir. 2002). '[O]n the contrary, **he is a copyright infringer**, because in order to create his work he has copied the underlying work.' *Id. see also Latimer*, 601 F.3d at 1233-34.

*Niang as Next Friend of A.N. v. PhatMojo, LLC*, 2024 WL 5112989, *4 (N.D. Ga. Sept. 9, 2024) (bold emphasis added).

Here, it is undisputed that Defendants received a direct copy of the AML Code from Pineo according to his Verification. *See* **Ex. 7**, ¶¶ 3-5. In other words, Pineo provided Defendants a specific, line by line copy of the AML Code. Defendants then admittedly used that line by line AML Code to create derivative copies. *Id.* at ¶ 10.  Thus, this is not a case where proof of access

and/or probative similarity needs to be shown. Rather, there is no dispute that Defendants received a copy of the AML Code and are using it freely, along with unauthorized derivative copies admittedly made from the AML Code. As a result, this element is also satisfied.

### c.        Non-Exclusive License Rights.

As explained above, Athena at best received a non-exclusive, revocable license to use the AML Software for a payment of $75,000 per month. Athena may argue that the license provides an excuse to avoid copyright infringement. However, any purported license rights have terminated due to lack of payment, and Athena is still liable for infringement following termination. Athena also exceeded the scope of its license rights.

### i.        The License Terminated Due to Athena Ceasing Payments.

As explained above, any conveyance of copyright, including an exclusive license, must be in writing. *Jacob Maxwell*, 110 F.3d at 751. AML undisputedly did not provide an exclusive license in writing to any of the Defendants. Moreover, Pineo also asserted in his Verification that any rights were non-exclusive. **Ex. 7, ¶ 5.** Thus, only non-exclusive rights are at issue here.

A non-exclusive license to use copyrighted material may be granted orally or implied from conduct. *Jacob Maxwell*, 110 F.3d at 751. "The difference between an exclusive and a non-exclusive license in copyright is akin to the difference between a fee simple and an easement on real property." *Fodere v. Lorenzo*, 2011 WL 465468 (S.D. Fla. Feb. 4, 2011). "An exclusive license is a conveyance of copyright ownership, "a promise that the same rights will not be conveyed to others." *Id.* (citing 6 William F. Patry, *Patry on Copyright* § 21:15 (2010)). On the other hand, "a nonexclusive license, on the other hand, is "a bare right to use the licensed intellectual property without any right to exclude others, including other licensees of the grantor." *Id*

A non-exclusive license that is not supported by consideration is revocable. *Fokiss, Inc. v. TLM Global, LLC*, 2025 WL 353923 *6 (S.D. Fla. Jan. 31, 2025); *see also Vergara Hermosilla v. The Coca-Cola Co.*, 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010); *Odom v. Navarro*, 2010 WL 11505459 *4 (S.D. Fla. March 11, 2010) (finding nonexclusive license was terminated for nonpayment because "implied licenses are terminable at will, and a party make [sic] revoke or rescind an implied license upon a breach"). Moreover, a revocable license is "revoked by the filing of a lawsuit." *Vergara*, 717 F. Supp. 2d at 1303 (citations omitted).

Even where consideration is provided, "'a material breach of the parties' oral understanding may entitle the licensor to revoke its permission for future use of the copyrighted materials.'" *Fokiss, Inc.*, 2025 WL 353923 at *6; *see also HH Advertising, Inc. v. Unique Vacations, Inc.*, 2025 WL 2027556 *17 (S.D. Fla. July 21, 2025) (a licensee's material breach of an implied license entitles the licensor to revoke the license). Once a license is revoked/terminated, "'the copyright proprietor may hold his former grantee liable as an infringer for *subsequent* use of the work.'" *Jacob Maxwell*, 110 F.3d at 753 (*citing* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.15[A], at 10–125–126).

Here, as a month to month license, monthly payments by Athena to AML was a condition precedent for the continued non-exclusive license to use the AML Code. Even according to Pineo's Verification, while Pineo classified the transaction as a sale, he confirmed that AML was to receive recurring payments for the use of the AML Code. **Ex. 7**, ¶ 4.[2] When Athena ceased making payments in September 2025, any and all license rights to use the AML Code became revocable and terminated. At the latest, the revocable license was revoked by the filing of this lawsuit against

---

[2] Pineo's Verification confirmed that, even under Defendants' incorrect classification of the transaction as a "sale," Athena did not pay AML the full amount owed. Ex. 7, ¶¶ 3-4, 9-10.

17

Athena for copyright infringement. *Vergara*, 717 F. Supp. 2d at 1303 (finding that the "license was unequivocally revoked the moment the present lawsuit was filed").

Even if Athena were to argue that it provided partial consideration for the use of the AML Code, Athena's material breach by non-payment entitled AML to revoke permission for future use of the copyrighted Code, which AML did by, at a very minimum, filing this lawsuit for copyright infringement against Athena. Once the license was revoked and terminated, all subsequent use of the AML Code (including derivatives made from the Code), constitutes copyright infringement.

### ii.      Additionally, Athena Exceeded the Scope of the License.

"Because a nonexclusive license does not transfer *ownership* of the copyright, the licensor can bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license." *Roskovensky v. Sanibel Captiva Island Vacation Rentals, LLC*, 2024 WL 1140893 * 5 (M.D. Fla. March 15, 2024) (*citing Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010) (emphasis in original); *see also Hoeltzell v. Caldera Graphics*, 2012 WL 13012954 *4 (S.D. Fla. June 11, 2012).

Here, even before termination of Athena's non-exclusive license, Athena exceeded the scope of the license. AML only provided Athena a right to use the AML Code in connection with Bitcoin ATMs. AML did not provide Athena a right to reproduce the Code, distribute it or use the Code to create derivative works from the Code. However, Pineo stated in his Verification that "the AML Source Code was used to create new source code." **Ex. 7, ¶ 10.** Such use of the AML Code to create new derivative codes was unauthorized, improper and exceeded the scope of the license right provided to Athena. Such unauthorized use beyond the scope of the non-exclusive license constitutes copyright infringement, which is in addition to and separate from Athena's copyright infringement following termination of the license.

As a result, AML has demonstrated a substantial likelihood of success on its declaratory judgment and copyright infringement claims.

**C.        Plaintiff Will Suffer Irreparable Injury if a Preliminary Injunction is Not Entered.**

AML has expended substantial time, money and other resources to develop the AML Code. Developing a similar code would take months or even years to develop, which is demonstrated by the fact that Defendants have attempted to hijack AML's Code to create derivative versions rather than just create their own.  Defendants maintain that they have acquired ownership to the AML Software and that they not only have the right to use the Software, but they also have the right to "distribute, sell, sublicense and otherwise exploit the AML Source Code." **Ex. 7**, ¶ 5.  That means that Defendants could sell or distribute the valuable Code to an infinite amount of third-parties to which AML has no control. If the AML Code were sold to multiple third parties, it would not only drastically diminish the value of the proprietary Code, which could not be measured in monetary damages, but those third parties would also be able to use the Code how they choose. Improper or inappropriate use of AML's Code by third parties could harm AML's reputation, and those third parties could continue to alter and change the Code, creating numerous derivative versions. Damages for such use could not be measured monetarily and, thus, AML will suffer irreparable harm.

Moreover, "'courts have recognized irreparable harm where the movant faces a risk of reputational damage and negative publicity based on improper use of intellectual property' that was difficult to quantify." *Fokiss, Inc.*, 2025 WL 353923 *8 (S.D. Fla. Jan. 31, 2025) (citations omitted).  At a very minimum, Defendants' use of the AML Code is harming AML's reputation. On or about September 8, 2025, the Attorney General separately sued Athena for financially exploiting district residents by charging undisclosed fees on deposits that Athena knows are the

result of scams. *See* https://oag.dc.gov/release/attorney-general-schwalb-sues-crypto-atm-operator. While only allegations at this stage, the mere fact that Athena is using the AML Code in connection with such egregious allegations certainly stands to harm AML's reputation and cause it negative publicity. Thus, irreparable harm is clear here.

**D.    The Threatened Injury Outweighs Any Harm an Injunction Would Inflict on Defendants.**

As noted, AML has expended substantial time, money and other resources to develop the AML Code. Should Defendants be allowed to continue to claim ownership rights in the AML Code and "distribute, sell, sublicense and otherwise exploit the AML Source Code," AML will suffer irreparable losses as discussed.  On the other hand, Defendants have no ownership rights in the AML Code and all license rights have terminated. Thus, being prevented from having ownership rights in something that Defendants do not actually own can cause them no harm.  Thus, the scales of justice weigh substantially in AML's favor.

**E.    The Relief Sought Serves the Public Interest.**

Among other things, "the public interest is served by preventing consumer confusion in the marketplace." *Davidoff*, 263 F.3d at 1304. Here, Defendants are using the AML Code or infringing derivative versions of that Code without authorization, which may cause consumer confusion as to ownership rights in the Code. Moreover, Defendants engaged in a scheme to attempt to pilfer AML's Code, and the public has a clear interest in preventing theft of valuable intellectual property and other assets. Thus, this element is clearly satisfied.

**F.    AML Requests a Minimal Bond.**

The posting of security upon issuance of a preliminary injunction is vested in the Court's sound discretion.  Fed. R. Civ. P. 65(c); *Carillion Importers, Ltd. v. Franke Pesce Int'l Group, ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997). Here, Defendants engaged in an elaborate scheme in

an attempt to pilfer AML's valuable and proprietary code. Given that there is no written contract whatsoever by AML conveying rights in the AML Code, pursuant to the Copyright Act, no rights have legally conveyed to Defendants and, at best, Athena held temporary license rights that are now revoked. Thus, Defendants would suffer no harm by entry of an injunction declaring that AML owns the AML Code that Defendants could not legally own. Similarly, Defendants would suffer no harm by entry of an injunction preventing them from using Code that they have no right to use. Therefore, AML requests that the Court exercise its discretion to require a minimal bond.

WHEREFORE, Plaintiff, AML SOFTWARE, INC., respectfully requests that the Court grant this Motion and enter preliminary injunctive relief against Defendants, ATHENA BITCOIN, INC. d/b/a ATHENA BITCOIN GLOBAL, PSBC, LLC, JORDAN MIRCH, BITOM LABS, INC. and RYAN PINEO, as follows:

A.      Declaring that: (i) AML owns and holds all rights in and to the AML Code, including all copyrights and other intellectual property associated with that Code; (ii) no rights in the AML Code conveyed to Defendants; and (iii) Defendants hold no ownership rights in the AML Code, including any copyrights or other intellectual property associated with that Code;

B.      Enjoining and restraining Defendants and their respective officers, employees, and agents, and all persons or entities in active concert or participation with Defendants: (i) from using, copying, modifying, distributing, selling, sublicensing, and/or otherwise exploiting the AML Code (or derivative versions of the AML Code) and/or otherwise from infringing AML's copyrights in the AML Code; and (ii) from injuring AML's goodwill and reputation;

C.      Requiring Pineo to pay AML any license fees received from other third-parties; and

C.      For such other and further relief the Court deems just and proper.

21

Dated: November 25, 2025          Respectfully submitted,

By:  /s/ Joshua D. Martin
Joshua D. Martin
Florida Bar No. 028100
josh.martin@johnsonmartinlaw.com
Matthew S. Nelles
Florida Bar No. 009245
matt.nelles@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd., Suite 430
Fort Lauderdale, Florida  33309
Telephone:  (954) 790-6699
Facsimile:  (954) 206-0017

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above has been filed through the

Court's CM ECF electronic filing system this 25th day of November, 2025.

/s/ Joshua D. Martin
Joshua D. Martin, Esq.

22