# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Action No.: 1:25-cv-24378-RAR**

AML SOFTWARE, INC., an Illinois
corporation,

                Plaintiff,

v.

ATHENA BITCOIN, INC., d/b/a
ATHENA BITCOIN GLOBAL, a Delaware
corporation, PSBC, LLC, a Delaware
limited liability company, and JORDAN MIRCH, an individual,
BITOM LABS INC., a Canadian Corporation,
and RYAN PINEO, an individual,

                Defendants.

_____/

**DECLARATION OF SONNY MERABAN**

I, Sonny Meraban, hereby declare and state:

1.      I am over the age of 21 and am otherwise *sui juris*.

2.      I have personal knowledge of the matters set forth herein.

3.      I am the Trustee of the Trust that owns AML Software, Inc. ("AML"), as well as the principal of AML. I am authorized to act on behalf of AML.

4.      AML developed and owns original, proprietary computer source code for use with Bitcoin ATMs (the "AML Software" or "AML Code"). Particularly in the world of cryptocurrency, the source code comprises the "guts" of Bitcoin ATMs. AML and its predecessor in interest, S&P, have been using AML's Code on software installed on Bitcoin ATMs for several years.

5.      Beginning in or around 2019, S&P contracted with third-party SilverLogic LLC ("SilverLogic") to create the initial version of the AML Code for S&P's use. The initial version of

1

the AML Code was completed in or about 2020, after which time S&P began using it in connection with its Bitcoin ATMs. At the time of its initial use of the AML Code, S&P owned and/or operated approximately 400 Bitcoin ATMs, which eventually increased to approximately 2,800.

6.      On or about March 10, 2021, S&P entered into a "Software Transfer Agreement" with AML transferring all rights, title and interest in the AML Code, and the proprietary software of which it comprises, to AML, including all copyrights and other intellectual property associated therewith. AML licensed back to S&P the right to use the AML Software on the S&P Bitcoin ATM machines on that same date. After obtaining ownership of the AML Code and all copyrights associated therewith, AML updated and continued to develop the Code.

7.      On September 9, 2025, AML was issued U.S. Copyright Registration TXu 2-507-802 ("'802 Registration") titled "AML Software Code."  AML is the owner and holder of the '802 Registration and owns all rights, title, and interest in and to AML's Code.  The chain of title to AML's Software ends with AML – there have never been any transfers or conveyances, whether in writing or otherwise, of and to the AML Code or copyrights associated therewith. Also, the AML Code has not been published and, thus, the registration was made before or within five years of publication of the work.

8.      Portions of AML's Code are trade secrets. AML has taken measures to keep them confidential, and they are not readily ascertainable by others.  AML has not disclosed its source Code to any third parties, and the only individuals with knowledge of the trade secrets portions are AML's code developers, all of whom signed confidentiality agreements.

9.      In early March 2023, S&P and several of its principals faced legal issues for, among other things, operating Bitcoin ATMs in Northwest Ohio without the requisite licensure.  Although the vast majority of the transactions that occurred at these Ohio ATMs were legitimate, and

2

investigators do not contend that S&P was involved in any scam transactions, unrelated third-parties allegedly utilized S&P's ATMs in furtherance of various nefarious schemes, which de facto implicated S&P. As a result of the charges against it, S&P was prohibited from continuing to operate its inventory of Bitcoin ATMs in Ohio and was left without the resources to continue operations nationwide.

10. This all left S&P in a vulnerable position, and Mirch and entities owned and/or controlled by him used that opportunity to misappropriate S&P Bitcoin ATM's. Among other things, through fraudulent misrepresentations to S&P and other unlawful conduct and while S&P was dealing with its legal issues discussed above, Mirch and entities owned and/or controlled by him managed to overtake all of S&P's 2,800 physical Bitcoin ATMs. Originally categorized by Mirch as "assisting" S&P, he instead pilfered the physical ATMs. This theft of the physical machines is the subject of a separate lawsuit in Cook County, Illinois, which case is currently stayed due to a bankruptcy filed by S&P.

11. S&P and AML are both owned by the same Trust. I am the Trustee of the Trust and principal of both S&P and AML. Needless to say, Mirch and I are not on good terms.

12. On or about June 14, 2024, I learned from AML's code developer, Ryan Pineo ("Pineo"), that Pineo had purportedly licensed the AML Software to Defendant Athena Bitcoin, Inc. ("Athena"). However, I did not object to a revocable, non-exclusive license because AML was in dire need of revenue/funds, and AML did not sign any document transferring title to the Code or transferring any intellectual property rights in the Code.

13. In a message chain with Pineo, I stated: "Would love to get 5 more of these deals. Even if they dont buy it and just pay is good. thats 75k a month." In other words, I understood that Athena was going to rent, or license, the AML Software on a non-exclusive, revocable basis for

$75,000 per month. Pineo responded to me: "Yup that's the goal," which clearly confirmed that Athena was receiving a non-exclusive license, not a full-blown sale. When I asked Pineo that same day if Athena could set up auto pay for AML, Pineo responded that "Their accounting team watches the auto ones" and went on to inform me that he, Pineo, would just continue to receive the payments directly and then pay portions to AML.  While I found that odd, at that point in time, I did not have an issue with Pineo receiving the funds from Athena and transferring them to AML.

14.     There was never any written contract entered into between AML and Athena whatsoever, whether concerning the AML Software or otherwise. Rather, AML consented to an oral, non-exclusive, revocable license for Athena to use the AML Software in connection with Bitcoin ATMs in exchange for payments by Athena of $75,000 per month (which fluctuated slightly because Athena made the payments in cryptocurrency). Those monthly payments were a condition precedent to use of the ATM Software and would continue until termination of the license or until Athena was in a position to actually purchase ownership of the AML Software for an additional lump sum of $2 million (similar to a lease to own arrangement). When I asked Pineo who would be buying the software eventually, Pineo responded that Athena would be buying it.

15.     Athena did not make any payments directly to AML. All payments for use of AML's Software were made to Pineo's separate company, Bitom Labs. Pineo then transferred half of those funds to AML and it is unclear whether Athena knew that AML ultimately received any of those funds. It is also unclear whether Athena even made those payments in the first place.

16.     At all times, AML believed and understood that it had provided an oral, non-exclusive, revocable license to Athena to use the AML Software for a temporary period of time. AML never authorized the sale of the AML Software and never transferred title to the AML Software to Bitom Labs in the first place.

4

17.     In October 2024, I first learned that Bitom Labs/Pineo contended that they had attempted to sell/assign all rights, title and interest in the AML Software rather than merely licensing it.  The following is a message chain between Pineo and I on October 28, 2024:

> Pineo:  "We're a bit past ¼ through that deal now just so you know"
> Meraban:  "What happens after its completed"
> Meraban:  "and they didnt buy it"
> Pineo: "they ride off into the sunset. Or whatever they want really"
> Pineo:  "the 2M is them buying it"
> Meraban:  "wait im confused… how much have they paid so far?"
> Pineo: "540 or so"
> Meraban:  "wow so ur saying I got $250k?
> Pineo: "yup"
> Meraban: "so after 2M is paid ur saying they own the software?"
> Pineo: "yup"
> Meraban: "so after 2M is paid ur saying they own the software?
> Pineo: "they do indeeed"
> Meraban:  "i thought you said they are renting it until they come up with 2M lump sum"
> Meraban: "and then they own it and meantime they are renting it"
> Pineo: "no they don't have to come up with any lump sum, and I don't expect them to. 2M over whatever time period is the price"
> Meraban: "i could have sworn i thought that was the deal"
> Pineo: "not sure, the only lump sum we talked about was they might want to just pay it off to be done with it, but regardless it's the same thing. Definitely never had any rental aspec to it"
> Meraban: "ah they got a great deal for sure"

18.     As shown, I confirmed multiple times that I always understood that Athena was "renting," or licensing, the AML Software until such time that Athena could come up with an additional $2 million to actually purchase it. Even at that point in October 2024, it was unclear to me that Bitom Labs had attempted to sell the AML Software to PSBC/Mirch and not Athena. Moreover, at that time, I was still unsure exactly what had transpired with respect to the Software and maintained that AML had only provided non-exclusive, revocable license rights. Indeed, I continued receiving recurring license payments from Pineo/Bitom Labs for what I maintained were Athena's license payments up through August 2025.

19. However, starting in early September 2025, AML ceased receiving payments for Athena or any other Defendant's use of the AML Software. Thus, any oral license rights that Athena (or any other Defendant) claim to have held to use the AML Software have been terminated, which was formally confirmed by the filing of this lawsuit for copyright infringement. Despite that any purported license rights have now terminated due to lack of payment and that Athena should have ceased any and all use of the AML Software, including any derivative works created from the AML Software, to the best of AML's knowledge, Athena has continued using the AML Software following that termination of the purported license.

20. Separate from the Athena license, AML also previously licensed the AML Software to other third parties. However, starting in September 2025, AML ceased receiving any license payments from those third-party licensees as well. Upon information and belief, Pineo has continued to receive those payments from the third-party licensees but has kept those payments for himself and failed to provide them to AML.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: November 25, 2025.

By: _____
Sonny Meraban