# Exhibit 2

## MASTER SERVICE AGREEMENT

This Master Service Agreement ("Agreement") is made as of this the **Jul 15, 2020** _____ (the "Effective Date"), by and between SilverLogic LLC ("Company") and SandP Solutions, Inc. a/k/a Bitcoin of America ("Client").  While the

The parties agree as follows:

**1. SERVICES PROVIDED BY COMPANY.** Company shall perform the services described in this Agreement and the Schedules attached hereto (collectively, the "Services"). The product of such Services shall be defined as a "Deliverables." This Agreement and the attached Schedules shall be collectively referred to as the "Contract Documents." Company shall be solely responsible for the supervision and direction of the work by its employees and contractors.

    **(a) SERVICES TO BE PROVIDED.** Notwithstanding anything herein to the contrary, the parties agree to utilize the process described in Schedule 1 for the provision of Services. The parties agree that modifications to both the Services provided and the pricing, may occur as necessary.

    **(b) DEVICES.**  Company will use its best efforts to ensure the satisfactory compatibility of the Deliverables when used on the devices, browsers, and operating systems, as such devices and operating systems exist on the date hereof, detailed on Schedule 3 affixed hereto, which is titled the Device Agreement and is to be executed at the same time as this Agreement.  The Company cannot and does not warrant that the Deliverables will function on any other devices, browsers, or operating systems or on future iterations or updates of the devices, browsers, or operating systems listed on the Device Agreement. The parties may enter into one or more Device Agreements. In the event that more than one Device Agreements have been executed, the most recent such Device Agreement will supersede all previous iterations.

**2. WORKING HOURS.** The days and hours for providing the Services, unless otherwise agreed by the parties, will be: 8 hours daily during 9:00 a.m. until 6:00 p.m. eastern time on Monday through Friday of each week, with the exception of public holidays and closures recognized by the Company. The Client may request the Company to provide services outside of the regular work hours, or in addition to the pre-determined amount of time to be dedicated to Clients ongoing projects, which shall be considered a "special work request." The Company may refuse the special work request. If the Company accepts a special work request, the Client shall be liable for any agreed upon increases in price.

**3. PERSONNEL.** Personnel performing Services for Client under this Agreement ("Personnel") shall be employees or contractors of Company and shall not become employees or contractors of Client during the term of this Agreement as a result of performing Services for Client hereunder.

    **(a) NON-SOLICITATION.** During the term of this Agreement and for the twelve (12) months following the later of the acceptance date of the last deliverable or the termination of this Agreement (the "Non-Solicitation Period"), Client will not, whether directly or indirectly, solicit or hire Company employees, independent contractors, or personnel for employment or engagement as an employee, consultant, or independent contractor of Client.

    **(b) LIQUIDATED DAMAGES.** Should Client employ or engage (whether as an employee, consultant or independent contractor) any Company employee during the Non-Solicitation Period, the Client shall pay Company one hundred percent (100%) of such person's first twenty-four (24) months of total compensation as paid by Client.

**4. FEES, EXPENSES & PAYMENT.** For all Services performed under any Contract Document or other request for Services that references this Agreement, Client shall: (i) pay to Company a daily transactions fee ("Fee"), which shall directly correlate with the transaction volume of the Client's ATM, Tablet, and Digital Wallet systems, as well as the Client's website (collectively referred to herein as "Client Systems").  The amount of the Fee due and owing to Company from the transaction volume of each of the Client Systems shall equate to a designated percentage of the total transaction volume of each Company System, as further specified in Schedule 1 attached hereto.  The daily transaction fee due and owing to Company from client for the Services contemplated hereunder, shall consist of a once daily payment in an amount equal to the combined total of the Fee percentages due from each Client System, and shall be automatically withdrawn by Company from a bitcoin wallet specifically designated by Client.  Such daily bitcoin withdrawals shall be made pursuant to the Withdrawal Authorization attached hereto as Schedule 2, and Client hereby acknowledges and agrees that so long as this Agreement remains in effect, Client shall: (i) not revoke Company's authority to initiate bitcoin withdrawals as hereby contemplated; (ii) not change, modify, close or otherwise affect the bitcoin wallet specifically designated for making such bitcoin payments; (iii) ensure that sufficient funds for the Fees due and owing to Company remain in the designated bitcoin wallet at all times in order to prevent failed withdrawal attempts; and (iv) be responsible for all costs, expenses or other fees and charges incurred by Company as a result of any failed or returned withdrawal attempts, whether resulting from insufficient sums being available in the designated bitcoin wallet.

Any and all fees billed in addition to the above referenced daily transaction fees, which may come due and owing to Company as a result of the Services contemplated hereunder, shall be paid within fifteen days of receipt of each invoice. All payments pursuant to this Agreement are non-refundable. Unless Client provides Company with a valid tax exemption or direct pay certificate upon execution of this Agreement, Client is responsible for all taxes, duties, and customs fees which may be assessed on the amounts paid for Services performed hereunder, excluding taxes based on Company's income or payroll. Client shall be afforded a fifteen (15) day grace period on the date upon which any invoice is due. Following the expiration of the grace period, Company reserves the right to invoice Client the lesser of five percent (5%) annual interest or the highest interest rate allowable under applicable laws for any outstanding, undisputed invoice.

**5. CONFIDENTIAL INFORMATION.** As used in this Agreement, the term "Confidential Information" shall mean: (i) any and all information which is disclosed by either party ("Owner") to the other ("Recipient") verbally, electronically, visually, or in a written or other tangible form which is either identified or should be reasonably understood to be confidential or proprietary, including but not limited to documents that preceded this Agreement that were identified or should be reasonably understood to be confidential or proprietary; and (ii) the terms, including without limitation, the pricing, of this Agreement and any proposals or other documents that preceded this Agreement. Confidential Information may include, but not be limited to, trade secrets, computer programs, software, documentation, formulas, data, inventions, techniques, marketing plans, strategies, forecasts, client lists, employee information, financial information, confidential information concerning Owner's business or organization, as Owner has conducted it or as Owner may conduct it in the future. In addition, Confidential Information may include information concerning any of Owner's past, current, or possible future products or methods, including information about Owner's research, development, engineering, purchasing, manufacturing, accounting, marketing, selling, leasing, and/or software (including third party software).

(a) **TREATMENT OF CONFIDENTIAL INFORMATION.** Owner's Confidential Information shall be treated as strictly confidential by Recipient and shall not be disclosed by Recipient to any third party except to those third parties operating under non-disclosure provisions no less restrictive than in this Section 5 and who need access to the Confidential Information to assist in performing the Services. Client shall protect the deliverables resulting from Services with the same degree of care. This Agreement imposes no obligation upon the parties with respect to Confidential Information which either party can establish by legally sufficient evidence: (a) was in the possession of, or was rightfully known by the Recipient without an obligation to maintain its confidentiality prior to receipt from Owner; (b) is or becomes generally known to the public without violation of this Agreement; (c) is obtained by

**WE MAKE IDEAS HAPPEN**

Recipient in good faith from a third party having the right to disclose it without an obligation of confidentiality; (d) is independently developed by Recipient without the participation of individuals who have had access to the Confidential Information; or (e) is required to be disclosed by court order or process of law (including subpoenas), provided notice is promptly given to the Owner and provided further that diligent efforts are undertaken to limit disclosure to the extent possible. The Recipient shall not obtain, by virtue of this Agreement, any rights, title, or interest in any Confidential Information of the Owner.

**6. OWNERSHIP.** The Deliverables and work product created by Company in providing the Services, including the intellectual property therein (including, without limitation, copyrights, trademarks, trade dress, patents, and trade secrets, whether or not registered, but excluding the Development Tools), shall be assigned to, and subsequently owned exclusively by, the Client, upon full payment of all outstanding fees for the Services. Company hereby grants to Client a worldwide, perpetual, non-exclusive, fully sublicensable license to use the Development Tools within the Deliverables. As used here, the term "Development Tools" means any software, code, algorithm, library, or content of any kind that is utilized in the Deliverables but not created specifically for the Client. Company further releases any and all rights, proprietary and non-proprietary interests, profits, and intellectual property in the deliverables and work product and provides them to Client upon full payment of all outstanding fees for the Services.

**7. PROPER USE OF SERVICES.** The Services will be provided pursuant to Schedule 1, provided that Client is not in breach of any terms thereof, including payment terms. Company reserves the right to terminate Client's access to the Services (as provided for in Section 12(a) of this Agreement) upon any breach of the Contract Documents, including non-payment of any fees. Client will not use the Services in any way which violates (a) any law or regulation, (b) the proprietary or intellectual property rights of any person (c) or the Contract Documents.

**8. REPRESENTATIONS AND WARRANTIES.** Each party represents warrants that it has the right and power to enter into this Agreement and an authorized representative has executed this Agreement. Company warrants that the Services will be performed in a professional and workmanlike manner in accordance with recognized industry standards. The parties agree that no specific result is assured or guaranteed. Company expressly disclaims all other representation or warranties, whether express, implied, or statutory (by any territory or jurisdiction) to the extent permitted by law, and further Company expressly excludes any warranty of non-infringement, title, fitness for a particular purpose, or merchantability to the extent permitted by law.

**9. LIMITATION OF LIABILITY.** Company's maximum liability for any action arising under this Agreement, regardless of the form of action and whether in tort or contract, shall be limited to the amount of fees paid by the Client for the Services from which the claim arose. In no event shall Company be liable for indirect, special, incidental, or consequential damages of any kind, including without limitation, lost data or lost profits, however arising, even if Client has been advised of the possibility of such damages. The parties agree that this allocation of risk is fair and appropriate.  Due to the fact that Company is not the original developer of the Client's website, and the same has been altered by multiple parties prior to Company's access to and monitoring of the website, Client hereby acknowledges and agrees that Company shall not be liable to Client or to any third-party for any direct, indirect, incidental, special, consequential, exemplary, or punitive damages, including but not limited to, damages for loss of profits, goodwill, use, data, or other intangible losses, even if the Company has been advised of the possibility of such damages or such damages were reasonably foreseeable, resulting from any hacks or infiltrations of the Client's website's systems, the use or the inability to use the Client's website, unauthorized access to or alteration of Client's transmissions or data through the website, and/or any other matter relating to the Clients website.

**10. INDEMNIFICATION.** Client agrees to indemnify, defend, and hold harmless the Company from and against any and all claims, liabilities, losses, or actions brought against or incurred by Company as a result of (i) Client's use of the Services or (ii) any third party's interaction with Client. Company agrees to indemnify, defend, and hold harmless the Client from and against any and all claims, liabilities, losses, or actions brought against or incurred by Client as a result of any claim for infringement of intellectual

property arising from the Services.

**11. NOTICE.** All notices or other communications referenced under this Agreement shall be made in writing and sent to the address specified in this Agreement, designated in the Blueprint, or designated from time to time in writing by the parties. All notices shall be deemed given to the other party if delivered receipt confirmed using one of the following methods: registered or certified first class mail, postage prepaid; recognized courier delivery; or electronic mail.

**12. TERMINATION.** This Agreement will terminate upon completion of the Services (as provided for in Schedule 1) unless earlier terminated in accordance with sections 12(a), 12(b), or 12(c) below.

> **(a) TERMINATION FOR CAUSE.** Either party may terminate the Contract Documents by written notice, effective immediately, if the other party fails to cure any material breach of any Contract Document within ten (10) days after receiving a written notice from the non-breaching party detailing the alleged material breach.

> **(b) TERMINATION FOR INSOLVENCY OR BANKRUPTCY.** Either party may immediately terminate the Contract Documents by giving written notice to the other party in the event of (i) the liquidation or insolvency of the other party, (ii) the appointment of a receiver or similar officer for the other party, (iii) an assignment by the other party for the benefit of all or substantially all of its creditors, or (iv) entry by the other party into an agreement for the composition, extension, or readjustment of all or substantially all of its obligations.

> **(c) TERMINATION FOR CONVENIENCE.** Client may terminate this Agreement for convenience at any time upon the provision of a 60-day written notice to Company, along with the payment of a termination penalty, the amount which shall vary based upon how much of the term has been completed. In the event that this Agreement is terminated during year 1 of the term, the Client shall be liable to Company for a termination penalty in the amount of $200,000.00 USD. In the event that this Agreement is terminated during year 2 of the term, the Client shall be liable to Company for a termination penalty in the amount of $100,000.00 USD. In the event that this Agreement is terminated during year 3 of the term, or at any point in the term beyond year 3, the Client shall be liable to Company for a termination penalty in the amount of $50,000.00 USD. The termination penalty shall be paid to Company as follows: 30% of the entire penalty amount shall become due and owing to Company immediately, and any balance thereof which remains unpaid, shall be paid to Company upon the completion of the hand-off period. The hand-off period, as used herein shall be defined as the relinquishing of access to any and all repositories, servers, and any further services or credentials remaining in Company's possession.

> **(d) TERMINATION UPON MUTUAL AGREEMENT.** This Agreement may be terminated at any time by mutual consent of the parties hereto, provided that such consent to terminate is in writing and is signed by each of the parties herein

> **(e) RIGHTS UPON TERMINATION.** Upon the termination of this Agreement, each party shall promptly return to the other all data, materials and other properties of the other held by it. Upon termination, Client will be obligated to pay any fee owed for any Services performed pursuant to and in accordance with this Agreement up to the effective date of termination.

**13. ASSIGNMENT UPON TRANSFER.** The provisions of this Agreement shall be binding on and shall inure to the benefit of the Client and any successor in interest to the Client who acquires all or substantially all of the Client's assets or the Client's proprietary software. In the event that Client desires to sell, assign, or otherwise transfer in its entirety, or a majority controlling equity interest in SandP Solutions, Inc. a/k/a Bitcoin of America or any proprietary software used by and which is necessary for Client to perform its daily functions and revenue generating operations, Client shall be required to receive a contractual guarantee from the purchaser that said purchaser shall acquire, receive such assignment of, and honor the then current terms of this Agreement with SilverLogic, LLC,

unless Client has received a express written waiver from Company, waiving Client's obligation to comply with this provision.

14. **WAIVER.** No modification to this Agreement nor any failure or delay in enforcing any term, exercising any option, or requiring performance shall be binding or construed as a waiver unless agreed to in writing by both parties.

15. **FORCE MAJEURE.** Except for Client's obligation to pay Company, neither party shall be liable for any failure to perform its obligations under the Contract Documents if prevented from doing so by a cause or causes beyond its control, including without limitation, acts of God or public enemy, failure of suppliers to perform, fire, floods, storms, pandemic, earthquakes, riots, strikes, war, and restraints of government.

16. **SEPARATE AGREEMENTS.** All Services provided herein are acquired separately from any software licenses agreed to between the parties. Specifically, Client may acquire software licenses without acquiring consulting Services. Client understands and agrees that this is a separate and independent contractual obligation from any schedule relating to software licenses. Client shall not withhold payments that are due and payable under this Agreement because of the status of any software licenses or schedules, nor shall Client withhold payments that are due and payable relating to software licenses or schedules because of the status of work performed hereunder. In addition, the ability to provide such Services are not exclusive or specific to Company and are commercially available from a variety of third-party service providers.

17. **CHOICE OF LAW; FORUM.** The Contract Documents and shall be governed, construed, and enforced exclusively in accordance with the laws of the state of Florida. Any dispute arising under this Agreement, or related to the subject matter of the Contract Documents referencing this Agreement, shall be brought exclusively in the state and federal courts located in Palm Beach County, Florida, and the parties hereto waive any objection to personal jurisdiction or forum non-conveniens therein.

18. **CLIENT TESTIMONIALS.** If Client provides Company with a testimonial (whether now or in the future), then Client hereby grants to Company the right and permission to use, reuse, publish, and republish Client's statements and comments made by Client, in whole or in part, without prior review, in all formats of the work and any derivative works, including without limitation electronic works and including for the purposes of sale, trade, promotion, or advertising. Client also acknowledges that any material and information provided by Client is provided without present or future remuneration from Company. Client warrants that the accounts told, written or furnished by Client are original and do not violate any copyright, personal, or proprietary right. Client confirms that none of the information disclosed was acquired as a result of a confidential relationship or is treated as a trade secret. Client releases Company from any and all claims, demands, or causes of action that Client might assert in connection with the above use or uses by Client.

19. **SURVIVAL.** Sections 3, 5, 6, 9, 10, 17, and 18 of this Agreement shall survive termination.

20. **ELECTRONIC COUNTERPARTS.** This Agreement may be executed in electronic counterparts with the same effect as if each party has signed the same document.

**21. COMPLETE AGREEMENT.** The Contract Documents constitute the entire understanding between the parties with respect to the subject matter herein and may only be amended or modified by a writing signed by a duly authorized representative of each party. The Contract Documents replace and supersede any prior verbal or written understandings, communications, and representations between the parties regarding the subject matter contained herein.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

**CLIENT**

sonny meraban (Jul 15, 2020 16:56 EDT)

Sonny Meraban
CEO
sonny@bitcoinofamerica.org
Date:

**COMPANY**

David Hartmann (Jul 15, 2020 16:57 EDT)

David Hartmann
CEO
dh@tsl.io
Date:

**SCHEDULE 1**

**SERVICE SPECIFICS AND STATEMENTS OF WORK**

**1.** Following the execution of the Contract Documents, the Company will begin performing support services, and will load "stories," representing individual features of the project on to the TSL Dashboard or other services to be performed ("Services") for Client (the "Loading Phase"). Each story will be considered a statement of work arising under the Contract Documents.

**2. Services To Be Performed.**   The Services to be performed by Company shall include, but may not be limited to the following and may be subject to the following lists specified below:

> **a.   Transaction Processing and Development Services.**   Company will be responsible for providing remote maintenance and support of the systems necessary for Client to process transactions through Client's various instruments of operation (i.e. ATMs, Tablets, Digital Wallets, and Website).   Company will provide feature implementation and development services as may be reasonably requested by Client, pending Company's approval, which may be withheld in Company's sole discretion.

> **b. Pending Approvals.** Company will begin working on stories on the Pending Approvals list once such stories have been approved by either Client or Company.

> **c. Pending Review.** Each story will be added to the Pending Review list upon completion of the story. Each party will have access to the Pending Review list and may sign off on stories included thereon. Client will review each story added to the Completed List within fourteen days of its addition to the Pending Review list, unless a particular story thereon has already been signed off by Company. With respect to any stories which have not yet been signed off by Company, Client must contact Company within fourteen days to request changes to any story listed as "Pending Review." The parties will work in good faith to make such changes. If Client does not click "Sign-Off" or contact the Client's appropriate Personnel contact person within fourteen days of a story being listed as "Pending Review," it will be deemed signed-off. .

**3. Scope and Anticipated Production Load.**   The anticipated amount of time, effort, and work afforded to the Services contemplated hereunder, to be dedicated and performed by Company on behalf of the Client, shall be that which results from the provision of Company's reasonable best efforts in performing such Services specified hereunder.   The amount of time dedicated and work to be provided by Company on a monthly basis may be subject to fluctuation in direct correlation with the Client's transaction volume during any given specified time period.   In months with lower work volume, Client may also request assistance with the implementation of features or development of new products, within reason, so long as such implementation or development would not impede Company's ability to perform the recurring Services contemplated hereunder..   In the event that Client wishes to increase the workload being provided by Company on Client's projects beyond that of the anticipated monthly workload, via a special work request, whether due to a significant increase in work volume, due to the implementation of new products or features, or for any other reason in Client's discretion, Client shall inform Company of its desire to increase said workload beyond that of the then-current, reasonable monthly workload, and Company shall provide Client with an estimated price range of an hourly rate to be paid in addition to the daily transaction fee, as compensation for the increased workload.   The estimate provided shall be subject to Client's approval, but no amount of work which materially exceeds that of the anticipated and reasonable monthly workload will be initiated by Company, until an agreed upon additional billing rate is reached by and between both parties hereto. The estimated price range for any additional work will not be exceeded without the Client's consent. The additional compensation due for Services completed beyond that of the anticipated monthly workload, shall be billed to the

**WE MAKE IDEAS HAPPEN**

751 Park of Commerce Dr. • Suite 126 • Boca Raton, FL 33487 • +1-561-569-2366 • tsl.io **Confidential**

Client via invoice. Client agrees to pay the additional invoiced amounts provided that they are within the estimated price range or approved by Client.

In the event that, in addition to the maintenance and implementation of features as the Company's reasonable best efforts may permit, Client wishes for Company to perform a re-write of Client's website in Python, the transaction volume percentages of the daily transaction fees for the "Site," as specified in the table shown in Section 4 below, shall be increased from a transaction volume percentage of 0.20% to 0.30%, upon Company's agreement to perform said re-write on Client's behalf.

**4. Daily Transaction Fees.** The daily transaction fees to be debited from Client's Designated Bitcoin Wallet on a daily basis for the Services contemplated hereunder, shall be paid out pursuant to the following percentages of the daily transaction volume of each of the following Client Systems, which shall change at certain maturity points of this Agreement, as specified in the table below:

| Timeline Estimate | Year 1 | Year 2-5 |
|---|---|---|
| ATM | 0.40% | 0.30% |
| Tablets | 0.70% | 0.55% |
| Wallet | 0.05% | 0.04% |
| Site | 0.20% | 0.20% |

**5. Term Length, Contingency, and Tolling Initiation.** This Agreement shall take effect upon the Effective Date listed above, and remain in existence for a period of five (5) years, and shall automatically renew for a subsequent five (5) year term, unless the same is terminated by either party pursuant to the Termination Section of the Agreement to which this Schedule 1 is affixed, or unless notice is provided to Company by Client of its desire for the Agreement to expire upon the five (5) year anniversary of the Effective Date, no less than six (6) months prior to expiration of the five (5) year term. This Agreement may also be terminated by Client after four (4) years from the Effective date, upon the provision of no less than twelve (12) months' notice of the same to Company, prior to the expiration of the four (4) year term.

The table displayed above, under Section 4 of this Schedule 1, shows the specific transaction volume percentages payable to Company, and details the predetermined change in those transaction volume percentages as the Agreement matures, which is set to occur between Year 1 and Year 2 of the term of this Agreement. This Agreement shall become legally binding as of the Effective Date cited in the Agreement to which this Schedule 1 is affixed, and the Services shall initiate on the Effective Date, at the transaction volume percentage rates cited above for Year 1. However, for purposes of the change in the transaction volume percentages with respect to the tablets, the initiation of Year 1 of the term of this Agreement shall be tolled until Client rolls out a minimum of an additional fifty (50) Tablets from the number of Tablets Client has currently active and in use as of the Effective Date of this Agreement. Company may void the tolling and trigger the initiation of Year 1 of the term of this Agreement with respect to the tablets at any time, within its sole discretion. As such, the transaction volume percentage rates specified above for Years 2-5 for the tablets shall not begin until one (1) year from the Client tablet rollout listed above taking place, or until one (1) year from the date that Company triggers the initiation of Year 1 of the term of this Agreement.

**6. Approvals.** When Company is providing additional work or special work requests for the Client, which shall be billed separately, as specified above, the Client will be emailed a daily digest of items added, approved, and signed-off (provided that no email will be sent if there are no items added, approved, or signed-off). If Client does not dispute the authenticity of the daily digest items within 24-hours, they will be deemed final. Additionally, Company has the right to reasonably approve the implementation of certain features to Client's Systems without approval from Client, in the event that Company determines in its

expert opinion, that the implantation of such features is necessary, or will be greatly beneficial to Client or Client's systems.

**7. Authorization.**  The Client agrees that the following representatives are authorized to bind the Client: Sonny Meraban - CEO

## SCHEDULE 2

### WITHDRAWAL AUTHORIZATION

Effective Date:   **Jul 15, 2020**

Through Client's consent and agreement with the terms included herein, Client hereby authorizes Company to electronically debit and credit any bitcoin wallet which Client designates ("Designated Bitcoin Wallet") to be used in conjunction with payment of the daily transaction fees which shall come due and owing to Company for Services provided, and, when applicable, to correct or reimburse any erroneous debits and credits from or to the Designated Bitcoin Wallet, pursuant to the following terms:

    a)   Debits Frequency: Debits may be made multiple times per calendar day

Client hereby agrees and also acknowledges that the amount and frequency of the any debits and/or credits may vary on a day-by-day basis, and that Client hereby consents and agrees to waive its right to the receipt of prior notice of the date and amount of each debit and/or credit to hit the Designated Bitcoin Wallet.

Through Client's consent and agreement with the terms included herein, Client hereby authorizes Company to electronically debit Client's Designated Bitcoin Wallet (and, if ever applicable, to electronically credit Clients bitcoin wallet to correct erroneous debits) pursuant to the following terms:

    a)   Types of Applicable Debits: Daily Transaction Fees
    b)   Frequency of Applicable Debits: Once Daily

Client hereby acknowledges and agrees that this electronic authorization fully and sufficiently represents Client's written authorization for such bitcoin withdrawal transactions as provided herein and that such authorization shall remain in full force and effect until Client provides Company with notice that Client wishes to revoke said authorization.   Client may effectively revoke such authorization by sending its request to the following email: admin@tsl.io.   Client shall notify Company of its desire to revoke said authorization, at least three business days prior the date of the scheduled debit of any bitcoin withdrawal transaction set to hit the Designated Bitcoin Wallet. In the event that Company does not receive such notice prior to the requisite three business days before the scheduled debit date, Company may, in its sole discretion, attempt to cancel the scheduled charge or transaction. However, Company is under no obligation to do so, and hereby disclaims any and all liability or responsibility for any losses resulting from Company's failure to do so. In the event that Client revokes its electronic authorization provided herein, Company shall refrain from initiating any further bitcoin withdrawals, and will begin invoicing any further applicable charges for such Services. Please be aware that the revocation of Clients electronic authorization contained herein shall not apply to any bitcoin withdrawals or transactions which occur prior to the effective revocation of such authorization, and in no way shall Client's revocation of the electronic authorization affect Client's obligation to pay any amounts due and owing to Company.

**WE MAKE IDEAS HAPPEN**

**SCHEDULE 3**

**DEVICE AGREEMENT**

This Device Agreement is entered into by and between SilverLogic LLC ("Company") and the below client (the "Client") as of the date listed below. This Device Agreement is incorporated into that certain Master Service Agreement entered into by and between the Company and the Client (the "MSA"). Capitalized but undefined terms used herein shall have the meanings ascribed thereto in the MSA. The parties agree as follows:

Company will use its best efforts to ensure the satisfactory compatibility of the Deliverables when used on the devices, browsers, and operating systems, as such devices and operating systems exist on the date hereof, listed below.  The Company cannot and does not warrant that the Deliverables will function on any other devices, browsers, or operating systems or on future iterations or updates of the devices, browsers, or operating systems listed below.

| Device | Operating System | Browser | Notes |
|---|---|---|---|
| Desktop or Laptop (3840x2160, 2560x1440, 1920x1080, 1440x900, 1366x768) | Windows 10 Mac Catalina | Chrome 79, 80 Firefox 73, 74 | web platform |
| Desktop or Laptop (3840x2160, 2560x1440, 1920x1080, 1440x900, 1366x768) | Windows 10 Mac Catalina | Firefox 73, 74 | web platform |
| Desktop or Laptop (3840x2160, 2560x1440, 1920x1080, 1440x900, 1366x768) | Mac Catalina | Safari 12, 13 | web platform |
| iPad (1024x1366 (logical), 768x1024 (logical)) | iOS 12, iOS 13 iPadOS 13 | Safari 12, 13 | web platform |
| Desktop or Laptop (3840x2160, 2560x1440, 1920x1080, 1440x900, 1366x768) | Windows 10 | Edge 79, 80 | web platform |
| iPhone 11 Pro, iPhone 11, iPhone XS, iPhone X, iPhone 8 | iOS 12 iOS 13 | Safari 12, 13 Chrome 79, 80 | web platform |
| Samsung S10, Google Pixel 4, OnePlus 7T | Android 9 Android 10 | Chrome 79, 80 | web platform |
|  |  |  |  |

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the last date written below.

| Signature | Name | Title | Date | Email |
|---|---|---|---|---|
| _sonny meraban (Jul 15, 2020 16:56 EDT)_ | sonny meraban | pres. | 07/15/20 | sonny@bitcoinofamerica.org |
| _David Hartmann (Jul 15, 2020 16:57 EDT)_ | David Hartmann | CEO | 07/15/20 | dh+sign@tsl.io |

**WE MAKE IDEAS HAPPEN**

# TSL - BTCOA - Master Service Agreement - v2

Final Audit Report                                                2020-07-15

| | |
|---|---|
| Created: | 2020-07-14 |
| By: | David Hartmann (dh+sign@tsl.io) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAGRQK2WEFrpqriqccVCkb2zcqEGL_0xWH |

## "TSL - BTCOA - Master Service Agreement - v2" History

📄 Document created by David Hartmann (dh+sign@tsl.io)
2020-07-14 - 1:33:08 AM GMT- IP address: 167.88.91.25

📧 Document emailed to sonny meraban (sonny@bitcoinofamerica.org) for signature
2020-07-14 - 1:35:54 AM GMT

📄 Email viewed by sonny meraban (sonny@bitcoinofamerica.org)
2020-07-14 - 1:53:14 AM GMT- IP address: 107.77.207.208

📄 Email viewed by sonny meraban (sonny@bitcoinofamerica.org)
2020-07-15 - 8:55:48 PM GMT- IP address: 12.233.15.2

✍ Document e-signed by sonny meraban (sonny@bitcoinofamerica.org)
Signature Date: 2020-07-15 - 8:56:41 PM GMT - Time Source: server- IP address: 12.233.15.2

📧 Document emailed to David Hartmann (dh+sign@tsl.io) for signature
2020-07-15 - 8:56:43 PM GMT

📄 Email viewed by David Hartmann (dh+sign@tsl.io)
2020-07-15 - 8:56:55 PM GMT- IP address: 66.102.8.113

✍ Document e-signed by David Hartmann (dh+sign@tsl.io)
Signature Date: 2020-07-15 - 8:57:12 PM GMT - Time Source: server- IP address: 172.58.14.236

✅ Signed document emailed to David Hartmann (dh+sign@tsl.io), Samantha Miller (hr@bitcoinofamerica.org), sonny meraban (sonny@bitcoinofamerica.org), and wsuriano@sbcglobal.net
2020-07-15 - 8:57:12 PM GMT

Adobe Sign