**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Action No.: 1:25-cv-24378-RAR**

AML SOFTWARE, INC., an Illinois
corporation,

               Plaintiff,

v.

ATHENA BITCOIN, INC., d/b/a
ATHENA BITCOIN GLOBAL, a Delaware
corporation, PSBC, LLC, a Delaware
limited liability company, and JORDAN MIRCH, an individual,
BITOM LABS INC., a Canadian Corporation,
and RYAN PINEO, an individual,

               Defendants.

_____/

## PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

1

Plaintiff, AML SOFTWARE, INC. ("AML" or "Plaintiff"), hereby moves for entry of a preliminary injunction against Defendants, ATHENA BITCOIN, INC. d/b/a ATHENA BITCOIN GLOBAL ("Athena"), PSBC, LLC ("PSBC"), JORDAN MIRCH ("Mirch"), BITOM LABS INC. ("Bitom Labs"), and RYAN PINEO ("Pineo") (collectively "Defendants"), and in support states:

## I.      SUMMARY OF RELIEF SOUGHT

AML respectfully requests that the Court enter preliminary injunctive relief (a) declaring that Defendants do not own title or intellectual property rights in the AML Software and/or in any purported modified version of the AML Software (*i.e.*, the purported PSBC Code); (b) enjoining Defendants from using, copying, modifying, conveying, transferring, licensing, sub-licensing and/or otherwise exploiting the AML Software (including the purported PSBC Code) because any license rights have now terminated; and (c) ordering Defendant Pineo to account for all payments and revenues received by Pineo, or by any entity owned or controlled by Pineo, for the licensing/sublicensing of the AML Software (or any derivatives thereof), and ordering Pineo to turn over to AML its 50% share of said revenues. Without such preliminary injunctive relief, AML will continue to suffer irreparable harm.

## II.     INTRODUCTION

AML owns valuable and proprietary software and computer source code used with Bitcoin ATMs ("AML Code" or "AML Software"), along with all copyrights and other intellectual property rights in and to its AML Software. AML has licensed use of its AML Software to multiple third parties on a non-exclusive, non-transferrable basis either via direct licenses or sublicenses through Defendant Bitom Labs. AML consented to the same non-exclusive, non-transferrable (sub)-license for Defendant Athena to use the AML Software. However, rather than simply use the AML Software as authorized, Defendants engaged in a fraudulent scheme to attempt to acquire title to the AML Software and associated intellectual property and made millions of dollars in a matter of days based on the fraudulent sale. According to Defendants, PSBC (not Athena) received a sublicense to the AML Software from Bitom Labs, modified the Code, and then sold title to the modified version (alleged "PSBC Code") to Athena for triple the price just days later – despite neither Bitom Labs nor PSBC having any authority to create derivatives of the AML Software or authority to sell the AML Software. Defendants have not presented any evidence that PSBC actually modified the AML Code at all and indisputably did not do so in a matter of days. Thus, PSBC clearly just transferred a replica of the AML Code to Athena under the illusory contention

that it was a modified version that PSBC claimed to own. Regardless, AML has not entered into any written agreement transferring title or intellectual property rights in the AML Software (or any derivatives thereof) to any Defendant, and Defendants cannot circumvent the strict writing requirements of the Copyright Act by claiming that PSBC received license rights in the AML Code that it purportedly could modify to convert to legal title and sell to Athena – modified or not. Defendants hold no ownership rights in the AML Code or purported PSBC Code.

Moreover, Defendants ceased making the license payments to AML that even Defendants admit Defendants were required to make. Defendants also exceeded the scope of the license. Thus, AML terminated those license rights. Yet Defendants continue to use the AML Code. Finally, Pineo has also withheld all payments received from all of AML's other licensees – AML's sole revenue – clearly in an effort to cripple AML. AML is entitled to preliminary injunctive relief.

**III.   FACTUAL BACKGROUND**

**A.   Factual Allegations.**

**1.   The AML Software.**

AML developed and owns original, proprietary computer source code for use with Bitcoin ATMs. *Sonny Meraban ("Meraban") Declaration*, ¶ 4, attached as **Exhibit "1"** (*see also* DE 49-1).[1] AML and its predecessor in interest, S&P, have been using AML's Code on software installed on Bitcoin ATMs for several years. *Id*. AML acquired legal title and associated intellectual property to the original version of the AML Software on March 10, 2021 via a "Software Transfer Agreement," and then continued to develop that code. *Id*.

On September 9, 2025, AML was issued U.S. Copyright Registration TXu 2-507-802 ("'802 Registration") titled "AML Software Code." *Id.*; DE 6-1. AML is the owner and holder of the '802 Registration and owns all rights, title, and interest in and to AML's Code. *Id.* AML has not conveyed the AML Code or intellectual property associated therewith to any third parties. *Id.*

**2.   The Scheme to Acquire Ownership of AML's Software.**

**a.   AML's Consent to an Oral, Non-Exclusive License to Athena.**

Starting in or about 2023, AML began licensing the AML Software to third parties on a non-exclusive, non-transferrable basis, similar to licenses for any common business software such as Microsoft Word or Adobe PDF. *Id.* at ¶ 5. AML had invested at least $2.5 million in the AML

---

[1] Meraban is the principal of AML and Trustee of the Trust that is the sole shareholder of AML.

3

Software, in addition to the years of development it took to build the Code, and needed to make revenue. *Id.* The license payments were based on ATM sales by the licensee (generally 1% of sales per industry standard) – a "rent to own" where the licensee would make monthly payments based on ATM sales until the licensee could eventually come up with a lump sum to buy a "copy" (*i.e.*, a fully paid-up license). *Id.*, ¶¶ 6-8. Pineo (AML's code developer) and Meraban referred informally to the sale of software licenses as the "sale of a copy," similar to a consumer purchasing a license to use any common business software such as Microsoft Word or Adobe PDF. *Id.*, ¶ 5.[2] Meraban and Pineo always discussed either (1) a lump sum payment by a licensee for a fully paid-up license for multi-million dollars ("sale of a copy" of a software license, similar to a license to business software such as Microsoft Word); or (2) "renting" or "leasing" a copy for monthly payments based on ATM transaction sales (1%) that would be month to month. *Id.*, ¶¶ 5-6. They also referred to renting/leasing as a "rent to own" arrangement, because the licensee had the option to make monthly payments based on ATM transaction sales until the licensee could eventually come up with a lump sum to buy a "copy" (*i.e.*, a fully paid-up license). *Id.*, ¶ 6. As noted by Pineo, most third-parties could not "afford one outright" (lump sum) but wanted to rent to own to "have that option [to buy a fully-paid up license] down the line." *Id.*, ¶ 6.

The licenses were always only for use of a "copy" of the AML Software for use on a single licensee/operator's Bitcoin ATM machines. *Id.*, ¶ 7. Each separate licensee/operator was required to have a separate license with separate monthly payments. *Id.* Sublicenses were strictly prohibited (except from Bitom Labs to third parties as explained below). *Id.* This was to prevent a single licensee from cutting out AML and profiting off of the Software by sublicensing the Software to unlimited third parties. *Id.* Per the arrangement between AML and Pineo, AML split the license payments with Pineo. *Id.* at ¶ 8.

One potential licensee that Pineo and Meraban discussed in 2023 was Athena. *Id.* at ¶ 9. Despite initial efforts, Pineo was unable to license the AML Software to Athena in 2023. However,

---

[2] Licenses are often referred to as purchases where the purchase is of a limited license. For example, no one would argue that someone who purchases a copy or download of Microsoft Word could make derivative works and modify it as a they saw fit for resell.  However, a "sale of a copy" of the Code for a third-party to use the Code is substantially different than a third-party actually acquiring legal title/ownership to the Code, in which case AML would no longer hold ownership interests and could not license the Software to other third-parties – which is what the Bitom-PSBC and PSBC-Athena Agreements attempt to provide for here.

on or about June 14, 2024, Pineo informed Meraban that he was able to license the AML Software to Athena. *Id.* at ¶ 10. According to Pineo, the license arrangement was the same as other licensees – *i.e.*, a non-exclusive, non-transferable, single license for monthly payments based on ATM sales. *Id.* On that same day, Meraban stated to Pineo in a message that he "Would love to get 5 more of these deals. Even if they dont buy it and just pay is good. thats 75k a month." *Id.* at ¶ 10. (DE 21-6). Pineo responded, "Yup that's the goal." *Id.* This clearly confirmed a "rent to own" with an option to purchase a fully-paid up license in the future. *Id.*[3] Indeed, the license payments that AML began receiving from Athena were based on ATM transaction sales and varied each payment. *Id.*

While some of AML licenses were directly with certain third parties, according to Pineo's Second Affidavit provided in this case, AML provided a non-exclusive license to Pineo's company, Bitom Labs, in 2023, and then Bitom Labs "sub-licensed the software to multiple Bitcoin operators" including PSBC/Athena. (DE 38-1, ¶¶ 3, 8). Pineo and Meraban expressly discussed the scope of the license from AML to Bitom Labs in their messages. For example, they discussed as follows:

7-5-2024:     SM: No idea I'm good with just what we got for now let's keep this going we gave each other our word.
SM: 1 – we split everything 50/50%
SM: 2 – any income minus any expense then 5050 split until sold and then 5050 split after sold on sale amount your company has with each operator only and it's meant for that operator exclusively only and no other.
SM: 3 – **the software sold is exclusively to be used by the operator your company contracted with only and not to be resold by any operator** or your company **unless theres a new payment split of 5050 same as above**. and your company is only acting as a middle man only for that operator if needed or aml would be the seller. Either way is ok as long as is 5050 split. **Any other operator who we sell the software to would be the same thing would apply where 50/50 split would incure with aml and your company until sold then we split all proceeds of sale 50/50**. It's never meant for a one time sale to ur company and then can be resold as many time. **Basically with every new operator that brings in new income that needs to be split with AML.** Or AML, which is handled by Ryan can do the splitting and pay your company. The spirit is any new company. Any new sales get split between me and you.

---

[3] Meraban's express statement that Athena was to make payments per month (based on ATM sales) "[e]ven if they don't buy it and just pay" – was a reference to the rent-to-own arrangement where Athena had the ability in the future to eventually pay for a fully-paid up license. Pineo **confirmed** that was the deal. *Meraban Dec.*, ¶¶ 10.

(DE 38-1, pp. 40-41) (emphasis added). While this particular written message was in July 2024, this was the same agreement that AML and Bitom Labs had in place since 2023, as confirmed in the message: "let's keep this going we gave each other our word." *Id.* Of course, Bitom Labs could not sublicense rights that Bitom Labs had not acquired from AML.

>            b.            **Bitom Labs/PSBC "Consulting Agreement."**

AML did not enter into any written agreement with Athena or any Defendants. *Meraban Dec.*, at ¶ 13. The single sublicense provided to Athena was oral. *Id.* However, Defendants maintain that the license was actually to PSBC (Mirch's company) and not Athena. Defendants contend that the purported license rights to PSBC, which according to Defendants included the right to create a modified/derivative version of the AML Software, derive from an agreement that Bitom Labs entered into with PSBC – a "**Consulting Agreement,**" entered into on June 1, 2024 (the "Bitom-PSBC Agreement"), attached as **Exhibit "2."** Despite Defendants' mischaracterization of it as a license agreement, it was not a license agreement. Indeed, a license of the AML Software is not mentioned a single time in that Agreement. In fact, the AML Software is not mentioned anywhere in that Agreement. Rather, per that Agreement, Bitom Labs was to provide services in the form of "Development of Bitcoin ATM software platform" in exchange for payments based on ATM transaction sales up to $2 million. *Id.* The development schedule in the Consulting Agreement called for Bitom Labs to deliver the *developed* Bitcoin ATM software platform to PSBC on or by June 10, 2024, only nine days after the Effective Date. *Id.*

Clearly, and as acknowledged by Defendants, the "Development of Bitcoin ATM software platform" referred to delivery of the AML Code and not the development of a new software platform because development of a brand-new platform could not have been completed in 9 days (to recreate/develop the AML Code would take months or even years). *Meraban Dec.*, at ¶ 22. Defendants try to reconcile that language by claiming that it was intended for Bitom Labs to use the AML Software to create a modified version of the Software. But the timing is illogical, AML did not provide Bitom Labs license rights to modify and/or create derivative version of the AML Code, and Bitom Labs did not "develop" any software for PSBC – it just forked over AML's Code.

The Bitom-PSBC Agreement provided that the software platform ("Work Product"), including "all patents, copyrights, trademarks (together with the goodwill symbolized thereby), trade secrets, know- how, and other confidential or proprietary information, and other intellectual property rights" would be owned by PSBC. (DE 6-2, § 5.1). In other words, the Agreement

6

expressly provides that PSBC was to obtain ownership of title to the AML Software (modified or not), along with all intellectual property.

c.  **PSBC-Athena "Development Services Agreement."**

Simultaneous with the PSBC-Bitom arrangement, PSBC and Mirch had set up a separate arrangement with Athena to immediately sell and transfer the AML Software to Athena. Specifically, Athena and PSBC entered into a written "Development Services Agreement" on June 19, 2024 ("Athena-PSBC Agreement"), attached as **Exhibit "3."** Per that Agreement, Athena agreed to pay PSBC $5.5 million for "Development of a Bitcoin ATM software platform," the same exact language used in the PSBC-Bitom Agreement, but for nearly triple the price exacted for the same software just a few days earlier, and the "software platform" was to be delivered by June 18, 2024, just days after PSBC received the software platform from Bitom Labs. *Id.* Additionally, just like the PSBC-Bitom Consulting Agreement, the Athena-PSBC Agreement purportedly transferred ownership of the software platform and associated intellectual property to Athena. Specifically, it provided that "[e]ffective immediately upon execution of this Agreement," "[PSBC] hereby irrevocably transfer, conveys and assigns to [Athena] without reservation and in perpetuity **all right, title and interest** in the New Technology, **including Intellectual Property Rights** to such New Technology in all countries." (DE 6-3, § 3.1) (emphasis added).

In other words, rather than Bitom Labs merely providing a sublicense to PSBC or Athena for a single operator to use the AML Software as was authorized, Defendants entered into the devious series of transactions from Bitom Labs to PSBC to Athena as a covert attempt to transfer ownership of the AML Software – ultimately to Athena.[4]

This is further confirmed by a more recent Release and Termination Agreement entered into by Athena, PSBC and other parties on September 4, 2025, which references the Athena-PSCB Agreement and provides that "ownership of the New Technology and all associated Intellectual Property Rights has transferred to Athena" and "the Source Code (as defined in the Development Agreement) has been released and transferred to Athena as required therein including under Section 5.2 of the Development Agreement." That agreement is attached as **Exhibit "4."**

---

[4] While Meraban was aware (<u>after the fact</u>) that Mirch was a middleman, he did not know that Mirch planned to try to sell the AML Software and associated intellectual property rights for $5.5 million days later. *Meraban Dec.*, ¶ 12.

Defendants contend that PSBC received a license from AML to exploit the AML Software, and then PSBC used the AML Software to create a modified "PSBC Source Code" that PSBC was then able to sell to Athena. But PSBC never acquired title in the AML Code in the first place. Even if PSBC received a valid license from AML, PSBC was not legally able to convert that license into ownership rights by simply claiming that it modified the AML Code and then sold the modified version without authorization.  To be clear, Defendants have provided no evidence that the AML code was even modified at all by PSBC at that time, and it is abundantly clear based on the expedited timing of the transactions that Athena merely received an exact replica of the AML Code (or only with the slightest modifications), especially considering that the AML Code took years to get to its current state in June 2024. *Meraban Dec.*, ¶ 22. Indeed, Defendants' argument now in this lawsuit that PSBC transferred the purported PSBC Code to Athena further demonstrates their motive of circumventing the Copyright Act and acquiring ownership of AML's Software. Regardless, license rights did not magically convert to a conveyance of ownership and, even though the license provided was non-transferable, at best, Athena's license rights were limited to the scope of license rights that PSBC purportedly obtained. And PSBC's license rights would be limited by the license rights that Bitom Labs had received from AML.

Of course, if this were truly an arms-length transaction as Defendants argue, Pineo and Mirch would have simply executed an actual license agreement, not a "Consulting Agreement" between Bitom Labs and PSBC and then a subsequent transfer agreement with Athena. But the highly suspect timing and pattern of dealings between Bitom Labs, PSBC and Athena make it abundantly clear that no one was "developing a Bitcoin ATM software platform" – they were just handing over the AML Software, first for $2 million and then for $5.5 million a few days later.

As previously discussed, transfer of the AML Software to Athena also violated the scope of license rights provided to Bitom Labs, as AML was supposed to receive 50% of any license fees received from any new operator.  AML did not receive 50% of the $5.5 million, which was paid just days after the license to PSBC. Again, this clearly demonstrates Defendants' goal of thwarting AML from receiving revenue it was entitled to.

Subsequently, *after* the concealed transactions at issue between Pineo, PSBC and Athena had already occurred, Pineo informed Meraban that he had used Mirch as a middleman, which initially made sense because Pineo was previously unsuccessful licensing to Athena directly. *Id.*, ¶ 11. And, Pineo had expressly confirmed in his message that it was Athena licensing the AML

Software. *Meraban Dec.*, ¶¶ 11-12. Pineo even stated that Athena had "the same contract," or equal monthly payment amounts. Regardless, the license was for a single licensee and the fact that Mirch was a middle-man for payment was of no relevance to Meraban (provided that AML received its full agreed upon 50%, which it did not). *Id.*

### 3.       AML's Discovery of Defendants' Scheme and Termination of the License.

In October 2024, Meraban first caught wind of Defendants' scheme, though he did not fully understand the ramifications. *Meraban Dec.*, ¶ 15. Pineo informed him, months after the subject transactions, that Athena (or PSBC) only intended to make capped monthly payments up until the total reached $2 million and then would "own the software." As they had always discussed sales in terms of license sales and Meraban had previously informed Pineo that he would not sell ownership of the AML Software, it was unclear to Meraban whether Pineo was indicating that Athena would have a fully paid-up license at that point in time or whether Athena would own title outright. *Id.* Both were incorrect. If he was referring to a fully paid-up license, that was not the rent to own arrangement based on ATM sales that AML had agreed to with Bitom Labs (or any of AML's other licensees). *Id.* Indeed, Meraban responded "i thought you said they are renting it until they come up with 2M lump sum . . . and then they own it and meantime they are renting it." *Id.* While Meraban did allow Pineo to license the AML Software to third parties through Bitom Labs, Pineo only had the ability to license rights that were provided to Bitom Labs. In other words, PSBC could not have acquired from Bitom Labs what Bitom Labs had not acquired from AML. And those license rights were the same as provided to all licensees (as confirmed by the messages) - non-exclusive, non-transferable and for either monthly payments based on ATM sales or a lump sum for a fully paid-up license. *Id.* This was neither.

On the other hand, if Pineo was referring to ownership of title and intellectual property rights outright, that also would have been incorrect, especially considering that AML never conveyed title or IP rights in the AML Software to any party in the first place. *Id.* Again, a "sale of a copy" of the Code is substantially different than a third-party actually acquiring legal title/ownership to the Code. Meraban later learned that the written agreements between Bitom Labs Inc., PSBC, and Athena purported to convey title and IP rights. *Id.* Regardless, Meraban was in shock and was unsure exactly how to respond or proceed. *Id.* Meraban, in no way, intended for the informal WhatsApp messages to be some form of confirmation of Pineo's actions. *Id.* However, on that same day, Pineo made it crystal clear that PSBC or Athena (whichever party received the

9

proper license) <u>could not resell/license the Software</u> (modified or not), despite Defendants' contention that PSBC acquired rights in the AML Software to sell to Athena. DE 38-1, p. 45; *Meraban Dec.*, ¶ 16.

Despite Meraban's confusion at the time as to what exactly transpired, AML continued receiving recurring license payments from Athena (or PSBC) up through August 2025. *Id.* at ¶ 17. However, starting in early September 2025, AML ceased receiving payments for Athena's (or PSBC's) use of the AML Software. *Id.* at ¶ 19. Thus, AML terminated any oral license rights that Athena (or PSBC) held to use the AML Software by the filing of this lawsuit for copyright infringement. *Id.* Moreover, to alleviate any doubt, AML also sent Defendants a termination letter on December 26, 2025 confirming termination effective September 23, 2025 and formally terminating any purported license rights that still existed as of that date, if any. *See* **Exhibit "5."** However, despite that any and all purported license rights have now terminated and that Defendants should have ceased any and all use of the AML Software (including derivative works created from the Software), to the best of AML's knowledge, Athena has continued using the AML Software (or unauthorized derivatives) following termination of the purported license. *Id.*

Even according to Defendants, as of September 2025, PSBC still owed AML $200,000 for what Defendants contend was going to be a fully paid-up license. However, AML never received that $200,000. Moreover, under Defendants' theory that license payments were capped, AML should have actually received 50% of the $5.5 million paid by Athena, which it did not receive. Thus, even accepting all of Defendants' arguments and contentions as true, Defendants failed to pay the full amount due according to even what Defendants claim was supposed to be paid. AML filed this lawsuit later that month in September 2025.

### 4.    Pineo's Failure to Provide AML Any License Payments.

In addition to Athena/PSBC failing to pay AML for license payments owed even according to Defendants, starting in September 2025, Pineo also stopped providing AML payments received from all of AML's other licensees as well. *Id.* at ¶ 21. Thus, AML is no longer receiving license payments from any of its licensees, which is its only source of revenue. *Id.* Pineo has also intentionally withheld information concerning the identity of the other licensees. Defendants' efforts to block AML from receiving revenue is clearly intended to cripple AML. Pineo should be required to make an accounting of who the licensees are and the amounts received by him or his company, and should be required to turn over to AML its 50% share of the licensing revenues.

#### IV.      PROCEDURAL HISTORY

Defendants ceased making license payments to AML, including license payments received from third parties, in September 2025. AML then filed this action on September 23, 2025.  On November 26, 2025, AML filed its initial Motion for Preliminary Injunction (DE 21). However, because Pineo and Bitom Labs are located in Canada and had not yet been served with the Complaint when AML filed the initial Motion, on December 2, 2025, the Court denied that initial Motion without prejudice as premature, and with leave to refile (DE 22). Defendants then served their Motion for Sanctions under Rule 11 on AML on December 5, 2025, which AML responded to on December 26, 2025.  On December 22, 2025, Defendants filed their Motion to Dismiss (DE 27) and then proceeded to file their Motion for Sanctions on January 7, 2026 (DE 38).  AML was forced to respond to both Motions.  This Renewed Motion seeking preliminary injunction follows.

#### V.      MEMORANDUM OF LAW

**A.      Legal Standard.**

To obtain a preliminary injunction, AML must demonstrate a (1) substantial likelihood of success on the merits; (2) that AML would be irreparably harmed if injunctive relief were denied; (3) that the threatened injury to AML outweighs whatever damage the injunction may cause to the Defendants; and (4) that the injunction, if issued, would not be adverse to the public interest. *See Davidoff & CIE, S.A. v. PLD Intern. Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001).

**B.      AML Demonstrates a Substantial Likelihood of Success on the Merits.**

**1.      Declaration that AML owns the AML Software and Any Modified Versions.**

It is well settled under the Copyright Act that any transfer of ownership of copyright must be in writing. *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 751 (11th Cir. 1997); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010). Specifically, the Copyright Act provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Exclusive licenses fall under the requirement that they must be in writing to be enforceable. *Jacob Maxwell*, 110 F.3d at 751. "The chief purpose of section 204(a), (like the Statute of Frauds), is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995); *see also Nealy*

11

*v. Atlantic Recording Corp.,* 2021 WL 2280025, at \*5 (S.D. Fla. June 4, 2021) (Section 204(a) "protect[s] copyright owners from persons mistakenly or fraudulently claiming that a copyright was transferred orally") (citations omitted); *Gordon v. Lee*, 2007 WL 1450403, \*11 (N.D. Ga. May 14, 2007) (finding that defendants' argument that they held ownership rights in home designs failed because neither of the copyright owners executed a written document transferring ownership and, thus, "a valid transfer of copyright ownership never took place").

Here, it is undisputed that there was no agreement in writing between AML and any of the Defendants conveying title and/or intellectual property rights in the AML Software. Thus, any such attempted sale and conveyance to PSBC was legally impermissible, ineffective and inconsequential and did not convey rights in the Code. Similarly, PSBC did not have legal title to transfer ownership of any rights to Athena, regardless of whether the AML Code was modified by PSBC or Pineo.  The fact that there is no written agreement by AML conveying rights is conclusive and irrefutable evidence that AML is still the true and correct owner of AML Software and all copyrights associated therewith.[5]

As to the purported PSBC Code, one of 'the exclusive rights of a copyright owner' is 'to prepare and to authorize others to prepare 'derivative works based upon the copyrighted work.'" *Peter Letterese And Associates, Inc. v. World Inst. Of Scientology Enterprises*, 533 F.3d 1287, 1297, n.9 (11th Cir. 2008) (*quoting* 17 U.S.C. § 106(2)). "'[P]rotection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.'" *Latimer*, 601 F.3d at 1233-34 (quoting 17 U.S.C. § 103(a)) (there is no protection if a work is a "derivative work[] made without the [the owner's] authorization"). Indeed, if the underlying work in a defendant's derivative work is protected by copyright, "*he is a copyright infringer*, because in order to create his work he has copied the underlying work." *Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548, 563 (3d Cir. 2002).

Here, AML retains the exclusive right to prepare derivative versions of its AML Software. While Defendants contend now in this lawsuit that PSBC received a license right to modify the AML Software and acquire ownership of the modified version, there is no written document

---

[5] While Defendants argue in other briefs that they do not claim ownership of the AML Software, the Bitom-PSBC Agreement and PSBC-Athena Agreement expressly provide for a conveyance of title of the AML Code and all associated intellectual property. Moreover, Defendants expressly claim ownership of the purported PSBC Code, yet there is no evidence that the purported PSBC Code is anything more than a mere copy or replica of the AML Code.

supporting such contention as would be required by the Copyright Act to convey ownership rights. Also, AML did not provide any Defendant the right to modify and/or create derivative works from the AML Code, let alone acquire ownership of a modified version, including Bitom Labs. Indeed, there is ample evidence demonstrating the limitations on the license rights that AML provided Bitom Labs, including as set forth in the messages between Meraban and Pineo. (*See* DE 49, p. 14). For example, Meraban and Pineo discussed their prior agreement going back to 2023 that the AML Software "is exclusively to be used by the operator your company [Bitom Labs] contracted with only and not to be resold by any operator or your company unless theres a new payment split of 5050 same as above" and "Basically with every new operator that brings in new income that needs to be split with AML." *Id.* In other words, those communications make clear that the license rights provided to Bitom Labs were limited to use of the AML Software by single operators per sub-license. Neither Bitom Labs, nor any sub-licensee/operator, were permitted to re-sell the AML Software or otherwise exploit the Software. Those limitations directly contradict Defendants' contentions that Bitom Labs had the authority to provide PSBC license rights to modify the AML Software, create derivative versions of the Software, and then sell the modified versions. Thus, Bitom Labs never acquired any right to modify the AML Code and could not transfer rights it did not have to PSBC through a sublicense.

Indeed, Defendants contend that Pineo had unlimited authority to act on behalf of AML and provide any party in the world – including PSBC – unlimited rights to do whatever those third parties want with the AML Software (at any cost or for free). But such contention blatantly ignores logic, as well as the communications between Pineo and Meraban where they expressly discussed the scope of Pineo/Bitom Lab's authority to sublicense the AML Software, as well as the terms and scope of the permitted licenses/sublicenses. Regardless, the oral license at issue here was between Bitom Labs and PSBC, not AML and PSBC, according to Pineo's own testimony in his Affidavit (DE 38-1). Thus, Pineo was acting on behalf of Bitom Labs, not AML, and Pineo/Bitom only had authority to provide sublicense rights to PSBC that Bitom Labs had acquired from AML.[6]

---

[6] Moreover, Pineo cannot claim that he had apparent authority to provide unlimited license rights from AML to Bitom Labs. Pineo's authority derived from Meraban as the owner of AML and to whom Pineo reported, and Meraban acted fully on behalf of AML when dealing with Bitom Labs, which was controlled by Pineo, so that Pineo could not self-deal. As discussed, the communications between Meraban and Pineo expressly confirm that Meraban negotiated all rights on behalf of AML with respect to Bitom Labs, as well as the scope of the license rights.

Moreover, even assuming *arguendo* that Defendants could establish PSBC had properly obtained a license right to modify the AML Code (which it did not), there is no evidence that the purported PSBC Code is even modified from the AML Code.  In fact, as discussed above, based on the timing of the subject agreements and transactions between Bitom Labs, PSBC and Athena, it would have been impossible for PSBC to modify the AML Code in a matter of days. Thus, Defendants' claim that PSBC acquired license rights to modify the AML Code, modified it, and then took ownership of that modified version is nothing more than an illusion to steal ownership of the AML Code.

Regardless of whether the AML Code has been modified by Defendants or not, AML owns the exclusive right to modify and creative derivative versions of its Code and AML did not provide any Defendant authorization to do so. It is entirely irrelevant what Defendants now claim they thought they received from Bitom Labs – they were only entitled to receive license rights that Bitom Labs possessed, which were limited to simple use of the AML Software and nothing more. PSBC did not acquire any right to modify and/or make derivative versions of the AML Software, let alone the right to resell the AML Software or modified version for nearly triple the price just days after receiving license rights.  AML is entitled to injunctive relief declaring that it owns its AML Code and any purported derivative/modified versions (including the purported PSBC Code).

### 2. Copyright Infringement.

To state a claim for copyright infringement, a plaintiff must allege "(1) ownership of a valid copyright, and (2) copying of the constituent elements of the work that are original." *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996). Here, AML demonstrates a substantial likelihood of success on both elements.

### a. AML Owns the Copyrights in the AML Code.

"'[C]ertificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.'" *Latimer*, 601 F.3d at 1233 (*quoting* 17 U.S.C. § 410(c)). "Once the plaintiff produces a certificate of registration, the burden shifts to the defendant to establish that 'the work in which copyright is claimed is unprotectable (for lack of originality).'" *Id.*

Here, AML is the owner of the '802 Registration titled AML Software Code. AML also established the chain of title from original creation of the AML Code and that AML is the true and correct owner of the AML Code and all rights associated with that Code. Moreover, the AML

Code has not been published and, thus, the registration was made before or within five years of publication of the work. *Meraban Dec.*, ¶ 7.  As a result, AML has asserted prima facie evidence of its ownership and of the validity of its copyrights in the AML Code and satisfied this prong.

### b.      Defendants Copied the AML Code.

To satisfy the second prong, "a plaintiff must establish, as a factual matter, that the alleged infringer actually copied plaintiff's copyrighted material." *Latimer*, 601 F.3d at 1233. "Proof of copying may be shown either by direct evidence of the copying or, in the absence of such evidence, '[c]opying as a factual matter typically may be inferred from proof of access to the copyrighted work and 'probative similarity.'" *Bateman*, 79 F.3d at 1541.  Moreover, as explained above, there is no protection if a work is a "derivative work[] made without the [the owner's] authorization." *Latimer*, 601 F.3d at 1233-34 (quoting 17 U.S.C. § 103(a)). Indeed, if the underlying work in a defendant's derivative work is protected by copyright, "***he is a copyright infringer***, because in order to create his work he has copied the underlying work." *Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548, 563 (3d Cir. 2002) (emphasis added).

Here, it is undisputed that Defendants received a direct copy of the AML Code from Pineo according to his Verification. *See* DE-21-7, ¶¶ 3-5. In other words, Pineo provided Defendants a specific, line by line copy of the AML Code. According to Defendants, they then used that line by line AML Code to create a derivative/modified code (though there is no evidence that Defendants modified it at all). *Id.* at ¶ 10.  Thus, this is not a case where proof of access and/or probative similarity needs to be shown. Rather, there is no dispute that Defendants received a copy of the AML Code and are using it freely, along with unauthorized derivative copies. Both use of the AML Code and any derivatives created from that AML Code constitute infringement, and if Defendants' license defense fails, AML satisfies this element.

### c.      Non-Exclusive License Rights.

Defendants' sole defense to copyright infringement is that PSBC received a license for use of the AML Software and that such license was irrevocable. AML disagrees that the license was irrevocable because, among other things, AML agreed to a license for use in exchange for monthly payments based on ATM sales – directly in line with its other non-exclusive licensee arrangements. Defendants' reliance on the Bitom-PSBC Consulting Agreement for its contention that the license was irrevocable fails because, as discussed above, that was not a license agreement and it did not even mention or reference a license of the AML Software anywhere in the agreement (or reference

15

payment for a license). Regardless, even accepting Defendants' contention that the license was previously irrevocable, Defendants are still liable for infringement because that license became revocable for lack of payment as explained below.

### i. The License Terminated Due to Athena Ceasing Payments.

Any conveyance of copyright, including an exclusive license, must be in writing. *Jacob Maxwell*, 110 F.3d at 751. AML undisputedly did not provide an exclusive license in writing to any of the Defendants. Moreover, Defendants concede that any license rights were non-exclusive. Thus, only non-exclusive rights are at issue here.

A non-exclusive license to use copyrighted material may be granted orally or implied from conduct. *Jacob Maxwell*, 110 F.3d at 751. "The difference between an exclusive and a non-exclusive license in copyright is akin to the difference between a fee simple and an easement on real property." *Fodere v. Lorenzo*, 2011 WL 465468 (S.D. Fla. Feb. 4, 2011). "An exclusive license is a conveyance of copyright ownership, "a promise that the same rights will not be conveyed to others." *Id.* (citing 6 William F. Patry, *Patry on Copyright* § 21:15 (2010)). On the other hand, a nonexclusive license is "a bare right to use the licensed intellectual property without any right to exclude others, including other licensees of the grantor." *Id*

A non-exclusive license that is not supported by consideration is revocable. *Fokiss, Inc. v. TLM Global, LLC*, 2025 WL 353923 *6 (S.D. Fla. Jan. 31, 2025); *see also Vergara Hermosilla v. The Coca-Cola Co.*, 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010); *Odom v. Navarro*, 2010 WL 11505459 *4 (S.D. Fla. March 11, 2010) (finding nonexclusive license was terminated for nonpayment because non-exclusive "licenses are terminable at will, and a party make [sic] revoke or rescind" such a license upon a breach). Moreover, a revocable license is "revoked by the filing of a lawsuit." *Vergara*, 717 F. Supp. 2d at 1303 (citations omitted).

Even where consideration is provided, "'a material breach of the parties' oral understanding may entitle the licensor to revoke its permission for future use of the copyrighted materials.'" *Fokiss, Inc.*, 2025 WL 353923 at *6; *see also HH Advertising, Inc. v. Unique Vacations, Inc.*, 2025 WL 2027556 *17 (S.D. Fla. July 21, 2025) (a licensee's material breach entitles the licensor to revoke the license). Once a license is revoked/terminated, "'the copyright proprietor may hold his former grantee liable as an infringer for *subsequent* use of the work.'" *Jacob Maxwell*, 110 F.3d at 753 (*citing* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.15[A], at 10–125–126).

Here, AML authorized a single, non-transferrable license to one of the Defendants to use the AML Software in exchange for monthly payments based on ATM transaction fees – *i.e.*, a month to month license or rent to own – similar to all of AML's other licensees.[7] Thus, monthly payments by Athena (or PSBC) to AML were a condition precedent for the continued non-exclusive license to use the AML Code. Indeed, payments to AML were based on ATM transaction sales and varied monthly. Thus, when Defendants ceased making payments in September 2025, Defendants' right to use the AML Code also ceased.

Moreover, even accepting Defendants' contentions that the total license payments were capped at $2,000,000 and that the license was irrevocable, Defendants have failed to pay the full amount owed even according to them. Thus, the license became revocable based on material breach and entitled AML to revoke permission for future use of the copyrighted Code. The revocable license was revoked by the filing of this lawsuit against Defendants for copyright infringement. *Vergara*, 717 F. Supp. 2d at 1303 (finding that the "license was unequivocally revoked the moment the present lawsuit was filed"). However, to alleviate any doubt, AML also sent Defendants a termination letter on December 26, 2025 confirming termination effective September 23, 2025 and formally terminating any purported license rights that still existed, if any. Once the license was revoked and terminated, all subsequent use of the AML Code (including derivatives made from the Code), constitutes copyright infringement.

### ii. Additionally, Athena Exceeded the Scope of the License.

"Because a nonexclusive license does not transfer *ownership* of the copyright, the licensor can bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license" because such use beyond the scope constitutes copyright infringement. *Roskovensky v. Sanibel Captiva Island Vacation Rentals, LLC*, 2024 WL 1140893 * 5 (M.D. Fla. March 15, 2024) (*citing Latimer*, 601 F.3d at 1235) (emphasis in original); *see also Hoeltzell v. Caldera Graphics*, 2012 WL 13012954 *4 (S.D. Fla. June 11, 2012).

Here, even before AML terminated any of Defendants' license rights, Defendants exceeded the scope of the license. AML only provided a single Defendant the nontransferable right to use

---

[7] To clarify, Bitom Labs could have provided separate, non-transferrable licenses to multiple defendants for use of the Software if each defendant paid separately for those licenses, per the agreement between AML and Bitom Labs and the scope of license rights that Bitom Labs received from AML. In no case could Bitom Labs have conveyed ownership or a right to modify the Code.

the AML Code in connection with Bitcoin ATMs.  AML did not provide that single licensee a right to reproduce the Code, distribute it or use the Code to create derivative works from the Code. However, even according to Defendants, PSBC used the AML Code to create a modified "PSBC Code," and then sold that alleged modified AML Code, including intellectual property rights, to Athena a few days later for triple the amount that PSBC allegedly was supposed to pay AML (but has not paid that full amount). Defendants' use of the AML Code to allegedly create a new derivative code, as well as further conveyance of the AML Code, was unauthorized, improper and exceeded the scope of the license right provided to the single Defendant. Such unauthorized use beyond the scope of the non-exclusive license constitutes copyright infringement.

Thus, AML is substantially likely to prevail on its copyright infringement claim.

### 3. Breach of Fiduciary Duty Claim against Pineo.

To state a claim for breach of fiduciary duty, a plaintiff must allege: "1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *OPS Int'l., Inc. v. Ekeanyanwu*, 672 F. Supp. 3d 1228, 1237 (M.D. Fla. 2023). A breach occurs when the defendant "'engages in a transaction which tends to bring his personal interest into conflict with his obligations as a fiduciary agent,'" especially when "'the agent derives profits form [sic] transactions which operate directly to the prejudice of his master's business.'" *Id.* at 1238. Indeed, "[i]t has long been settled that embezzlement is precisely the kind of misconduct that typifies an employee's breach of fiduciary duty." *Id.*

In their Motion to Dismiss, Defendants acknowledged that Pineo owed fiduciary duties to AML. Pineo breached those duties by, at a very minimum, failing to provide AML payments received from other licensees and withholding those license payments for himself. That withholding of AML's payments in itself is sufficient to establish a breach of fiduciary duty, as Pineo is "deriv[ing] profits [from] transactions which operate directly to the prejudice of [AML's] business." Notably, despite all of Defendants' briefs already filed in this case, they have not denied that Pineo has withheld payments from AML received from other licenses – indeed it is undisputed that he has done so. AML has been damaged in the form of those lost license payments. AML is substantially likely to proceed on its breach of fiduciary duty claim against Pineo.

### C. Plaintiff Will Suffer Irreparable Injury if a Preliminary Injunction is Not Entered.

AML has invested at least $2.5 million in the AML Software, in addition to the years of development it took to build the Code. Developing a similar code would take months or even years

18

to develop, which is demonstrated by the fact that Defendants have attempted to hijack AML's Software to allegedly create derivative versions rather than just create their own. Defendants maintain that they have acquired ownership and intellectual property rights in a "modified" version of the AML Software (though it is not clear whether they have modified it all and if so, how much). That means that Defendants could sell or distribute the AML Software (or slightly modified version) to an infinite amount of third-parties to which AML has no control. If the AML Software were sold to multiple third parties, it would not only drastically diminish the value of the proprietary Code, which could not be measured in monetary damages, but those third parties would also be able to use the AML Software how they choose. Improper or inappropriate use of AML's Software by third parties could harm AML's reputation, and those third parties could continue to alter and change the Code, creating numerous derivative versions. Damages for such use could not be measured monetarily and, thus, AML will suffer irreparable harm.

Moreover, "'courts have recognized irreparable harm where the movant faces a risk of reputational damage and negative publicity based on improper use of intellectual property' that was difficult to quantify." *Fokiss, Inc.*, 2025 WL 353923 *8 (S.D. Fla. Jan. 31, 2025) (citations omitted).  At a very minimum, Defendants' use of the AML Sofware is harming AML's reputation. On or about September 8, 2025, the Attorney General separately sued Athena for financially exploiting district residents by charging undisclosed fees on deposits that Athena knows are the result of scams. *See* https://oag.dc.gov/release/attorney-general-schwalb-sues-crypto-atm-operator. The mere fact that Athena is using the AML Software in connection with such egregious allegations certainly stands to harm AML's reputation and cause it negative publicity. Thus, irreparable harm is clear here.

AML will also continue to suffer irreparable harm by Pineo withholding all license payments from AML, which is AML's sole source of revenue. While financial harm does not ordinary constitute irreparable harm, it can constitute irreparable harm when the financial harm deprives the plaintiff of its sole source of revenue.  *Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, 2008 WL 11432138, *2 (D. Conn. Aug. 1, 2008) ("this type of injury would constitute more than just financial harm, and be nearly impossible to rectify").

Pineo's withholding of all license payments from AML is clearly intended to cripple AML, as AML has not received any revenue since September 2025. AML will eventually become insolvent if Pineo is permitted to continue withholding all license payments from AML during the

court of this litigation. Indeed, this type of injury is more than just financial harm but rather will be nearly impossible to rectify and constitutes irreparable harm.[8]

**D.      The Threatened Injury Outweighs Any Harm an Injunction Would Inflict on Defendants.**

As noted, AML has expended substantial time, money and other resources to develop the AML Software. Should Defendants be allowed to continue to improperly claim ownership rights in a purported modified version of the Code, as well as continue to use the AML Software without even paying the license fees that Defendants acknowledge were owed, AML will suffer irreparable losses as discussed.  On the other hand, Defendants have no ownership rights in the AML Software or modified versions and all license rights have terminated. Thus, being prevented from exercising ownership rights in something that Defendants do not actually own, and preventing Defendants from modifying, selling, transferring, or licensing the software when they admittedly ceased making payments, can cause them no harm.  Thus, the scales of justice weigh substantially in AML's favor.

**E.      The Relief Sought Serves the Public Interest.**

Among other things, "the public interest is served by preventing consumer confusion in the marketplace." *Davidoff*, 263 F.3d at 1304. Here, Defendants are using the AML Code or infringing derivative versions of that Code, which may cause consumer confusion as to ownership rights in the Code. Moreover, Defendants engaged in a scheme to attempt to pilfer AML's Code, and the public has a clear interest in preventing theft of valuable intellectual property and other assets. Thus, this element is clearly satisfied.

**F.      AML Requests a Minimal Bond.**

The posting of security upon issuance of a preliminary injunction is vested in the Court's sound discretion.  Fed. R. Civ. P. 65(c); *Carillion Importers, Ltd. v. Franke Pesce Int'l Group, ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997). Here, Defendants engaged in an elaborate scheme in an attempt to pilfer AML's valuable and proprietary code and made millions of dollars doing so in a matter of days. AML did not convey rights in the AML Code, including any right to create a

---

[8] Further, if Pineo and Bitom Labs are permitted during the entirety of this case to expend licensing revenues that should have been paid to AML, then such revenues will likely be unrecoverable and Pineo and Bitom Labs will not have the means to pay damages assessed against them, leaving AML irreparably harmed.

modified or derivative version, and Defendants' license rights have now terminated for failing to pay the license payments that even Defendants contend were owed. Thus, Defendants would suffer no harm by entry of an injunction. Therefore, AML requests that the Court exercise its discretion to require a minimal bond.

## VI.    CONCLUSION

WHEREFORE, Plaintiff, AML SOFTWARE, INC., respectfully requests that the Court grant this Motion and enter preliminary injunctive relief against Defendants, ATHENA BITCOIN, INC. d/b/a ATHENA BITCOIN GLOBAL, PSBC, LLC, JORDAN MIRCH, BITOM LABS, INC. and RYAN PINEO, as follows:

A.    Declaring that Defendants do not own or hold title or intellectual property rights in the AML Software and/or in any purported modified version of the AML Software (*i.e.*, the purported PSBC Code);

B.    Enjoining and restraining Defendants and their respective officers, employees, and agents, and all persons or entities in active concert or participation with Defendants from using, copying, conveying, transferring, modifying, distributing, selling, licensing, sublicensing, and/or otherwise exploiting the AML Software, or derivative versions of the AML Software (*i.e.*, the purported PSBC Code), and/or otherwise from infringing AML's copyrights in the AML Software;

C.    Ordering Pineo to account for all payments and revenues received by Pineo, or by any entity owned or controlled by Pineo, for the sale or licensing/sublicensing of the AML Software (or any derivatives thereof) and ordering Pineo to turn over AML's 50% share of said license fees received from third-parties to AML; and

D.    For such other and further relief the Court deems just and proper.

Dated: February 27, 2026         Respectfully submitted,

By:  /s/ Joshua D. Martin
Joshua D. Martin
Florida Bar No. 028100
josh.martin@johnsonmartinlaw.com
Perry S. Clegg (*Pro Hac Vice*)
perry.clegg@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd., Suite 430
Fort Lauderdale, Florida  33309
Telephone:  (954) 790-6699
Facsimile:  (954) 206-0017

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this document has been filed through the Court's CM ECF electronic filing system this 27th day of February, 2026.

/s/ Joshua D. Martin
Joshua D. Martin, Esq.