# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Action No.: 1:25-cv-24378-RAR**

AML SOFTWARE, INC., an Illinois
corporation,

                Plaintiff,

v.

ATHENA BITCOIN, INC., d/b/a
ATHENA BITCOIN GLOBAL, a Delaware
corporation, PSBC, LLC, a Delaware
limited liability company, and JORDAN MIRCH, an individual,
BITOM LABS INC., a Canadian Corporation,
and RYAN PINEO, an individual,

                Defendants.

_____/

**DECLARATION OF SONNY MERABAN**

I, Sonny Meraban, hereby declare and state:

1.      I am over the age of 21 and am otherwise *sui juris*.

2.      I have personal knowledge of the matters set forth herein.

3.      I am the Trustee of the Trust that owns AML Software, Inc. ("AML"), as well as the principal of AML. I am authorized to act on behalf of AML.

4.      AML developed and owns original, proprietary computer source code for use with Bitcoin ATMs (the "AML Software" or "AML Code"). AML acquired the original version of the AML Software and associated intellectual property from a related entity, SandP Solutions, LLC, on March 10, 2021 and continued to develop the code into its current form by its code developer, Ryan Pineo ("Pineo"). AML is the owner and holder of U.S. Copyright Registration TXu 2-507-802 for the AML Software including all rights, title, and interest in and to the AML Software. AML

1

has not transferred or conveyed the AML Software, whether in writing or otherwise, to any third parties.

5.　　In 2023, Pineo and I understood the value of AML's Software for use in Bitcoin ATMs and discussed licensing the AML Software to as many third parties as possible on a non-exclusive, non-transferable basis. Pineo resides in Canada, and we primarily communicated through WhatsApp Messages. As can be seen from our WhatsApp Messages, we referred to the sale of software licenses as the "sale of a copy," similar to a consumer purchasing a license to use any common business software such as Microsoft Word or Adobe PDF. AML had invested at least $2.5 million in the AML Software, in addition to the years of development, so AML sought financial returns on its investment in the AML Software to begin generating revenue from the Software.

6.　　In my communications with Pineo regarding payment arrangements for licenses to third parties, we always discussed either (1) a "sale of a copy," which would mean a lump sum payment by a licensee for a fully paid-up license for multi-million dollars or (2) "renting" or "leasing" a copy for monthly payments based on ATM transaction sales that would be month to month. We also referred to renting/leasing as a "rent to own" arrangement because the licensee had the option to make monthly payments based on ATM transaction sales until the licensee could eventually come up with a lump sum to buy a copy (*i.e.*, a fully paid-up license).  The standard amount for monthly rental/license payments in the industry was 1% of ATM sales.

7.　　Pineo and I always discussed that each license offered would be non-exclusive and non-transferable.  The licenses, whether for the sale of a copy or monthly payments (renting), were always only for use of a single "copy" of the AML Software per licensee/operator. Each separate licensee/operator was required to have a separate license with separate monthly payments.

2

Sublicenses were strictly prohibited.  This was to prevent a single licensee from gaining access to the AML Software and diverting license fees from third parties for their own profit – *i.e.*, from sublicensing third parties in need of Bitcoin ATM software and collecting the 1% of ATM sales from those third parties for themselves. Additionally, licensees did not have authorization to alter the AML Code or make derivative versions from the Code. This is all similar to a consumer purchasing a license to business software such as Microsoft Word or Adobe PDF. Each consumer needs a license and does not have authorization to make and sell derivative versions.

8.      As seen in the messages, Pineo had difficulty finding licensees that could afford multi-million dollars as a lump sum, so "rent" or "rent to own" based on ATM transaction sales was the best arrangement for all of AML's licensees. Eventually, Pineo was successful in securing several licensees for AML – all based on the standard monthly payments of approximately 1% of ATM sales.  Because Pineo was the one seeking and finding licensees, AML agreed to split license fees with Pineo. Generally speaking, Pineo would collect license fees from each licensee and send 50% of those license fees to AML.

9.      One potential licensee that Pineo and I discussed in 2023 was Athena Bitcoin, Inc. ("Athena"). I expected that Athena's ATM sales would be larger than other licensees, meaning the monthly license payments would be higher to AML. Pineo tried providing demos to Athena but was unsuccessful in licensing the AML Software to Athena at that time.

10.      However, on or about June 14, 2024, I learned from Pineo that he was able to license the AML Software to Athena. According to Pineo, the license arrangement was the same as other licensees – a non-exclusive, non-transferable, single license for monthly payments based on ATM sales.  In fact, on June 14, 2024, right after Pineo informed me of the license, I stated in our WhatsApp messages: "Would love to get 5 more of these deals. **Even if they dont buy it and just**

3

**pay is good. thats 75k a month**.” (emphasis added). Pineo responded to me: “**Yup that's the goal**.” (emphasis added). This clearly confirmed that Athena's oral license was a rent to own license with monthly payments based on ATM sales with an option to purchase a fully paid-up license in the future, similar to all of AML's other licensees. Indeed, the license payments that AML began receiving from Athena were based on ATM transaction sales and varied each payment.

11.     Subsequently, Pineo informed me that his arrangement was not actually with Athena directly, but rather with Jordan Mirch. According to Pineo, Mirch was merely a middleman (“sitting in the middle” was Pineo's wording) and that Mirch had the same arrangement with Athena (*i.e.*, same payment amount). Considering that Pineo was previously unsuccessful licensing the AML Software to Athena, it made sense that there was a middleman.

12.     To be clear, I have a history with Jordan Mirch involving other litigation against Mirch and his entities. Mirch and I are not on good terms. However, I was able to accept Mirch simply as a middleman, and Pineo expressly confirmed in the messages that it was Athena licensing the AML Software from AML. Mirch being a middleman did not impact Athena's single, non-exclusive, non-transferrable license. Moreover, it was never expressed to me that Mirch's entity, PSBC, LLC (“PSBC”) would have any type of license and/or that PSBC would purportedly attempt to acquire ownership interests in the AML Software or a modified version of the Software. Pineo did provide me a copy of an agreement between Bitom Labs Inc. (“Bitom Labs”) and PSBC at some point, but that was a Consulting Agreement, did not mention any type of license of the AML Software, and I understood it to mean that Pineo was merely providing separate consulting/development services to PSBC. I also did not know that PSBC would attempt to sell the AML Software and associated intellectual property for $5.5 million.

4

13.     There is not and has never been any written contract entered into between AML and Athena concerning the AML Software. There is not and has never been any written contract entered into between AML and PSBC.  The single non-transferrable license to Athena was an oral license.

14.     Also, AML did not sign any document conveying title to the AML Software or conveying any intellectual property rights in the AML Software to any third parties, including to any Defendants. AML did not ever authorize the sale of the AML Software (its primary asset) or the intellectual property associated with the AML Software. In fact, in January 2025, Pineo asked in messages if he could purchase the AML Software outright. I told him that "I don't want to sell it" and "I would never sell it."  That has always been the case.

15.     In October 2024, I first caught wind of Defendants' scheme, though I did not fully understand the ramifications. Pineo informed me that Athena (or PSBC) only intended to make payments up until the total reached $2 million and then would "own the software." As we had always discussed sales in terms of license sales and I had previously informed Pineo that I would not sell ownership of the AML Software, it was unclear to me what Pineo meant. I am not an attorney, and it was unclear whether Pineo was indicating that Athena would allegedly have a fully paid-up license at that point in time or whether Athena would own title to the AML Software outright.  Both were incorrect.  If he was referring to a fully paid-up license, that was not the rent to own arrangement based on ATM sales that AML had agreed to with Athena (or PSBC) or any of AML's other licensees.  In fact, I responded "i thought you said they are renting it until they come up with 2M lump sum." While I did allow Pineo to license the AML Software to third parties through Bitom Labs, Pineo only had the ability to license rights that were provided to Bitom Labs. And those license rights were the same as provided to all licensees (as confirmed by the messages) - non-exclusive, non-transferable and for either monthly payments based on ATM sales or a lump

5

sum for a fully paid-up license. On the other hand, if Pineo was referring to ownership of title and intellectual property rights outright, that also would have been incorrect, especially considering that AML never conveyed title or IP rights in the AML Software to any party in the first place. A "sale of a copy" of the Code for a third-party to use the Code is substantially different than a third-party actually acquiring legal title/ownership to the Code, in which case AML would no longer hold ownership interests and could not license the Software to other third-parties. I later learned that the written agreements between Bitom Labs Inc., PSBC, and Athena attempted to convey title and intellectual property rights in the AML Software. Regardless, I was in shock of Pineo's messages and was unsure exactly how to respond or proceed. I, in no way, intended for my informal WhatsApp messages to be some form of confirmation or acknowledgment that Pineo was correct.

16.     On that same day, I did ask Pineo if "its only 1 copy to them no one else thou" and "they cant resell a copy I mean." Pineo responded that "they cannot resell. Correct." Thus, that at least gave me some peace of mind that Athena (or PSBC) could not or would not claim ownership rights. However, I subsequently learned that Pineo's written assurances were contradicted by the subject agreements and PSBC and Athena's actions.

17.     Following those messages in October 2024, AML continued to receive license payments based on ATM sales for Athena's license through August 2025. Despite Pineo's messages, AML still maintained that the license payments based on ATM sales were on a rent to own basis.

18.     Additionally, I always understood the licenses provided to AML licensees, including the license to Athena, to be revocable. They were based on monthly payments that could be revoked at will. However, whether the license to Athena was revocable or irrevocable does not

6

affect the issue of ownership. AML still owns the AML Software (including modified versions) regardless of whether the license was revocable or not.

19.     Additionally, whether or not the license was revocable does not limit AML's ability to terminate the license for non-payment, which AML properly did. In early September 2025, Athena ceased making the very license payments that even Defendants contend were supposed to be made. AML then filed this lawsuit a few weeks later on September 23, 2025.  Any oral license rights that Athena (or PSBC) claim to have held to use the AML Software terminated upon the filing of this lawsuit for copyright infringement.  Additionally, because Defendants contend that the filing of the lawsuit did not terminate the license, AML, through counsel, sent a letter to Defendants on December 26, 2025 confirming that the license terminated effective September 23, 2025. To the extent termination was not effective as full termination on September 23, 2025, the letter terminated any of Defendants' remaining license rights at least as of December 26, 2025. Athena (or PSBC) never made any other license payments to AML after failing to make payment in early September 2025.

20.     Despite that any purported license rights have now terminated due to the lack of payment and that Athena should have ceased any and all use of the AML Software, including any derivative works created from the AML Software, to the best of AML's knowledge, Athena has continued using the AML Software following that termination of the purported license.

21.     Moreover, starting in early September 2025, Pineo stopped providing AML license payments from the other third-party licensees as well. Upon information and belief, Pineo has continued to receive those payments from the third-party licensees but has kept those payments for himself and failed to provide them to AML.

7

22.     AML learned for the first time through this lawsuit that Defendants contend that PSBC had a right to modify and create derivative versions of the AML Code – what Defendants call the PSBC Code – and that PSBC then had the right to sell that modified AML Code (PSBC Code), including all associated intellectual property rights.  First, I have no knowledge of whether PSBC even modified the AML Code or is simply using/sold an exact copy of the AML Code. Based on the timing of the Agreements between Bitom Labs, PSBC and Athena, in addition to the fact that the AML Code took years to get to its current form, it is extremely unlikely that the so-called PSBC Code has been modified significantly from the AML Code. Second, AML never authorized any licensee the right to modify the AML Code, make derivative copies of the AML Code and/or sell a modified version of the AML Code or the associated intellectual property rights. Third, because AML never conveyed title to the AML Code or associated intellectual property rights (nor ever intended to), no Defendant obtained or acquired the right to convey title to the AML Code (including derivative versions) or any associated intellectual property.

23.     Finally, despite Defendants' attempt to portray this case as a personal vendetta against Mirch, this lawsuit has nothing to do with my history with Mirch. This lawsuit was brought for the sole purpose of protecting AML's valuable and sole asset. While I continue to be frustrated with Mirch's past actions, and he has indeed cost me significant damage in the millions of dollars, those past actions are not the basis for this lawsuit.  My reference to Defendants not getting away with stealing $28 million is absolutely true – Defendants' improper conduct regarding the theft of physical Bitcoin ATMs is addressed in other proceedings. Defendants' attempt to steal ownership of AML's Software is at issue in this proceeding.

24.     Moreover, Defendants' contention that Pineo did not authorize the filing of this lawsuit is entirely irrelevant. As the Trustee of the sole shareholder of AML, I have authority and authorized the filing of this lawsuit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:  January 16, 2026.                    By: _____

                                                          Sonny Meraban

9