**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Action No.: 1:25-cv-24378-RAR**

AML SOFTWARE, INC., an Illinois
corporation,

               Plaintiff,

v.

ATHENA BITCOIN, INC., d/b/a
ATHENA BITCOIN GLOBAL, a Delaware
corporation, PSBC, LLC, a Delaware
limited liability company, and JORDAN MIRCH, an individual,
BITOM LABS INC., a Canadian Corporation,
and RYAN PINEO, an individual,

               Defendants.

_____/

**PLAINTIFF'S REPLY IN SUPPORT OF RENEWED**
**MOTION FOR PRELIMINARY INJUNCTION**

1

Plaintiff, AML SOFTWARE, INC. ("AML" or "Plaintiff"), hereby submits its Reply in support of its Renewed Motion for Preliminary Injunction (DE 67) against Defendants, ATHENA BITCOIN, INC. d/b/a ATHENA BITCOIN GLOBAL ("Athena"), PSBC, LLC ("PSBC"), JORDAN MIRCH ("Mirch"), BITOM LABS INC. ("Bitom"), and RYAN PINEO ("Pineo") (collectively "Defendants"), and states:

## I.      INTRODUCTION

AML's sole asset is its extremely valuable AML Software. Prior to September 2025, AML received recurring licensee fees from both third-party operators and for PSBC/Athena's use of the AML Software. However, starting in September 2025, Defendants completely shut out AML and thwarted AML from receiving any revenue, despite continuing to use the AML Software. Athena complains that it could not operate if forced to cease use of the AML Software. But it is AML that has been fatally halted from operating since September 2025 due to Defendants' actions. Not only did Defendants scheme to steal ownership of the AML Software and associated intellectual property, but their goal is to get AML out of the way and put AML completely out of business.

Defendants' contention that Athena's $17,000,000 market cap would be zero without the AML Software is disingenuous and ignores the fact that Athena's Bitcoin ATMs were operating using another software prior to implementing the AML Software. Yet, Defendants' contention reiterates just how valuable that Software is to the parties and why Defendants went to such great lengths in their scheme to attempt to improperly acquire title and IP rights in the Software. It also provides a clear insight as to why Defendants have aggressively sought dismissal and even pursued frivolous sanctions in an attempt to coerce AML to drop this case. Regardless, Athena has been operating Bitcoin ATMs since 2015 and had over 2000 operational Bitcoin ATMs in early 2024, prior to obtaining the AML Software in June 2024. Thus, Athena's claim that it would go out of business without the AML Software is erroneous because it could simply continue operations as it did prior to June 2024.

Defendants' response arguments are largely duplicative of their other briefs. Even accepting Defendants' theory of the facts as true (it is not), the undisputed facts remain that Bitom/Pineo sublicensed the AML Software to "multiple Bitcoin operators," including PSBC (*Pineo Aff.*, ¶ 3, 8), AML received license fees for each operator's use of the AML Software, PSBC/Athena ceased making license payments in September 2025 even though they owe over $100,000 even according to Defendants' theory of the case, Pineo ceased providing AML license

payments from the other operators in September 2025, AML sent a termination letter to Defendants terminating all license rights based on Defendants' material breaches, and Defendants continue to use the AML Software in violation of AML's copyrights. While Defendants claim that AML is not irreparably harmed because it seeks monetary damages, this disregards the nature of the injury to AML and its intellectual property. AML is being irreparably harmed by Defendants' infringement, and both injunctive relief and monetary damages are collectively proper in intellectual property infringement cases under the present factual circumstances as further explained below. And Defendants' claim that AML should have brought this action in 2024 is without merit considering Defendants did not cease making payments until September 2025. AML filed this action that same month.

AML is respectfully entitled to a preliminary injunction to prevent Defendants' continued infringement. At a very minimum, Defendants should be enjoined from further transferring the AML Software and/or modifying the AML Code.

## II.     ARGUMENT

**A.     Substantial Likelihood of Success.**

**1.     Pineo's Purported Authority Does Not Defeat AML's Claims.**

Defendants' primary defense against copyright infringement continues to be that "[t]he scope of th[e] license [to PSBC] is established by Pineo, who was the sole person with authority to grant it." *Resp.*, pp. 2, 7. Defendants argue that Pineo had the "actual authority to grant an irrevocable, unlimited license to Defendants." *Id.*, p. 7. In other words, Defendants contend that Pineo, as President of AML, had authority to provide whatever license rights he wanted to PSBC. However, Defendants' argument fails as a matter of law because, among other things, there are two separate licenses that Defendants continue to intertwine and conflate – the license from AML to Bitom **in 2023**, and the separate sublicense from Bitom to PSBC **in June 2024**. *Pineo Aff.*, ¶¶ 3, 8. Those must be considered separately.

In terms of the original license from AML to Bitom in 2023, the only evidence regarding the terms and scope of that license demonstrates that those rights provided by AML to Bitom were limited to allow Bitom to provide non-transferrable sublicenses to third parties for use of a single copy only of the AML Software per sub-licensee/operator. *See* DE 67, p. 5; DE 38-1, pp. 40-41; *Meraban Dec.*, ¶¶ 5-7 (DE 67.1). That evidence from AML is not inconsistent with Pineo's testimony, and Defendants have not provided any evidence to suggest that the scope of the license

from AML to Bitom in 2023 was otherwise. Thus, while AML maintains that Meraban acted on behalf of AML when dealing with Bitom so that Pineo could not self-deal, any contention by Defendants that Pineo had authority to self-deal between AML and Bitom is entirely irrelevant because the scope of that license to Bitom in 2023 is set forth in the uncontroverted evidence. Regardless of authority, Pineo does not have the ability now in this case to undo the license to Bitom and retroactively contend that the license rights were broader than what was actually provided to Bitom in 2023.[1] The license from AML to Bitom is a critical step in the chain of rights that Defendants intentionally seek to ignore because Bitom could not provide sublicense rights to PSBC that exceeded the scope of the rights held by Bitom.

The second license was the subsequent sublicense from *Bitom to PSBC* in June 2024 – the oral license at issue in this case. Because that sublicense came from Bitom, **all dealings by Pineo with PSBC were on behalf of Bitom, not AML**. Thus, Defendants' contentions that Pineo "*had apparent authority*" to act on behalf of AML and that the PSBC Defendants were entitled to rely on that authority is entirely misplaced because, as expressly averred by Pineo, PSBC did not contract with AML. Any claimed authority by Pineo on behalf of AML is irrelevant because Pineo acted on behalf of Bitom. And, as discussed, Bitom could only provide sublicense rights to PSBC that it held from AML. Thus, while Pineo avers that the sublicense that Bitom provided PSBC was "a nonexclusive, perpetual, irrevocable, royalty-free, fully paid-up, worldwide right and license to make, have made, modify, use, distribute, sell, sublicense, and otherwise exploit the AML Source Code" (*Pineo Aff.*, ¶ 9), Bitom legally did not have such broad license rights to even provide PSBC because such rights far exceed the scope of the actual license rights that Bitom received from AML in 2023. Pineo could not re-do in 2024 the license rights that Bitom received in 2023, and Pineo's Affidavit is clear that the AML-Bitom license was provided in 2023. Thus, Defendants' primary defense that Pineo had authority to grant an "unlimited license" to Defendants is legally incorrect.

Defendants also continue to argue that Pineo did exactly what Meraban sought when he "sold a copy" of the AML Software to Athena for $2 million. *Resp.*, p. 4. But Defendants have expressly acknowledged throughout their filings that Pineo absolutely did not do that.  Rather,

---

[1] Defendants contend that Pineo asked Meraban to formally document the arrangement between AML and Bitom specifically for the PSBC transaction. That is a red herring. Any formal written agreement between Bitom and AML would have simply memorialized the terms set forth in the their communications, which differ from what Defendants contend now in this case.

according to Defendants, Bitom sought to provide PSBC (not Athena) the right to modify the AML Software and sell the modified version. Bitom did not contract with Athena and did not provide Athena a license to use the AML Software for $2 million. In fact, Athena actually paid $5.5 million to PSBC for the Software that Athena received, but AML never received its portion of that revenue.

The fact remains that PSBC only received a non-transferable, single license limited to use of the AML Software. Defendants did not receive a right to modify the AML Software and/or the right to ownership of the purported modified version and associated IP rights. Defendants' defenses are legally and factually without support. The single license that Defendants did receive terminated for material breach, and their continued use constitutes copyright infringement.

### 2. Purported Development of the "PSBC Code."

A continuing issue throughout the various motions and briefs is whether Bitom or PSBC actually modified the AML Code (the purported PSBC Code) for Athena or simply passed on the AML Code to Athena. Defendants argue that, according to Pineo's affidavit, Bitom (for PSBC) modified the AML Code to create the purported PSBC Code. *Resp.*, p. 7 (*citing Pineo Aff.*, ¶ 8). However, Pineo did not actually allege that the AML Code was modified for Athena. Rather, Pineo averred that the **"purpose"** of the sub-license from Bitom to PSBC was to modify the AML Code to create the PSBC Code, not that it was modified. *Pineo Aff.*, ¶ 8. Defendants have very carefully tread around taking a concrete position that Athena received a modified version of the AML Code.[2] Indeed, in all of Defendants' filings thus far, they have failed to assert any specifics regarding the claimed modification, such as when the modification took place, who modified the Code, how, and/or by how much. If Bitom/PSBC actually created a new "PSBC Code" for Athena, Defendants could have easily provided such minimal representations regarding that modified Code. Instead, the Court is left only with argument of counsel and an ambiguous, self-serving allegation by Pineo.

To the contrary, the timing of the subject agreements and transactions demonstrate that Athena received the AML Code, not some newly developed PSBC Code. Bitom entered into its agreement with PSBC on June 1, 2024 for delivery of the software platform to PSBC on or by June 10, 2024. Pursuant to the Athena-PSBC Development Services Agreement, PSBC then

---

[2] AML anticipates that the version of the Code that was delivered to Athena in June 2024 will be produced during discovery in this case, and AML should have an opportunity to run a comparison to the AML Code. Likely, for this reason, Defendants have been cautious to allege any specifics regarding the alleged development of their claimed PBSC Code.

delivered the software platform to Athena by June 18, 2024 – just a little over one week later. The entirety of the chain of transactions involving the AML Code took place within a matter of 17 days. Considering that the AML Code took years of development to get to its current state, it would have been impossible to develop a new "PSBC Code" in just a matter of days. DE 67-1, ¶¶ 5, 22.

The issue of modification is significant to ownership because Defendants claim to own title to the "PSBC Code" but not the AML Code. Since the timing of the transactions demonstrate that Athena simply received the AML Code with very little and likely no modifications, and Defendants have provided no evidence that the code Athena received was a different and/or newly developed Code, Defendants' claim to ownership of the PSBC Code is without merit. Rather the only available facts validate AML's allegations regarding Defendants' scheme to attempt to acquire ownership of the AML Software.

### 3. Termination of License.

The parties have already briefed at length whether AML could terminate the single oral license based on Defendants admittedly ceasing payments that were owed even under Defendants' theory of the case. But in their Response, Defendants finally acknowledge, as they must, that under Eleventh Circuit precedent, a material breach of the license does in fact provide the licensor the right to terminate the license. *Resp.*, p. 9 (*citing Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir. 1997). A failure to **make payments owed is a material breach**. *Naval Logistics, Inc. v. M/V Petrus*, 753 F. Supp. 3d 1298, 1306 (S.D. Fla. 2024) ("Without question, Pack's failure to pay Defendants tens of thousands of dollars that he agreed to pay . . . is a material breach of the [subject] Agreement"); *see also Star2Star Commc'ns, LLC v. AMG Grp. Of Brunswick, LLC*, 2021 WL 4442668, at *3 (M.D. Fla. Sept. 28, 2021) (finding that, even though the defendant made payments under the agreements for several months, the failure to pay remaining amounts owed was a material breach). Defendants try to justify their breach by claiming that AML received "substantial consideration" in the amount of $892,000. But a failure to pay over **$100,000** that even they acknowledge is owed is "[w]ithout question . . . a material breach." *See Naval*, 753 F. Supp. 3d at 1306.[3] AML was justified in terminating the license based on material breach.

Defendants' additional argument that AML could not effectuate termination of the license by filing this lawsuit is wrong. The *Hermosilla* case from this District cited by AML supports

---

[3] Ironically, Defendants claim in this section that $892,000 is substantial but in other sections that Athena has a market cap of $17,000,000 and would go out of business without that Software.

AML's position on this issue. Moreover, in addition to the facts applicable in *Hermosillo*, AML sent a termination letter to Defendants confirming termination and formally terminating any purported license rights that still existed, if any.[4] Defendants ignore that termination letter.

4. **Pineo's Withholding of Payments.**

Defendants acknowledge that Pineo, through Bitom Labs, "sub-licensed the software to multiple Bitcoin operators . . . in order to generate revenue for AML." *Pineo Aff.*, ¶ 3 (DE 68-2). Notably, Defendants do not deny that Pineo/Bitom ceased providing AML its portion of the revenues from those sublicenses in September 2025. Yet the only defense Defendants raise is that AML has not identified the specific third-party sublicensees or the specific payments. But Pineo/Bitom contracted with those sublicensees, not AML, and has refused to provide AML their specific identity. And the payment amounts were based on ATM sales and therefore fluctuate monthly. Only Pineo/Bitom know the amounts being received. Defendants cannot escape liability where Pineo/Bitom have admittedly denied AML its revenue by withholding the very information that they accuse AML of lacking. At a very minimum, AML is entitled to an accounting regarding the license payments that Pineo has received but is withholding from AML. Additionally, while AML maintains that it is entitled to preliminary injunctive relief requiring Pineo to turn over AML's sole revenue, if the Court were to determine otherwise, Pineo should at least be required to deposit the withheld revenue in a constructive trust and/or be enjoined from transferring or disposing of the funds owed to AML. *See Hong Kong Leyuzhen Tech. Co. Ltd. v. Inds., Corps., L.L.C.s, Partnerships, and Unincorp. Assns., Identified on Schedule "A"*, 2025 WL 4098278 *3 (S.D. Fla. Nov. 21, 2025) (entering injunction preventing defendants from "[t]ransferring or disposing of any money or other assets in any of Defendants' financial accounts.").

B. **Irreparable Harm.**

1. **Copyright Infringement Results in Irreparable Harm.**

Courts in this Circuit repeatedly find irreparable harm based on copyright infringement. *See, e.g., C.B. Fleet Co., Inc. v Unico Holdings, Inc.*, 510 F. Supp. 2d 1078, 1083 (S.D. Fla. 2007) (finding irreparable harm due to loss of market share); *Hong Kong*, 2025 WL 4098278 at *3 (granting preliminary injunction and finding irreparable harm because consumers may be confused or disappointed by quality of infringing products and plaintiff may suffer loss of sales); *Global*

---

[4] Additionally, the *Lulirama* case cited by Defendants for the erroneous proposition that a licensor cannot terminate a license by filing a lawsuit did not involve a breach by the licensee. *Resp.*, p. 9.

*Brother SRL v. Shixiaolong*, 2025 WL 3033633, *4 (M.D. Fla. Oct. 30, 2025) ("There is no evidence that Defendants have stopped infringing Plaintiff's works" and "Plaintiff's works would remain vulnerable to continued, repeated infringement.") *Vergara Hermosilla v. The Coca-Cola Co.*, 717 F. Supp. 1297, 1305-06 (S.D. Fla. 2010) ("'[T]he loss of customers and goodwill is an 'irreparable injury.''"); *XYZ Corp. v. Inds., Partnerships, and Unincorp. Assns., Identified on Schedule "A"*, 668 F. Supp. 3d 1268, 1276 (S.D. Fla. 2023) ("An award of monetary damages alone will not cure the injury to Plaintiff's reputation and goodwill that will result if Defendants' infringing actions are allowed to continue."); *Kevin Harrington Enters., Inc. v. Bear Wolf, Inc.*, 1998 WL 35154990, *8 (S.D. Fla. Oct. 8, 1998) (finding irreparable harm where plaintiff is left "without the ability to control its own reputation and goodwill").

Moreover, the fact that AML also seeks monetary damages does not preclude injunctive relief as Defendants argue. Temporary injunctive relief is expressly permitted under the Copyright Act. 17 U.S.C. § 502. Indeed, "[i]njunctive relief is a traditional remedy for copyright infringement." *Sony Music Enter., Inc. v. Global Arts Productions*, 45 F. Supp. 2d 1345, 1347 (S.D. Fla. 1999). Yet, despite injunctive relief being a traditional remedy for copyright infringement, the Copyright Act also expressly allows for monetary damages. 17 U.S.C. § 504; *see also Global Brother*, 2025 WL 3033633 *4 (awarding both injunctive relief and monetary damages).

AML has set forth several grounds establishing irreparable harm, including loss of sales/revenue, loss of market share, harm to reputation and goodwill, consumer confusion, inability to monitor infringing software, and loss of value in its AML Software, all of which cannot be cured by monetary damages alone. Without injunctive relief, Defendants' infringement will continue. Notably, in arguing against irreparable harm, Defendants did not cite any cases where a court found a substantial likelihood of success on the plaintiff's copyright infringement claim but then denied preliminary injunctive relief because monetary damages were sufficient. *See Resp.*, pp. 11-13. Also, the fact that Defendants originally used the AML Software pursuant to a license does not preclude a finding of irreparable harm now that Defendants are infringing. *See Vergara*, 717 F. Supp. 2d at 1303, 1305-06 (finding irreparable harm where defendant originally had a nonexclusive license). Whatever rights Athena held have terminated, Defendants have committed copyright infringement, and continued infringement will cause AML irreparable harm.[5]

---

[5] Defendants also argue that the lawsuit filed by the Attorney General against Athena for charging undisclosed fees on deposits cannot serve as reputational harm to AML because AML was not

Finally, Defendants argue that AML cannot suffer irreparable harm due to Pineo withholding license payments because AML could license the software to other third parties. The two are not related. More importantly, there are only a limited amount of Bitcoin ATM operators in the market, and AML/Bitom already attempted to license the AML Software to the operators in need of software. Thus, simply stating that AML could hypothetically license the AML Software to an unlimited number of Bitcoin ATM operators that do not actually exist does not eliminate the irreparable harm that AML is suffering due to Pineo withholding all of AML's revenue.

### 2.    AML Did Not Delay in Seeking Injunctive Relief.

Defendants contend that AML, through Meraban, first knew of facts giving rise to its copyright infringement claim in October 2024. That is false. As argued repeatedly by Defendants in this case, AML consented to a license and, as of October 2024, AML was still receiving license payments from Defendants for that license. A copyright infringement claim would have been premature, not ripe and improper at that time. It was not until September 2025 that AML ceased receiving license payments from Defendants. AML immediately filed this action that same month.

Defendants at best could claim that Meraban first learned of the subject transactions by October 2024. However, Meraban and AML had not yet become aware of Defendants' scheme to convert AML's Software and put AML out of business by withholding all of the revenues from AML. All Meraban and AML knew was that Pineo/Bitom had licensed the AML Software to either PSBC or Athena and that AML was receiving recurring license payments based on ATM sales for that single license. At no time in 2024 did AML know that Athena claimed ownership of the modified AML Software and all associated intellectual property. Nor was AML aware that PSBC claimed to have the right to modify the AML Software and/or that PSBC sold the purported modified version to Athena for $5.5 million. While Defendants contend that Meraban received a copy of the Bitom-PSBC Agreement, that Agreement did not provide for any of those terms. Rather, it was a merely "Consulting" agreement for Bitom to provide consulting services to PSBC, and it did not mention the AML Software anywhere in the Agreement, let alone some purported right provided to PSBC to modify and sell the AML Software. Thus, Defendants' argument that Meraban/AML should have known of Defendants' improper scheme based on that Consulting

---

named as party in that case. But the fact is that Athena is using AML's Software, and consumers may recognize and compare Athena's use of the AML software with other legitimate operators of AML's Software, which will irreparably harm the reputation and goodwill built in that Software.

agreement is a red herring, because that agreement does not state what Defendants claim it states. There was no reason for AML to file an action in October 2024 because it was not aware of Defendants' scheme, which Defendants intentionally concealed.

In September 2025, Defendants ceased making all license payments. As noted, AML did not delay but **immediately** filed this lawsuit that same month. After filing the initial Complaint, Defendants served AML and its counsel with their first baseless Rule 11 motion. In response, AML filed an Amended Complaint on October 22, 2025, and then swiftly moved for preliminary injunctive relief a few weeks later on November 26, 2025, which was denied without prejudice on December 2, 2025 because certain Defendants had not yet been served.

As outlined in AML's Motion, Defendants then served AML with their second threatened Rule 11 Motion days later on December 5, 2025.  AML and its counsel spent the better portion of December responding to Defendants in an effort to avoid Rule 11 motion practice. Defendants, of course, were determined to harass Plaintiff and its counsel with Rule 11 motion practice despite the facts, and AML was forced to respond to Defendants' Rule 11 Motion and Motion to Dismiss in January.  AML then refiled its Motion for Preliminary Injunction in February.[6]

AML did not delay in filing its Complaint after discovering Defendants' infringement and also did not delay in moving for preliminary injunctive relief after the Complaint was filed. The only time period that could even be considered under Defendants' unexplained delay argument is between December 2025 when the Court denied the original MPI and February 2026 when AML filed its Renewed Motion. But given the circumstances and the baseless Rule 11 threats and subsequent Motion that AML and its counsel was forced to defend against, the timing of AML's Motion should not weigh against irreparable harm. *See Larweth v. Magellan Health, Inc.*, 841 Fed. Appx. 146, 158-59 (11th Cir. 2021) (finding months-long delay in seeking preliminary injunction was justified); *Sexual MD Solutions, LLC v. Wolff*, 2020 WL 2197868, *24 (waiting seven months to seek preliminary injunction was justified and not unreasonable) (*citing BellSouth Advert. & Publ'g. Corp. v. Real Color Pages, Inc.*, 792 F. Supp. 775, 785 (M.D. Fla. 1991) ("finding that "'Plaintiff's delay of seven to eight months [was] not an unreasonable amount of delay, and [did]

---

[6] Defendants contend that AML waited from the end of January until the end of February to file its Renewed MPI.  While AML maintains that such time period should not impact the irreparable harm analysis, to the extent the Court deems that period relevant, it should note that Plaintiff's lead counsel suffered a severe case of shingles (including nerve damage) that started on January 22, 2026 and lasted several weeks into February.

not necessitate the preclusion of a finding of irreparable injury.'"); *Intec, Inc. v. Monster Cable Products, Inc.*, 2011 WL 13223537 *3 (S.D. Fla. Sept. 6, 2011) (finding five month delay did not militate against granting a preliminary injunction).

**C.      The Harm to AML Substantially Outweighs the Claimed Harm by Defendants.**

Defendants claim that an injunction prohibiting Athena from using the AML Software/PSBC Code on its Bitcoin ATMs would put Athena out of business. But Athena did not start using the AML Software until at least June 2024 per the subject agreements. According to Athena's website, Athena (or its predecessor) has been in the cryptocurrency business for a decade and installed its first ATM in October 2015, long before June 2024. *See* printout from Athena's website, attached as **Ex. 1**. Indeed, as of February 10, 2024, prior to installing the AML Software, Athena had 2288 operational Bitcoin ATMs. *See* separate printout, attached as **Ex. 2**. Thus, if enjoined from using the AML Software/PSBC Code, Athena could simply revert back to using whatever software it was using on its Bitcoin ATMs prior to using AML's Software. But in no event would it be put out of business by simply changing back to its old software. Thus, Defendants have not presented any actual real harm that they would suffer by ceasing use of software that they admittedly do not own and have not paid for in months. The balance of the harms favors AML.

**D.      An Injunction Would Serve the Public Interest.**

Defendants do not argue that an injunction would not serve the public interest but rather merely claim that AML has not met its burden. However, if AML establishes a substantial likelihood of confusion on the merits, clearly an injunction prohibiting copyright infringement would serve the public interest. *See Vergara*, 717 F. Supp. 2d at 1306 (finding public interest satisfied by injunction in copyright infringement case because "Copyright law's 'ultimate aim is . . . to stimulate artistic creativity.'").

**E.      AML Should Only be Required to Post a Minimal Bond.**

Defendants argue that AML should be required to post a bond equal to the sales that Athena would lose between now and trial from not using the AML Software on Athena's Bitcoin ATMs. However, as discussed, Athena could simply revert back to the software it was using prior to switching to the AML Software. By switching back to the old software, Athena could continue to operate without loss of revenue.  Thus, AML should only be required to post a minimal bond.

AML respectfully requests that the Court enter a preliminary injunction against Defendants as set forth in its Motion.

Dated: March 20, 2026

Respectfully submitted,

By:   /s/ Joshua D. Martin
Joshua D. Martin
Florida Bar No. 028100
josh.martin@johnsonmartinlaw.com
Perry S. Clegg (*Pro Hac Vice*)
perry.clegg@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd., Suite 430
Fort Lauderdale, Florida  33309
Telephone:  (954) 790-6699
Facsimile:  (954) 206-0017

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this document has been filed through the Court's CM ECF electronic filing system this 20th day of March, 2026.

/s/ Joshua D. Martin
Joshua D. Martin, Esq.

12