**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CV-24378-RAR**

**AML SOFTWARE, INC.**,

Plaintiff,

v.

**ATHENA BITCOIN, INC.** *d/b/a*
**ATHENA BITCOIN GLOBAL**, *et al.*,

Defendants.
_________________________________/

**ORDER DENYING IN PART AND GRANTING IN PART**
**DEFENDANTS' MOTION TO DISMISS**

**THIS CAUSE** is before the Court on Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) ("Motion"), [ECF No. 27], filed on December 22, 2025. The Court has reviewed the Amended Complaint, [ECF No. 6]; Plaintiff's Response Memorandum to Defendants' Motion to Dismiss ("Response"), [ECF No. 52]; Defendants' Reply Memorandum in Support of their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) ("Reply"), [ECF No. 59]; and Plaintiff's Sur-Reply in Response to Defendants' Reply in Support of their Motion to Dismiss ("Sur-Reply"), [ECF No. 63]. The Court having carefully considered the relevant submissions and applicable law, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion, [ECF No. 27], is **DENIED IN PART** and **GRANTED IN PART** as set forth herein.

## BACKGROUND

Plaintiff AML Software, Inc. ("AML"), an Illinois limited liability company with its principal place of business in Illinois, owns "valuable and proprietary computer source code used

with Bitcoin ATMs" ("AML Software") as well as "copyrights and other intellectual property rights in and to its AML Code, portions of which are protected trade secrets." Am. Compl. ¶¶ 1, 11. This source code was developed in or around 2019 by AML and its predecessor in interest, S&P, which contracted with SilverLogic LLC to create an initial version of the code. Am. Compl. ¶¶ 28–31. On or about March 10, 2021, S&P entered into a "Software Transfer Agreement" whereby all rights, title, and interest in the AML Software and its proprietary software was transferred to AML. Am. Compl. ¶ 33. After obtaining ownership of the AML Software and continuing to develop it, AML was issued U.S. Copyright Registration TXu 2-507 802 on September 9, 2025. Am. Compl. ¶¶ 34–35. And since obtaining ownership of the AML Software, AML "has[s] never [engaged in] any transfers or conveyances, whether in writing or otherwise, of and to the AML Code or copyrights associated therewith." Am. Compl. ¶ 36. Further, because portions of the AML Software are trade secrets, AML has taken measures to keep them confidential, has not disclosed its source code to any third parties, and AML's code developers, the only individuals with knowledge of the trade secrets portions, are required to sign confidentiality agreements. Am. Compl. ¶ 37.

***i. AML's License to Athena***

Defendant Jordan Mirch ("Mirch") is a resident of Miami-Dade County, Florida and Chief Executive Officer and/or managing member of Defendant PSBC, LLC ("PSBC"), a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Am. Compl. ¶¶ 13–14. Defendant Ryan Pineo ("Pineo") is a Canadian resident who was the primary code developer for AML and formerly listed as President and as a director of AML. Am. Compl. ¶ 16. In or around May or June of 2024, Pineo and Mirch launched "an elaborate scheme to pilfer and substantially profit off of AML's valuable Software/Code." Am. Compl. ¶¶ 5, 43.

Specifically, on June 14, 2024, AML's principal, Sonny Meraban ("Meraban"), learned that Pineo granted to Defendant Athena Bitcoin Inc. *d/b/a* Athena Bitcoin Global ("Athena"), a Delaware corporation with its principal place of business in Miami-Dade County, Florida, a revocable, non-exclusive license to the AML Software. Am. Compl. ¶¶ 12, 44. Meraban did not object to such a license, given AML's dire need for revenue. Am. Compl. ¶¶ 44–45. However, no written contract between AML and Athena was ever executed, nor was there any record "documenting the purported scope of the purported license, the length of the purported license, the monetary amount for the purported license or any other terms." Am. Compl. ¶ 46. AML understood that Athena would make payments just under $100,000 per month until it was in a position to actually purchase the AML Software for a lump sum of $2 million. Am. Compl. ¶ 47. Athena did not make any payments directly to AML; rather, all payments were made to Pineo's company, Defendant Bitom Labs Inc. ("Bitom Labs"), a Canadian corporation, which transferred portions of those funds[1] to AML. Am. Compl. ¶¶ 15, 45, 48.

***ii. The PSBC-Bitom Consulting Agreement***

Plaintiff alleges that, contrary to its belief, Pineo had not actually licensed the AML Software to Athena. Am. Compl. ¶ 49. Despite the fact he never owned the AML Software, he "purportedly sold and assigned title to the AML Software and all associated intellectual property to Mirch's company, PSBC." Am. Compl. ¶ 49. The only written agreement evincing this transaction, according to Plaintiff, was an agreement entered into on June 1, 2024 between PSBC and Bitom Labs ("PSBC-Bitom Consulting Agreement"), executed by Mirch and Pineo, respectively. Am. Compl. ¶ 53. Pursuant to that agreement, in exchange for the payment of $2 million, Bitom Labs was to provide services to PSBC in the form of "Development of Bitcoin

[1] Plaintiff notes that it is unclear whether Athena knew that AML ultimately received any of those funds, or whether Athena even made such payments in the first place. Am. Compl. ¶ 48.

ATM software platform" according to a development schedule which "called for Bitom Labs to deliver the *developed* Bitcoin ATM software platform to PSBC on or by June 10, 2024, only nine days after the Effective Date of the Agreement." Am. Compl. ¶¶ 54, 56. And under the PSBC-Bitom Consulting Agreement, "all Work Product under that Agreement, including 'all patents, copyrights, trademarks (together with the goodwill symbolized thereby), trade secrets, know- how, and other confidential or proprietary information, and other intellectual property rights' would be owned by PSBC." Am. Compl. ¶ 55 (quoting Exhibit 2, PSBC-Bitom Consulting Agreement ("Ex. 2"), [ECF No. 6-2] at 3).

Plaintiff alleges that the PSBC-Bitom Consulting Agreement was a "farce" as the "development of a brand-new platform could not have been completed in 9 days" and that it was entered into "to further conceal the actual attempted sale of the AML Software to PSBC from AML." Am. Compl. ¶¶ 57–58. Had the sale been a "true arms-length transaction", Pineo and Mirch would have executed an agreement between PSBC and AML, rather than a "Consulting Agreement" between Bitom Labs and PSBC. Am. Compl. ¶ 58. And the PSBC-Bitom Consulting Agreement does not include any representations that Bitom Labs owned the AML Software. Am. Compl. ¶ 59.

***iii. The Athena-PSBC Agreement***

Thereafter, on June 19, 2024, Athena and PSBC entered into a written "Development Services Agreement" ("Athena-PSBC Agreement"), whereby Athena agreed to pay PSBC $5.5 million for the "Development of a Bitcoin ATM software platform" and deliver the software platform on or before June 18, 2024. Am. Compl. ¶¶ 61–62 (citing Exhibit 3, Athena-PSBC Agreement ("Ex. 3"), [ECF No. 6-3]). Though AML continued to believe it was merely providing a non-exclusive, revocable license to Athena, PSBC was just "handing over the AML Software,

first for $2 million [from Bitom Labs to PSBC] and then for $5.5 million [to Athena] a few days later." Am. Compl. ¶¶ 63–64. Further on September 4, 2025, Athena, PSBC, and other entities entered into a Release and Termination Agreement, referencing the Athena-PSBC Agreement and providing that "ownership of the New Technology and all associated Intellectual Property Rights has transferred to Athena" and "the Source Code (as defined in the Development Agreement) has been released and transferred to Athena as required therein including under Section 5.2 of the Development Agreement." Am. Compl. ¶ 70.

***iv. AML Learns of Defendants' Alleged Scheme and Brings the Instant Action***

In or around October 2024, AML learned that Pineo and Bitom Labs "had attempted to sell/assign all rights, title and interest in the AML Software rather than merely licensing it." Am. Compl. ¶ 65. At or around this time, AML ceased receiving payments from Athena, thus terminating any oral license that Athena or any other Defendant could have held. Am. Compl. ¶ 68. Yet, "Athena claims to own the AML Software and all rights associated therewith." Am. Compl. ¶ 69. Further, AML previously licensed the AML Software to other third parties but had ceased receiving any license payments. Am. Compl. ¶ 72. Plaintiff alleges that "Pineo has received those payments from the third-party licensees but has kept those payments [for] himself and failed to provide them to AML." Am. Compl. ¶ 72.

According to Plaintiff, "Defendants' continued use, reproduction, publication, distribution, and making of derivative works of and from AML's copyrighted Code, following the termination of any license rights, constitutes, among other things, copyright infringement and misappropriation of trade secrets." Am. Compl. ¶ 71. In furtherance of this claim, on September 23, 2025, Plaintiff filed the instant action. *See* [ECF No. 1]. The Amended Complaint, filed on October 22, 2025, asserts eight claims against Defendants: (1) a declaratory judgment action against all Defendants

regarding ownership of the AML Software; (2) a claim for breach of fiduciary duty against Pineo; (3) a copyright infringement claim against all Defendants; (4) a contributory copyright infringement claim against Mirch and PSBC; (5) a vicarious copyright infringement claim against Mirch; (6) a misappropriation of trade secrets claim against all Defendants; (7) a claim for conversion against all Defendants regarding the AML Software; and (8) a claim for conversion against Pineo regarding the license payments. Am. Compl. ¶¶ 89–152.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiffs receive the benefit of all favorable inferences that can be drawn from the facts alleged. *See Chaparro v. Carnival Corp*., 693 F.3d 1333, 1337 (11th Cir. 2012); *Iqbal*, 556 U.S. at 678.

A court considering a Rule 12(b)(6) motion is generally limited to the facts contained in the complaint and attached exhibits—but may also consider documents that are central to the claim and whose authenticity is undisputed. *See Johnson v. City of Atlanta,* 107 F.4th 1292, 1300 (11th Cir. 2024). While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. "Dismissal pursuant to Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (citation and quotation omitted).

## ANALYSIS

Defendants' Motion seeks to dismiss with prejudice the eight counts asserted in Plaintiff's Amended Complaint. *See generally* Mot. Specifically, Defendants seek dismissal of Plaintiff's claims on the following grounds: Count I "because there is no actual controversy regarding title to the AML Source Code" and "[a]s a matter of law, title cannot be transferred without a written agreement"; Count II "because AML's allegations demonstrate that Pineo acted with the knowledge, authorization, and acquiescence of Sonny Meraban"; Counts III, IV, and V because the "license is irrevocable . . . conclusively demonstrat[ing] that [AML] will never be able to assert a claim for copyright infringement"; Count VI because "[t]he irrevocable license constitutes consent for the PSBC Defendants to use any purported trade secrets that may be contained in the AML Source Code"; Count VII because "AML's allegations establish that Defendants were acting pursuant to an irrevocable license", "copyright infringement cannot be the basis for a conversion claim", and "this claim is preempted by the Copyright Act"; and Count VIII because Plaintiff "fails to identify the 'third-party licensees' referenced, rendering the claim impermissibly vague[.]" *See* Mot. at 2–4. The Court addresses each argument in turn.

### I. Count I – Declaratory Judgment

Count I seeks a declaratory judgment that "AML is the owner of title and all accompanying rights in and to the AML Software, including all intellectual property rights associated with the AML Software, that Defendants do not have a right to use, access, reproduce, copy or distribute the AML Software or any derivatives of the AML Software[,] and that Defendants should return and/or destroy any copies or versions of the AML Software, including any derivatives of the AML Software." Am. Compl. ¶ 100. Defendants argue that Count I should be dismissed pursuant to Rule 12(b)(1) and (6) on the grounds that "[t]here is no actual controversy over title to the AML

source code" and that it seeks "relief [that] is duplicative of the relief AML seeks elsewhere in the Amended Complaint." Mot. at 9–10. These arguments both fail.

*First*, Defendants maintain that there is no "actual controversy" affording Plaintiff declaratory judgment relief because "[t]here are no allegations that the PSBC Defendants contend they own the title to the AML Source Code." Mot. at 9. Defendants are correct and Plaintiff does not dispute that "the Declaratory Judgment Act 'provides that a declaratory judgment may only be issued in the case of an actual controversy.'" *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019) (citing *Emory v. Peeler*, 756 F.2d 1547, 1551–52 (11th Cir. 1985) and 28 U.S.C. § 2201); *see also Barley as trustee of Mary L. Barley Fam. Tr. dated 1/10/1996 v. Islamorada, Vill. of Islands*, 794 F. Supp. 3d 1226, 1249 (S.D. Fla. 2025) ("'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). The parties primarily disagree over whether there are sufficient allegations in the record that Defendants own or owned title to the AML Software. *See* Mot. at 9–10; Resp. at 12–14; Reply at 3–4. A detailed examination of the allegations and exhibits on which the parties rely is therefore warranted.

Defendants assert that "AML bases this entire claim on statements by Pineo in his Verification", *see* Mot. at 9, referring to the "Verification by Ryan Pineo" ("Verification"), sworn under oath and penalty of perjury, and attached as Exhibit 7, [ECF No. 21-7], to Plaintiff's prior Motion for Preliminary Injunction. *See generally* Verification. Plaintiff counters that this is "blatantly false", pointing to its express allegation that "PSBC, and now Athena, claim to own title and rights in the AML that AML Software." Resp. at 13 (quoting Am. Compl. ¶ 9Software,

including derivative copies of 5). Plaintiff also references the PSBC-Bitom and Athena-PSBC Agreements which "clearly provide for conveyance of title to the AML Code and all associated intellectual property." Resp. at 13.

Review of the PBSC-Bitom Agreement reveals that it does in fact state that all "Work Product" and "Intellectual Property Rights" under the Agreement "shall be owned exclusively by [PSBC]." *See* Ex. 2, PSBC-Bitom Consulting Agreement at 3. And the Athena-PSBC Agreement states that "[PSBC] hereby irrevocably transfers, conveys and assigns to [Athena] without reservation and in perpetuity all right, title, and interest in the New Technology[.]" Ex. 3, Athena-PSBC Agreement at 4. While Defendants aver that these agreements "explicitly contemplate development of a new software", *see* Reply at 4, Plaintiff's allegations cast doubt on the credibility of this statement. Indeed, Plaintiff alleges per the PSBC-Bitom Agreement that "Bitom Labs was supposedly required to 'develop' a Bitcoin software platform for PSBC just 9 days after Pineo contends he sold the Source Code to PSBC" and that "per the Athena-PSBC Agreement, PSBC was to deliver the Bitcoin ATM software platform 'on or by June 18, 2024,' the day before the Effective Date of that agreement." Am. Compl. ¶¶ 62, 84.

Drawing all inferences in Plaintiff's favor—as the Court must at this juncture, *see Chaparro*, 693 F.3d at 1337—the record indicates that Bitom Labs "[sold] (or attempted to sell) the AML Software, including title to the Software and all accompanying copyrights and other intellectual property, to Defendant Mirch's company, PSBC." Am. Compl. ¶ 5. And PSBC may have "transferred the AML Software, including all copyrights and other intellectual property rights, to Athena[.]" Am. Compl. ¶ 6. It therefore is inappropriate to decide that Defendants never claimed ownership over title to the original AML Software. Such a question is better *left* for summary judgment, with the benefit of a full record.

The Verification does not disturb this finding. It does state that "PSBC was granted a nonexclusive, perpetual, irrevocable, royalty-free, fully paid-up, worldwide right and license to make, have made, modify, use, distribute, sell, sublicense, and otherwise exploit the AML Source Code[.]" Verification ¶ 5. Defendants claim that the Verification, which is central to AML's claims and can be properly considered in connection with the instant Motion, should control because it contradicts the conclusory allegations in the Amended Complaint. Mot. at 9 (citing *Barley as trustee of Mary L. Barley Fam. Tr. dated 1/10/1996*, 794 F. Supp. 3d at 1245). But this statement does not clearly address whether the new software was developed pursuant to the PSBC-Bitom and Athena-PSBC Agreements. Indeed, the Verification reiterates that "Bitom Labs [] entered into a Consulting Agreement with PSBC for the purpose of developing the new software"—but does not explain how such new software could have been developed in just nine days. Verification ¶ 3.

Moreover, it is not clear that the Verification is "central" to AML's claims. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). While the Amended Complaint does reference the Verification to illustrate that Pineo's averments are "self-serving and unreliable", it does not seem to, as Defendants contend, "form[] the entire foundation of Count I". Mot. at 9. At most, the Verification creates a disputed issue of fact, which the Court is not permitted to decide at this stage in the proceedings. The Court therefore declines to hang its hat on the conclusory statement in the Verification, especially given the numerous allegations in the Amended Complaint which inject ambiguity into the title of ownership of the AML Software.

*Second*, Defendants contend that the relief Plaintiff seeks in Count I—a declaration "that Defendants do not have any right to use, access, reproduce, copy, or distribute the AML Source Code, and should return or destroy any copies or derivatives of the software"—is duplicative of

the relief AML seeks elsewhere in the Amended Complaint and therefore "serves no independent purpose." Mot. at 10. While Defendants are correct that "courts generally decline to entertain the declaratory judgment count" where it "would serve no useful purpose because the issues will be resolved by another claim", the case to which they cite, *Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, was decided by this Court at summary judgment. 416 F. Supp. 3d 1369, 1376 (S.D. Fla. 2019). Indeed, because "12(b)(6) motions only test the validity of a claim, not its redundancy[,]" courts routinely "refuse to dismiss [declaratory judgment] claims for duplicity." *Falcaro v. Integon Nat'l Ins. Co.*, No. 220CV327FTM38MRM, 2020 WL 4734902, at *1 (M.D. Fla. Aug. 14, 2020) (internal quotations and citations omitted); *see also Regions Bank v. Commonwealth Land Title Ins. Co.*, No. 11-23257, 2012 WL 5410609, at *4 (S.D. Fla. Nov. 6, 2012) ("To be sure, mere redundancy is not grounds for dismissal under Rule 12(b)(6) for failure to state a claim.").

Further, it is not clear that the declaratory relief sought in Count I is purely duplicative of the relief sought in Counts III through VII, as Defendants contend. Mot. at 10. In these counts, Plaintiff seeks various forms of relief including damages and preliminary and permanent injunctive relief. *See generally* Am. Compl., Prayer for Relief. The relief sought in Count I, on the other hand, seeks to clarify the legal rights and responsibilities of the parties. *See New Mkt. Realty 1L LLC v. Great Lakes Ins. SE*, 341 F.R.D. 322, 326 (M.D. Fla. 2022) ("The purpose of declaratory relief is to clarify the legal relations between parties to a dispute. . . . The court, in effect, declares the parties' legal rights and responsibilities, so that they may conform their future conduct to the law and minimize the risk of future injury." (citing *Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC*, 783 F. Supp. 2d 1214, 1216 (S.D. Fla. 2011)). The Court therefore cannot say at this juncture whether Count I serves *no* useful purpose. *See e.g., Medmarc Cas. Ins. Co.*, 783 F. Supp.

2d at 1216 (explaining that where "the declaratory relief requested by each party hinge[s] on a different interpretation of the parties' conduct . . . the []claim should not be dismissed as redundant."). And "[e]ven if it is redundant, Plaintiff[] will suffer no prejudice in allowing [these] claims . . . to proceed alongside each other." *Uganda v. Est. of Tonder*, No. 2:21-CV-916-JES-NPM, 2022 WL 3369496, at *4 (M.D. Fla. Aug. 16, 2022) (citing *Regions Bank*, 2012 WL 5410609 at *5). Accordingly, the Court exercises its discretion in declining to dismiss Count I on this basis. *Medmarc Cas. Ins. Co.*, 783 F. Supp. 2d at 1216 ("In deciding whether to entertain a declaratory judgment action, district courts are provided 'ample' discretion.").

## II. Count II – Breach of Fiduciary Duty

Count II alleges that Pineo "breached his fiduciary duty to AML by purporting to sell and transfer AML's sole valuable asset, namely the AML Software, for his own personal benefit and/or the benefit of Bitom Labs" and "by failing to forward payments to AML received from licensees of the AML Software." Am. Compl. ¶¶ 104–105. As this Court has explained, "a claim for breach of fiduciary duty requires a plaintiff to show (1) existence of a fiduciary duty; (2) a breach of that duty; and (3) damage proximately caused by that duty." *Benessere Inv. Grp., LLC v. Swider*, No. 24-21104, 2024 WL 4652090, at *10 (S.D. Fla. Oct. 31, 2024) (internal quotations and citation omitted). The parties agree that Pineo "owed fiduciary duties to AML", but Defendants contend that "the Amended Complaint fails to plausibly allege breach of duty, the second required element, because Meraban, the trustee of AML's sole shareholder, was aware of, did not object to, and encouraged the transactions involving the AML Source Code." Mot. at 11. The Court disagrees.

"A breach of [fiduciary] duty occurs when an agent engages in a transaction which tends to bring his personal interest into conflict with his obligations as a fiduciary agent, particularly when the agent derives profits from transactions which operate directly to the prejudice of his master's business." *Lupin Atlantis Holdings SA v. Zeng*, No. 23-61621, 2025 WL 2966038, at *5

(S.D. Fla. Oct. 21, 2025) (quoting *OPS Int'l, Inc. v. Ekeanyanwu*, 672 F. Supp. 3d 1228, 1238 (M.D. Fla. 2023) (cleaned up)). Here, Plaintiff has plausibly pled allegations that would allow the Court to draw a reasonable inference that Defendant Pineo breached his fiduciary duty to AML by selling and transferring the AML Software to PSBC for his personal benefit. Defendants contend that the mere fact Meraban did not object to the license "demonstrates that Meraban and AML made a conscious business decision to permit the transaction[.]" Mot at 11. But while Meraban and AML may have permitted the license, they certainly never authorized Pineo to claim ownership over or sell the AML Software without authorization. Indeed, what Defendants characterize as "Meraban's enthusiastic endorsement of the deal structure", *see id.*, can only be said to apply to the licensing scheme Plaintiff thought it was entering into; there are no allegations in the Amended Complaint that Plaintiff ever authorized Pineo to engage in the alleged transactions that form the basis for the instant action.

Plaintiff also notes that "at a very minimum, AML alleges that Pineo has failed to provide AML payments received from other licensees and withheld them for himself. That in itself is sufficient to establish a breach of fiduciary duty, as Pineo is 'deriv[ing] profits [from] transactions which operate directly to the prejudice of [AML's] business.'" Resp. at 14 (quoting *OPS Int'l., Inc.*, 672 F. Supp. 3d at 1238). Defendants reply that "AML identifies no well-pleaded facts showing Pineo received and diverted specific payments from identifiable licensees." Reply at 5.

While "facial plausibility" requires "more than 'naked assertions devoid of further factual enhancement'", considering these allegations together with those regarding Pineo's conduct surrounding the PSBC and Athena transactions, the Court can draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Marquez v. Amazon.com, Inc.*, 69 F.4th 1262, 1269 (11th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678); *see also Aldana v. Del Monte Fresh*

*Produce, N.A., Inc.*, 416 F.3d 1242, 1252 n.11 (11th Cir. 2005) (noting that in the Rule 12(b)(6) context, "[w]e read the complaint as a whole"). Thus, construing the allegations in the light most favorable to Plaintiff, the Amended Complaint sufficiently alleges a claim for breach of fiduciary duty.

Next, Defendants seek to apply the business judgment rule to argue that Pineo should be shielded from liability. Mot. at 11. Defendants specifically contend that because "[t]he licensing decisions were made with the knowledge, approval, and encouragement of the trustee of AML's sole shareholder and were undertaken to generate revenue for AML during a period of financial distress", that "Pineo's conduct [falls] square within the protection of the business judgment rule." Mot. at 12. As a threshold matter, it is "'debatable' whether a court should consider the protection of the business judgement rule on a motion to dismiss." *Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, No. 05-60080, 2008 WL 926509, at *4–5 (S.D. Fla. Mar. 31, 2008) (noting that it is "unwise to evaluate conduct and determine whether or not it is protected by the business judgment rule at the motion to dismiss stage."). But even if it were properly considered at this juncture, "[a]llegations of fraud-like behavior by executives, for their own personal gain, remove the executives' management decisions from the scope of the business judgment rule." *Id*. at *5. Thus, it would be inappropriate, in light of the allegations in the Amended Complaint, to decide that Pineo's conduct should be shielded by the business judgment rule at this stage.

Finally, Defendants claim that the Amended Complaint fails to satisfy the third element for breach of fiduciary duty: proximate harm. Mot. at 12. They aver that "[t]he pleaded facts affirmatively show that Pineo acted in good faith to benefit AML and that the challenged conduct generated substantial revenue, rather than harm." *Id*. This is incorrect. AML specifically pleads

that "[a]s a direct result of Pineo's breaches of fiduciary duty, AML has been damaged, as third parties now claim rights in and to the AML Software, including derivative versions of that AML Software, and are using the AML Software for their financial gain and without authorization from AML." Am. Compl. ¶ 106. The Court thus agrees with Plaintiff that because "AML has been damaged by another party claiming ownership rights in its AML Software and IP rights" and it "los[t] revenue it should have received . . . [t]he receipt of some revenue does not equate to AML not being damaged." Resp. at 15.

**III. Count III – Copyright Infringement**

Count III alleges that in violation of the Copyright Act of 1976, Defendants "without authorization, misappropriated, reproduced, published, distributed, used, and/or made derivative works from that AML Code." Am Compl. ¶¶ 109, 111. Specifically, Defendants willfully and deliberately "directly infringed AML's copyrights in and to the AML Code in violation of 17 U.S.C. § 501" and therefore "AML's exclusive rights . . . including without limitation, the right to use, copy, and/or distribute the work, and AML ha[ve] been damaged." Am Compl. ¶¶ 114–115. Defendants maintain that AML's purported "irrevocable, non-exclusive" license "dooms AML's copyright infringement claim" and that AML's "baseless[] claim[]" that "this license has been terminated" are an effort to avoid "this inevitable result." Mot. at 13–14.

As a threshold matter, "[t]he Copyright Act provides, 'A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.'" *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 751–52 (11th Cir. 1997) (quoting 17 U.S.C. § 204(a)). However, "a nonexclusive license to use a copyright may be granted orally, or may even be implied from conduct." *Id*. at 752. Here, the Amended Complaint concedes that AML never "enter[ed] into any written agreement whatsoever regarding the

sale/transfer of the AML Software" and Plaintiff correctly acknowledges that the purported license was "non-exclusive." Am Compl. ¶¶ 4, 96; *see also* Resp. at 16 ("AML undisputedly did not provide an exclusive license in writing to any of the Defendants. Moreover, Defendants concede that any license rights were non-exclusive."). The parties' dispute centers around the question of whether the license was revocable or irrevocable.

Because "[a] nonexclusive license is a 'mere waiver of the right to sue' for infringement[,]'" *see MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1216 (11th Cir. 2021) (quoting *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 242 (1927)), Defendants maintain that this claim cannot be sustained and that the license was "delivered without any express limitations [and thus] irrevocable as a matter of law[.]" Mot. at 13. They rely on *Barn Light Elec. Co., LLC v. BarnLight Originals, Inc.*, a case where the court found a "nonexclusive, implied license" and noted that because "no written or oral limitation was placed on the use of the material at any time", plaintiff was prevented by law from "revok[ing] the license and retroactively limit[ing] the license previously extended." No. 8:14-CV-1955-MSS-AEP, 2017 WL 11632561, at *3 (M.D. Fla. Aug. 3, 2017). Plaintiff attacks this argument on two grounds: (1) that the license terminated due to Athena ceasing payments; and (2) that Defendants exceed the scope of the license. *See* Resp. at 17–19.

Plaintiff contends that it "provided a single, non-transferrable license to one of the Defendants to use the AML Software in exchange for monthly payments based on ATM transaction fees – *i.e.*, a month to month license or rent to own – similar to all of AML's other licensees . . . [and that] when Defendants ceased making license payments to AML, any and all license rights by Defendants to use the AML Code also ceased." Resp. at 18. And even if "the total license payments were capped at $2,000,000 and [ ] the license was irrevocable, Defendants

ceased making license payments and have failed to pay the full amount owed even according to them." *Id.*

While "consideration makes a license irrevocable[,] . . . law in the Eleventh Circuit and elsewhere also reflects the notion that a copyright license can become *revocable* (though not automatically revoked) if materially breached." *Fuss v. Bensch*, No. 1:22-CV-64-AT, 2026 WL 777200, at *15 (N.D. Ga. Mar. 19, 2026) (citations omitted); *see also HH Advert., Inc. v. Unique Vacations, Inc.*, No. 23-24073, 2025 WL 2027556, at *17 (S.D. Fla. July 21, 2025) (explaining "a licensee's material breach of an implied license entitles the licensor to revoke the license." (citing *Jacob Maxwell, Inc.*, 110 F.3d at 753)).

The Amended Complaint clearly states that "AML has ceased receiving payments for Athena or any other Defendants' use of the AML Software. Thus, any oral license rights that Athena (or any other Defendant) claim to have held to use the AML Software have been terminated." Am Compl. ¶ 68. While Defendants would have the Court decide at this juncture that "the license at issue is undisputably supported by consideration" and thus irrevocable, Reply at 7, they once again overlook the fact that the Court must accept all of Plaintiff's allegations as true and draw all inferences in Plaintiff's favor. And whether Athena committed a material breach is clearly a question of fact not appropriate for resolution at this stage. *Bryka Skystocks, LLC v. Skystocks, Inc.*, No. 11-62135, 2013 WL 12090022, at *4 (S.D. Fla. June 11, 2013) ("The materiality of a breach is ultimately a question of fact for the factfinder.").

The cases cited by Defendants, *see* Reply at 7–8, do not change this outcome. They are readily distinguishable in terms of underlying facts, as well as procedural posture—one was decided at summary judgment, while two others arose in the context of preliminary injunction proceedings. *See e.g., Odom v. Navarro*, No. 09-21480, 2010 WL 11505459, at *4 (S.D. Fla. Mar.

11, 2010) (deciding at summary judgment that the license was revoked because it was "undisputed that there was an agreement that Defendants would pay Plaintiff for the Images" and upon nonpayment "Plaintiff took affirmative steps to terminate any sort of implied license that may have existed before that time."); *Fokiss, Inc. v. TLM Glob., LLC*, No. 24-14096, 2025 WL 353923, at *2, *6–7 (S.D. Fla. Jan. 31, 2025) (finding, after a "multi-day [evidentiary] hearing on [ ] cross-motions for Preliminary Injunction" that whether "consideration was exchanged [] is not disputed" and "to the extent an implied license existed" it was terminated "based on restrictions to the scope of the license placed by TLM Global at the time the work was delivered."); *Hermosilla v. Coca-Cola Co.*, 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010), *aff'd sub nom. Hermosilla v. Coca-Cola Co.*, 419 F. App'x 917 (11th Cir. 2011) (finding license was revocable and granting preliminary injunctive relief because "[Plaintiff] has made clear that he has, to date, accepted no consideration for his work.").

Further, Defendants cite *Jacob Maxwell, Inc.* for the proposition that "[o]ne party's breach does not automatically cause rescission of a bilateral contract." 110 F.3d at 753 (citation omitted); *see also* Mot. at 8. In that case, a composer gave a baseball team a nonexclusive license to use a copyrighted song but later argued that the "right should be treated as having been cancelled in its entirety by [the team's] material breach of their oral understanding when it failed" to comply with the terms of their agreement. *Id*. at 753. Instead of announcing a categorical rule that a nonexclusive license is *always* irrevocable, the Eleventh Circuit analyzed the facts surrounding the parties' conduct, finding that "[u]nder these circumstances, we cannot say that [the composer's] permission to play was conditioned on" completion of the terms of the contract. *Id*. at 754. Thus, *Jacob Maxwell, Inc.* highlights that the impact of a material breach on the revocability of a license is a fact-intensive inquiry, ill-suited for disposition at the motion to dismiss stage. Accordingly,

the Court cannot decide that the license was irrevocable at this juncture and finds that Plaintiff has stated a claim for copyright infringement.[2]

### IV. Counts IV and V – Contributory and Vicarious Copyright Infringement

Count IV alleges contributory copyright infringement against Mirch and PSBC and Count V alleges vicarious copyright infringement against Mirch. Am. Compl. ¶¶ 118–131. Defendants assert that because Plaintiff's claim for direct copyright infringement fails, so too do these counts. But given that Plaintiff *has* stated a valid claim for direct copyright infringement, this argument misses the mark. Defendants then posit in the alternative that "AML has failed to state any factual allegations in support of the remaining elements of contributory copyright infringement[.]" Mot. at 16. The Court disagrees.

The Eleventh Circuit "has stated the well-settled test for a contributory infringer as one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) (internal quotations and citations omitted). Here, the Amended Complaint avers that "Mirch and PSBC knew of the infringing activities described herein and they intentionally induced and/or encouraged Athena to directly infringe, and/or materially contributed, to Athena's direct infringement of[] AML's Code." *See* Am. Compl. ¶ 121. Plaintiff does more than just provide "[t]hreadbare recitals of the elements of a cause of action[.]" Mot. at 16 (quoting *Ashcroft,* 556 U.S. at 678). Throughout the Amended Complaint, Plaintiff describes in detail "the [alleged] scheme by Defendants to attempt to obtain title to the AML Software through a purported license-to-title bait-and-switch, including Mirch's involvement, knowledge and inducement of

[2] Because the Court finds that Plaintiff has sufficiently stated a valid copyright infringement claim, it need not consider Plaintiff's alternative argument that Defendants exceeded the scope of the license. *See* Resp. 18–19.

Defendants' infringement, as well as the fact that Mirch was a motivating force behind the scheme and profited millions of dollars in just days." Resp. at 20. Accordingly, Plaintiff has stated a claim for contributory copyright infringement and vicarious copyright infringement pursuant to Counts IV and V.[3]

### V. Count VI – Misappropriation of Trade Secrets

Count VI alleges misappropriation of trade secrets under 18 U.S.C. § 1836 *et seq*. Am. Compl. ¶¶ 132–142. Defendants argue that this claim is foreclosed because the license at issue is irrevocable. Mot. at 16. As this Court has explained, "[a] plaintiff seeking to protect a valid trade secret under the [Defend Trade Secrets Act, 18 U.S.C. § 1836] must establish that '(1) it owns a valid trade secret; (2) the trade secret relates to a product or service used in, or intended for use in, interstate commerce; and (3) a defendant misappropriated that trade secret.'" *La Potencia, LLC v. Chandler*, 733 F. Supp. 3d 1238, 1269 (S.D. Fla. 2024) (quoting *Florida Beauty Flora Inc. v. Pro Intermodal L.L.C.*, No. 20-20966, 2021 WL 1945821, at *4 (S.D. Fla. May 14, 2021); 18 U.S.C. § 1836(b)(1)).

As Plaintiff correctly notes, Defendants only challenge the third element of the claim—Defendants' alleged misappropriation. Resp. at 20. According to Defendants, "[a]s a matter of law, a party who is granted an unlimited license to software cannot misappropriate any trade secret embodied therein." Mot. at 16 (citing *AssetMktg. Sys., Inc. v. Gagnon,* 542 F.3d 748, 758 (9th Cir. 2008)). But accepting Plaintiff's well-pleaded allegations as true, the license was "non-exclusive [and] revocable[.]" Am. Compl. ¶ 4; *see also supra* Section III. Thus, Plaintiff has sufficiently alleged misappropriation at this juncture, and dismissal of Count VI is not warranted.

---

[3] Because Plaintiff has adequately pleaded direct infringement—and this is the only ground upon which Defendants attack Plaintiff's vicarious liability claim, *see* Mot. at 16—the Court finds that Plaintiff has stated a claim for vicarious copyright infringement pursuant to Count V.

**VI. Counts VII and VIII – Conversion**

Counts VII and VIII allege conversion claims against all Defendants regarding the AML Software and against Pineo regarding the license payments, respectively. Am. Compl. ¶¶ 143–152. Defendants seek dismissal of each of these claims, on different grounds.

***i. Conversion Claim Against All Defendants***

*First*, as to Count VII, Defendants argue that (1) the irrevocable license defeats AML's conversion claim; (2) AML cannot allege deprivation of property sufficient to sustain a conversion claim because the AML Software is a copyright; and (3) AML's conversion claim is preempted. Mot. at 16–18. For the reasons explained herein, Plaintiff has sufficiently alleged that the license was revocable. *See e.g.*, Am. Compl. ¶ 4. Accordingly, the Court considers only Defendants' remaining two arguments.

"[C]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *In re U.S. Sugar Corp. Litig*., 669 F. Supp. 2d 1301, 1329 (S.D. Fla. 2009) (quoting *Nat'l Union Fire Ins. Co. of Pa. v. Carib. Aviation, Inc*., 759 F.2d 873, 878 (11th Cir. 1985)). Defendants argue that "[c]opyright infringement will not form the basis of a conversion claim because copying a plaintiff's work amounts to an invasion of an intangible property right but fails to deprive the plaintiff of his property." Mot. at 17 (quoting *Santilli v. Cardone,* No. 807-CV-308-T-23MSS, 2008 WL 2790242, at *5 (M.D. Fla. July 18, 2008)). Plaintiff responds that "AML is not simply alleging unauthorized use/infringement[;] it has alleged that Defendants claim ownership rights in the AML Code (modified or not), which amounts to an attempted permanent deprivation. That wrongful assertion over ownership constitutes conversion." Resp. at 21.

"[C]ourts in the Eleventh Circuit have recognized conversion claims in the context of intangible property rights." *Jackson v. Angela Kogan & Perfection Plastic Surgery, Inc*., No. 22-

22972, 2022 WL 17582560, at *6 (S.D. Fla. Dec. 12, 2022); *see also Portionpac Chem. Corp. v. Sanitech Sys., Inc*., 217 F. Supp. 2d 1238, 1251 (M.D. Fla. 2002) ("In Florida, an action for tortious conversion will lie for a 'wrongful taking of intangible interests in a business venture.'" (quoting *In re Estate of Corbin*, 391 So. 2d 731, 732–733 (Fla. 3d DCA 1980)). The Court therefore declines to adopt the bright line rule that Defendants suggest—that "[a] claim to an intangible right is not subject to conversion." Reply at 10.

But the inquiry does not end there. Defendants further contend that any "claim to ownership does not deprive AML of permanent, physical possession of the AML Source Code" because it can still access and use that code. *Id*. The question is thus whether Plaintiff's continued possession of the AML Software prevents it from stating a conversion claim. While Plaintiff fails to provide any cases, courts have found that "[i]t is not necessary for a person to deprive another of *exclusive possession* of their property in order to be liable for conversion." *Total Mktg. Techs., Inc. v. Angel Medflight Worldwide Air Ambulance Servs., LLC*, No. 8:10-CV-2680-T-33TBM, 2012 WL 33150, at *4 (M.D. Fla. Jan. 6, 2012) (quotation omitted). Put another way, "total deprivation of another's property is not required" to state a claim for conversion. *Taylor v. Trapeze Mgmt., LLC*, No. 17-62262, 2018 WL 9708619, at *9 (S.D. Fla. Mar. 26, 2018). Here, Plaintiff's allegations, *see e.g.,* Am. Compl. ¶ 144, suffice to establish an "act of dominion wrongfully asserted over [Plaintiff's] property inconsistent with [its] ownership therein." *See United Techs. Corp. v. Mazer,* 556 F.3d 1260, 1270 (11th Cir. 2009) (quotation omitted). Accordingly, the Court finds that Plaintiff's continued possession of the code does not preclude its ability to state a claim for conversion.

Defendants finally assert that "even if AML could state a claim for conversion, this claim is preempted by the Copyright Act" because its conversion claim is based on the same allegations

as its copyright claim. Mot. at 17–18. Here, the Court agrees. "The Copyright Act preempts 'legal or equitable rights [under state law] that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103.'" *Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., L.L.C.*, 596 F.3d 1313, 1325 (11th Cir. 2010) (quoting 17 U.S.C. § 301(a)).

"The Eleventh Circuit has set forth a two-part test for district courts to use in assessing whether a state-law claim is preempted by the Copyright Act[.]" *MedSoftSys, Inc. v. CoolMoon Corp.*, 553 F. Supp. 3d 1275, 1279 (S.D. Fla. 2021). "Preemption by the Copyright Act occurs if the rights at issue: (1) 'fall within the subject matter of copyright set forth in sections 102 and 103[,]' and (2) 'are equivalent to the exclusive rights of section 106.'" *Poet Theatricals Marine, LLC v. Celebrity Cruises, Inc.*, 515 F. Supp. 3d 1292, 1299 (S.D. Fla. 2021), *aff'd*, No. 21-10410, 2023 WL 3454614 (11th Cir. May 15, 2023) (quoting *Crow v. Wainwright*, 720 F.2d 1224, 1225–26 (11th Cir. 1983) (cleaned up)). For the second prong, the "extra element" test is employed—specifically, "if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright and there is no preemption." *Foley v. Luster*, 249 F.3d 1281, 1285 (11th Cir. 2001).

Here, both parties fail to address whether Plaintiff's conversion claim comes within the scope of this test. Defendants state in a conclusory fashion that this claim must be dismissed because it is based on the same allegations as its copyright claim. *See* Mot. at 18. Plaintiff responds, without any reference to underlying authorities, that the claim falls outside of copyright infringement because it "is based on Defendants' attempted ownership of the AML Code, not just

copying and distribution[.]" Resp. at 21. The Court's independent analysis indicates that the conversion claim is preempted.

As to the first prong, "the Court must determine whether the works at issue are copyrightable." *Poet Theatricals Marine, LLC*, 515 F. Supp. 3d at 1300. "[S]everal courts have held that computer programs are entitled to copyright protection." *Priority Payment Sys., LLC v. Signapay, Ltd*, 161 F. Supp. 3d 1285, 1292 (N.D. Ga. 2015) (holding that "Plaintiffs' claim based on allegations that Defendants acquired and appropriated their computer program source code falls within the subject matter of copyright in satisfaction of the first prong of the preemption analysis."). And here, Plaintiff has alleged that it was issued U.S. Copyright Registration TXu 2-507-802 for the AML Software. Am. Compl. ¶ 35. The first prong of the preemption test is therefore easily met—the AML Software falls within the subject matter of copyright.

As to the second prong, the Eleventh Circuit has noted that "ownership of a copyright encompasses the exclusive rights set out in § 106." *Stuart Weitzman, LLC v. Microcomputer Res., Inc.*, 542 F.3d 859, 866 n.7 (11th Cir. 2008) (discussing how "all of the circuit court decisions holding that the Copyright Act has complete preemptive effect have involved infringement claims or claims of ownership of a copyright."). Thus, it cannot be said that Plaintiff's conversion claim, which alleges that Defendants "wrongfully asserted ownership and took possession of the AML Code", Am. Compl. ¶ 144, is "qualitatively different from the bundle of rights afforded to copyright owners in 17 U.S.C. section 106[.]" *Poet Theatricals Marine, LLC*, 515 F. Supp. 3d at 1302. Plaintiff attempts to avoid preemption by arguing that their "conversion claim is based on Defendants' attempted ownership of the AML Code, not just copying and distribution[.]" Resp. at 21. But alleging Defendants' "attempted ownership" does not remove their claim from those

exclusive rights set out in § 106. As such, Plaintiff's conversion claim, which seeks to enforce those same rights, is preempted.

Further, it is not clear that Plaintiff's conversion claim contains an "extra element" sufficient to avoid preemption. *See Galvan Arias v. Warner Bros. Ent. Inc.*, No. 24-25021, 2026 WL 1279150, at *6 (S.D. Fla. May 11, 2026) ("The Eleventh Circuit has held that a 'conversion claim is preempted by the Copyright Act, which preempts certain state-law claims.'" (quoting *Karlson v. Red Door Homes, LLC*, 611 F. App'x 566, 572 (11th Cir. 2015)); *see also OpenRisk, LLC, v. Microstrategy Servs. Corp.*, 876 F.3d 518, 524 (4th Cir. 2017) ("[I]t is clear that when a conversion claim . . . rests on an allegation of wrongful copying and distribution of intellectual property, it is 'equivalent' to a copyright infringement claim and thus preempted under the Copyright Act."). Accordingly, the Court finds that this conversion claim is preempted by the Copyright Act, and Defendants' Motion is granted as to Count VII.

***ii. Conversion Claim Against Pineo***

Count VIII alleges that "AML previously received license payments from third-party licensees and is entitled to such payments from those licensees" but "Pineo, ha[ving] received those payments from the third-party licensees[,] has kept those payments from himself and failed to provide them to AML." Am. Compl. ¶¶ 150–151. On this basis, "Pineo wrongfully asserts ownership of those license payments, which is inconsistent with AML's ownership and entitlement to those payments." Am. Compl. ¶ 151. Defendants argue that Plaintiff cannot state a conversion claim against Pineo because it "does not identify the allegedly converted funds, their source, their amount, the recipient of the funds, or how any transfer constituted a wrongful exercise of dominion over AML's property." Mot. at 18. The Court agrees.

"Money may be the subject of a conversion only where 'it consists of specific money capable of identification.'" *Kee v. Nat'l Rsrv. Life Ins. Co.*, 918 F.2d 1538, 1541 (11th Cir. 1990) (quoting *Belford Trucking Co. v. Zagar*, 243 So. 2d 646, 648 (Fla. 4th DCA 1970)); *see also Cutler v. Voya Fin., Inc.*, No. 18-20723, 2018 WL 4410202, at *3 (S.D. Fla. Aug. 23, 2018), *report and recommendation adopted*, No. 18-20723, 2018 WL 7627867 (S.D. Fla. Oct. 26, 2018) ("Several courts, applying Florida law on conversion, have found a claim for conversion is actionable when a party takes money from another, as long as the money is sufficiently identifiable.").

Here, Plaintiff fails to allege any specific money capable of identification. Nor does Plaintiff allege that there existed an obligation for Pineo to "keep intact or deliver the specific money at issue." *List Indus., Inc. v. Wells Fargo Bank, N.A.*, No. 17-61204, 2018 WL 4334876, at *6 (S.D. Fla. Sept. 11, 2018) ("Money only becomes a proper subject for a conversion claim where there exists 'an obligation for the receiver to keep intact or deliver the specific money at issue.'" (quoting *Indus. Park Dev. Corp. v. Am. Exp. Bank, FSB*, 960 F. Supp. 2d 1363, 1366 (M.D. Fla. 2013)). Though the Court is sympathetic to Plaintiff's argument that "[t]hose specific payment amounts, which vary by ATM sales, as well as the identity of the licensees, is all information known by Pineo and withheld from AML", courts routinely dismiss similar claims at the motion to dismiss stage when plaintiffs fail to "allege[] facts establishing that specific funds capable of identification exist." *Id.*; *see also Cutler*, 2018 WL 4410202, at *5 (explaining that a conversion claim is subject to dismissal when "Plaintiff (1) [has] failed to show that he was deprived of any specific money capable of identification, or (2) that Defendants had any obligation to keep intact the specific money in question[.]"); *Batlle v. Wachovia Bank, N.A.*, No. 10-21782, 2011 WL 1085579, at *2 (S.D. Fla. Mar. 21, 2011) (dismissing conversion claim where "Plaintiffs

make no allegations to establish that the funds in their account consist of specific monies capable of identification[.]"). Accordingly, Defendants' Motion is granted as to Count VIII.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion, [ECF No. 27], is **DENIED IN PART** and **GRANTED IN PART**. Counts VII and VIII are **DISMISSED *with prejudice***. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("A district court need not [] allow an amendment . . . where amendment would be futile."); *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) ("Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant."); *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 930 (11th Cir. 2016) (noting that the Eleventh Circuit "ha[s] never required district courts to grant counseled plaintiffs more than one opportunity to amend a deficient complaint, nor [] concluded that dismissal with prejudice is inappropriate where a counseled plaintiff has failed to cure a deficient pleading after having been offered ample opportunity to do so.").

2. Defendants shall file an answer to Counts I through VI of Plaintiff's Amended Complaint, [ECF No. 6], within **fourteen (14) days** of the date of this Order.

3. In light of the foregoing, Plaintiff's Renewed Motion for Preliminary Injunction ("Motion for Preliminary Injunction"), [ECF No. 67], is **DENIED *with leave to refile***. While the Motion for Preliminary Injunction does not appear to explicitly reference Plaintiff's claims for conversion, it does seek an order directing Pineo to turn over AML's 50% share of license fees received from third-parties—relief that may naturally stem from Plaintiff's conversion claim. *See* Mot. for Prelim. Inj. at 21. Accordingly, for clarity of the record, the Court finds that a renewed

request for preliminary injunctive relief, consistent with this Order, is warranted. *Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997) (noting that preliminary injunctions are "appropriate to grant intermediate relief of the *same character* as that which may be granted finally." (emphasis added)). To the extent that Plaintiff continues to seek preliminary injunctive relief, it shall submit a renewed motion **on or before September 8, 2026**.[4]

**DONE AND ORDERED** in Miami, Florida this 25th day of August, 2026.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

[4] To be clear, the mere fact that Plaintiff has stated a claim as to six of its eight counts is not to be interpreted as a determination that Plaintiff will be successful on the merits of this action. At the motion to dismiss stage, the Court is required to accept all of Plaintiff's well-pleaded allegations as true under Rule 12(b)(6). As discussed herein, issues of fact such as the revocability of the license will likely require a more fulsome record by way of an evidentiary hearing.